**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California  94108
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

**GOODWIN PROCTER LLP**
BRETT M. SCHUMAN (Cal. Bar No. 189247)
(BSchuman@goodwinlaw.com)
JENNIFER BRIGGS FISHER (Cal. Bar No. 241321)
(JFisher@goodwinlaw.com)
Three Embarcadero
San Francisco, California 94111
Telephone: (415) 733-6000
Facsimile: (415) 677-9041

*Attorneys for the Appellees*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>Reorganized Debtor. | Case Nos.  4:22-cv-02781-YGR;<br>4:22-cv-02783-YGR;<br>4:22-cv-02786-YGR; and<br>4:22-cv-02789-YGR<br>(Jointly Administered)<br><br>On Appeal from Bankruptcy Court<br>Case No. 3:20-bk-30242-HLB |
| The United States of America, on behalf of the Internal Revenue Service, and California Franchise Tax Board,<br><br>Appellants,<br><br>v.<br><br>The Levandowski Residual Liquidation Trust, as successor to the Debtor In Possession, and Anthony S. Levandowski,<br><br>Appellees. | **APPELLEES' OMNIBUS BRIEF IN RESPONSE TO OPENING BRIEFS OF THE UNITED STATES AND FRANCHISE TAX BOARD [TAX AND CONFIRMATION APPEALS]** |

# **TABLE OF CONTENTS**

JURISDICTION ................................................................................................ 1

ISSUES PRESENTED ...................................................................................... 1

STANDARD OF REVIEW ............................................................................... 2

STATEMENT OF THE CASE .......................................................................... 2

    I.    Uber Agrees to Indemnify Debtor, Google Sues Debtor, and Debtor
        Seeks to Enforce the Indemnity. .................................................... 2

    II.    Debtor, Google, and Uber reach a settlement. ................................ 3

    III.    The Tax Motion and Plan Confirmation. ....................................... 4

SUMMARY OF ARGUMENT ......................................................................... 6

ARGUMENT .................................................................................................... 8

    I.    The Bankruptcy Court Properly Asserted Authority Over the Tax
        Question. ........................................................................................ 8

        A.    The Bankruptcy Court Has the Unambiguous Power to Decide
            Tax Questions. ....................................................................... 8

        B.    The Tax Order Resolved an Actual Controversy. .............. 12

        C.    Policy Rationales are Irrelevant and, in Any Case, Support the
            Exercise of the Bankruptcy Court's Authority on These Facts. ..... 15

    II.    The Bankruptcy Court's Tax Ruling Was Correct. ....................... 16

        A.    The IRS Has Waived Its Merits Arguments on Whether the
            Main Uber Payment Is Taxable Income. ............................ 16

        B.    The Bankruptcy Court Correctly Applied the Insurance
            Approach in Determining the Main Uber Payment Should Not
            Be Included in Gross Income. ............................................ 18

            1.    The Appeals Fundamentally Misstate the Nature of the
                Indemnity. ..................................................................... 18

            2.    The Main Uber Payment Was Not Gross Income to the
                 Estate. .......................................................................... 19

            3.    The Tax Order may be affirmed on several
                 independent, alternative grounds. .............................. 23

                 a.    The Main Uber Payment Is Excludable from
                     Gross Income under the Tax-Benefit Rule. .......... 23

                 b.    The Main Uber Payment Is Excludable from
                     Gross Income as a Working Condition Fringe
                     Benefit. ........................................................... 25

           c.     **The Main Uber Payment Is Excludable from Gross Income as a Reimbursable Employee Expense.** .................................................................. 27

    C.     **Debtor Is Not Judicially Estopped from Raising Arguments Relating to the Insurance Treatment of the Main Uber Payment for Tax Purposes.** ............................................. 29

III.    **The Confirmation Order Should Be Affirmed.** ...................................... 31

    A.     **The Tax Order Should Be Affirmed, Mooting Plan Objections.** ........ 31

    B.     **The Bankruptcy Court Did Not Clearly Err or Abuse Its Discretion in Concluding that There Were Adequate Funds to Pay Taxes Unrelated to the Main Uber Payment.** ............................... 31

    C.     **There Is No Basis for the Taxing Authorities' Argument that Debtor Is Not Committing His Future Income to the Payment of Claims.** ........................................................................................... 32

    D.     **The Taxing Authorities' Right to Set Off Prepetition Claims Is Preserved.** ......................................................................................... 33

    E.     **The Principal Purpose of the Plan Was Not the Avoidance of Taxes.** ................................................................................................ 34

**CONCLUSION** .................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*99 Invs., Inc. v. Maricopa Cty. (In re 99 Investments, Inc.)*, 1999 U.S. App. LEXIS 33682 (9th Cir. 1999).................................................................................................................. 2

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014)................................................ 11

*Allis-Chalmers Corp. v. Goldberg (In re Hartman Material Handling Sys.)*, 141 B.R. 802 (Bankr. S.D.N.Y. 1992) ....................................................................................................... 14

*Alloure, Inc. v. FA Cooperative, Inc.*, 438 F. App'x 571 (9th Cir. 2011)..................................... 17

*Amerco & Subsidiaries v. Comm'r*, 96 TC 18 (1991) .................................................................. 21

*Bolker v. Comm'r*, 760 F.2d ................................................................................................... 20, 29

*California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1 (1985) .......................... 19

*Caylor Land & Dev., Inc. v. Comm'r*, 121 T.C.M. (CCH) 1205 (T.C. 2021) .............................. 22

*Central Valley AG Enters. v. United States*, 531 F.3d 750 (9th Cir. 2008) ..................... 2, 8, 9, 10

*Dobson v. Commissioner*, 320 U.S. 489 (1943) .......................................................................... 24

*Elbaz v. Commissioner*, 109 T.C.M. 1229 (2015) ....................................................................... 24

*Estate of Backemeyer v. Commissioner*, 147 T.C. No. 17 (2016) ............................................... 24

*Fla. Health Sciences Ctr., Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515 (D.C. Cir. 2016) .......................................................................................................................... 11

*Gardens Reg'l Hosp. & Med. Ctr. Liquidating Tr. v. California (In re Gardens Reg'l Hosp. & Med. Ctr.)*, 975 F.3d 926 (9th Cir. 2020) ................................................................ 33

*Goldblatt Bros., Inc.*, 106 B.R. 522 (Bankr. N.D. Ill. 1989) ...................................................... 10

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35 (9th Cir. 2022).......... 30

*Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370 (1983) ..................................................... 24

*In re Amoskeag Bank Shares, Inc.*, 215 B.R. 1 (Bankr. D.N.H. 1997)........................................ 10

*In re E.R. Fegert, Inc.*, 887 F.2d 955 (9th Cir. 1989) ................................................................. 17

*In re Grand Chevrolet, Inc.*, 153 B.R. 296 (C.D. Cal. 1993) ............................................ 9, 10, 13

*In re GYPC, Inc.*, 2021 Bankr. LEXIS 2817 (Bankr. S.D. Ohio Oct. 5, 2021) ...................... 9, 14

*In re Icenhower*, 757 F.3d 1044 (9th Cir. 2014).......................................................................... 2

*In re Kilen*, 129 B.R. 538 (Bankr. N.D. Ill. 1991) .......................................................... 11, 13, 14

*In re Luongo*, 259 F.3d 323 (5th Cir. 2001)................................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Main St. AC*, 234 B.R. at 775 ........................................................................................ 34

*In re Main St. AC, Inc.*, 234 B.R. 771 (Bankr. N.D. Cal. 1999) ........................................... 34

*In re Marshall*, 721 F.3d 1032 (9th Cir. 2013) ...................................................................... 2

*In re Popa*, 218 B.R. 420 (Bankr. N.D. Ill. 1998) ........................................................... 11, 13

*In re Rath Packing*, 55 B.R. 528 (Bankr. N.D. Iowa 1985) .................................................. 34

*In re Schmidt*, 205 B.R. 394 (Bankr. N.D. Ill. 1997) ........................................................... 13

*In re UAL Corp.*, 336 B.R. 370 (Bankr. N.D. Ill. 2006) ................................................. 12, 13

*Louisiana-Pacific Corp.*, 909 F.2d (9th Cir. 1990) .......................................................... 20, 29

*Matter of Inter Urban Broad. of Cincinnati, Inc.*, 180 B.R. 153 (Bankr. E.D. La. 1995) ........ 9, 14

*Office Depot Inc. v. AIG Specialty Insurance Co.*, 722 Fed. Appx. 745 (9th Cir. 2018) ............ 19

*Ogle v. IRS (In re Agway, Inc.)*, 447 B.R. 91 (N.D.N.Y. 2011) .......................................... 11

*Orozco-Lopez v. Garland*, 11 F.4th 764 (9th Cir. 2021) ...................................................... 9

*Pope Estate Co. v. Johnson*, 43 Cal. App. 2d 170 (1941) ................................................... 15

*R.V.I. Guar. Co. & Subsidiaries v. Comm'r*, 145 T.C. 209 (2015) ..................................... 23

*Reebok Int'l, Ltd. v. Marnatech Enters.*, 970 F.2d 552 (9th Cir. 1992) ................................. 2

*Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020) .................................... 12

*Schwartz v. Gardiner (In re Schwartz)*, 192 B.R. 90 (Bankr. N.J. 1996) ............................... 14

*Scofield v. Commissioner, T.C.M. (RIA) 1997-547* ............................................................... 27

*Simpson v. Burkart (In re Simpson)*, 557 F.3d 1010 (9th Cir. 2009) ..................................... 2

*Strike 3 Holdings LLC v. Doe*, 849 F. App'x 183 (9th Cir. 2021) ........................................ 10

*Sully v. Ayers*, 725 F.3d 1057 (9th Cir. 2013) .................................................................... 23

*United States v. Gilmore*, 372 U.S. 39 (1963) ................................................................... 27

*United States v. Pineda-Buenaventura*, 383 F. App'x 560 (7th Cir. 2010) ............................. 17

*Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510 (9th Cir. 1992) ......................................... 19

*WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008) .......................................................... 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# STATUTES

11 U.S.C. § 362 .................................................................................................... 33

11 U.S.C. § 505 ............................................................................................... passim

11 U.S.C. § 553 .................................................................................................... 33

11 U.S.C. § 1146 ............................................................................................ 10, 11

15 U.S.C. § 77(e) (Securities Act of 1933, Section 5) ........................................ 34

26 U.S.C. § 62 ................................................................................................ 28, 29

26 U.S.C. § 67 ...................................................................................................... 25

26 U.S.C. § 111 .................................................................................................... 23

26 U.S.C. § 132 ............................................................................................... 25, 27

26 U.S.C. § 162 ........................................................................................ 25, 26, 27

26 U.S.C. § 167 .................................................................................................... 25

28 U.S.C. § 1334 .................................................................................................... 1

28 U.S.C. § 157 ...................................................................................................... 1

28 U.S.C. § 158 ...................................................................................................... 1

28 U.S.C. § 2201 .................................................................................................. 12

California Insurance Code §533 .......................................................................... 19

# RULES

26 CFR § 1.132-5 ................................................................................................. 26

26 CFR § 1.62-2 ............................................................................................. 28, 29

Fed. R. Bankr. 9019 ............................................................................................... 4

Rev. Rul. 79-208 .................................................................................................. 27

Rev. Rul. 80-211 .................................................................................................. 27

Rev. Rul. 92-69 .............................................................................................. 25, 26

## **TREATISES**

11 *Collier on Bankruptcy* PTX 5.04 ............................................................. 14

BITTKER & LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 5.8.1. (Thomson Reuters/Tax & Accounting, 2d/3d ed. 1993-2019) ....................................... 20

Haber, *Federal Tax Issues in Bankruptcy Reorganizations: What Role Should Bankruptcy Courts Have in Declaring the Federal Income Tax Liability of Debtors and the Federal Income Tax Consequences of Chapter 11 Plans of Reorganization*, 3 ABI L.J. 407 (Winter 1995).......................................................................... 15

IRS Publication 15-B (2022) ........................................................................ 25

Jacobs, *The Bankruptcy Court's Emergence as Tax Dispute Arbiter of Choice*, 45 Tax Law. 971 (1992)......................................................................... 14

Joint Comm. on Taxation, General Explanation of P.L. 115-97, Part V.F. n. 310 ...................... 25

Oei, *Rethinking the Jurisdiction of Bankruptcy Courts Over Post-Confirmation Federal Tax Liabilities: Towards a New Jurisprudence of 11 U.S.C. 505,* 19 Akron Tax J. 49 (2004)....... 14

**JURISDICTION**

The United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") had jurisdiction over the chapter 11 case of Anthony S. Levandowski, Case No. 3:20-bk-30242-HLB (Bankr. N.D. Cal.) (the "Chapter 11 Case") pursuant to 28 U.S.C. §§ 157 and 1334.  While this Court may review the orders being appealed under 28 U.S.C. § 158, Appellees submit that the Court lacks jurisdiction to consider Appellants' appeals because, for the reasons stated in Appellees' Motion to Dismiss the Appeals, Appellants lack a redressable injury, and because the Appeals are equitably moot.[1]

**ISSUES PRESENTED**

1.   Did the Bankruptcy Court correctly conclude that it had the authority to make a tax determination associated with the "Main Uber Payment" under section 505 of title 11 of the United States Code (the "Bankruptcy Code")?

2.   Did the Bankruptcy Court correctly determine that Debtor should have no tax liability for the Main Uber Payment because Uber's indemnification of Debtor was sufficiently analogous to insurance payments?

3.   Did the Bankruptcy Court correctly exercise its discretion to approve the Plan?

---

[1]   For the sake of judicial economy, this Omnibus Brief responds to the four briefs filed by the Internal Revenue Service ("IRS") and the California Franchise Tax Board ("FTB," and, together with the IRS, "Appellants" or "Taxing Authorities").  Both the IRS and the FTB filed separate briefs challenging the Bankruptcy Court's tax determination, Docket Nos. 39 ("IRS Tax Brief"), 42 ("FTB Tax Brief"), and the Bankruptcy Court's confirmation of the Plan, Dkt. Nos. 40 ("IRS Confirmation Brief"), 43 ("FTB Confirmation Brief").

## STANDARD OF REVIEW

The Bankruptcy Court's legal conclusions—including whether the court had the authority to make a tax determination—are reviewed *de novo*.  *Reebok Int'l, Ltd. v. Marnatech Enters.*, 970 F.2d 552, 554 (9th Cir. 1992).  Decisions committed to the Bankruptcy Court's discretion are reviewed for an abuse of discretion, *In re Icenhower*, 757 F.3d 1044, 1049 (9th Cir. 2014), including the Bankruptcy Court's exercise of its tax determination authority, 11 U.S.C. § 505(a)(1).  *99 Invs., Inc. v. Maricopa Cty. (In re 99 Investments, Inc.)*, 1999 U.S. App. LEXIS 33682, at *2-3 (9th Cir. 1999); *Central Valley AG Enters. v. United States*, 531 F.3d 750, 764 (9th Cir. 2008).  The Bankruptcy Court's decision to confirm a plan is also subject to abuse-of-discretion review.  *In re Marshall*, 721 F.3d 1032, 1039 (9th Cir. 2013).  Factual determinations are reviewed for clear error.  *Simpson v. Burkart (In re Simpson)*, 557 F.3d 1010, 1014 (9th Cir. 2009) (citation omitted).

## STATEMENT OF THE CASE

### I.  Uber Agrees to Indemnify Debtor, Google Sues Debtor, and Debtor Seeks to Enforce the Indemnity.

Anthony S. Levandowski ("Debtor") was hired by Google in 2007.  In 2009, he became a member of a Google project aimed at developing and bringing to market a self-driving vehicle.  IRS Excerpts of Record [Docket No. 44-1] ("IRS ER") at 159.[2]  Debtor's agreements with Google included, among other things, non-competition and non-solicitation provisions.  *See id*. at 160.

In 2015, while working at Google, Debtor and a colleague formed a company, Ottomotto LLC ("Otto"), focused on self-driving trucks.  They left Google in January 2016 with several Google colleagues.  Otto was sold to Uber in August 2016.  As part of the sale of Otto, in anticipation that Google might sue if

---

[2]     All citations to the IRS ER are to the ECF page number.

1  Otto was sold to a significant competitor, Debtor entered into an Indemnification

2  Agreement with Uber dated April 11, 2016 (the "Indemnification Agreement").

3  Debtor and his co-founder colleague expected that Google might sue them for

4  selling their company to a competitor like Uber; Uber likewise recognized that

5  Google might bring suit over the transaction.  The Indemnification Agreement

6  required Uber to indemnify Debtor for certain claims brought by Google, including

7  claims for breach of fiduciary duty, breach of duty of loyalty, breach of non-

8  solicitation, non-competition, and confidentiality obligations.  *Id.*

9       Google commenced an arbitration against the Otto founders on October 28,

10  2016.  As relevant here, Google sought damages relating to the sale of Otto to Uber

11  based on contractual claims alleging that Debtor had violated non-competition and

12  non-solicitation obligations that he owed to Google.  *See Id.*; *see also* Appellees'

13  Supplemental Excerpt of Record ("SER"), Ex. 1 (Google Arbitration Demand).

14       Google prevailed in the arbitration and obtained a final award for

15  $179,047,998.64.  *See* SER, Ex. 2 (the "Arbitration Award").  On March 4, 2020,

16  the California Superior Court confirmed the award and entered judgment for the

17  award amount in Google's favor against Debtor ("Arbitration Judgment").  IRS ER

18  at 160.

19      **II.**    **Debtor, Google, and Uber reach a settlement.**

20       On the same day that Google obtained the Arbitration Judgment, Debtor

21  commenced the Chapter 11 Case.  Shortly thereafter, Debtor filed an adversary

22  proceeding against Uber seeking to enforce the Indemnification Agreement.  *See*

23  IRS ER at 163.  Google was permitted to intervene in that adversary proceeding.

24  In addition, Google filed a claim based on the Arbitration Judgment.  *See* IRS ER

25  at 160.[3]

26  _____

27  [3]    The Taxing Authorities refer to a criminal proceeding involving Debtor.
That proceeding was distinct from the Chapter 11 Case and the matters raised by

28  Google in the arbitration contained no allegations of criminal conduct or
misappropriation of trade secrets.  There is no evidence in the record to support the

The settlement ("Global Resolution") achieved three things:  it (1) resolved the various claims between Debtor, Uber, and Google; (2) resolved fraudulent transfer claims against Debtor's Charitable Lead Annuity Trust; and (3) established a roadmap for filing, and seeking confirmation of, a disclosure statement and Chapter 11 plan.  As relevant here, the material terms of the Global Resolution were as follows:  the parties would release one another, *e.g.*, Google would release Uber and vice-versa, Debtor would release Google and vice-versa, and Uber would release Debtor and vice-versa.  Uber would make an "indefeasible" payment[4] to Google ("Main Uber Payment")[5], and would also pay the estate $2 million, which would be used to pay claims in accordance with a proposed Chapter 11 plan.

### III.   The Tax Motion and Plan Confirmation.

In accordance with Federal Rule of Bankruptcy Procedure 9019, Debtor filed a motion for the Bankruptcy Court's approval of the Global Resolution ("Settlement Motion").  Debtor gave both Taxing Authorities notice of the Settlement Motion, but the Taxing Authorities did not challenge the Motion.  Debtor explained to the Bankruptcy Court that "a key provision" of the proposed settlement was "a direct, indefeasible payment to Google."  Franchise Tax Board

---

suggestion that the obligation to Google was not insurable or indemnifiable.  Indeed, the brief cited by the FTB explains that the Arbitration Judgment had *nothing* to do with the criminal proceeding or allegations of "willful" conduct that is not indemnifiable.  *See* Appellant Franchise Tax Board's Request for Judicial Notice in Support of Opening Briefs [Docket No. 45], Ex. 40.

[4]   As used in the Global Resolution, "indefeasible" means not recoverable from Debtor's estate—for the payment of taxes, or anything else.  *See* ER-FTB-0307-10 (discussing at length the nature and implications of the Main Uber Payment).

[5]   The amount of the Main Uber Payment was filed under seal and has not been disclosed in the Appeals.  The Taxing Authorities have assumed for purposes of the Appeal that the Main Uber Payment is in the full amount of the Arbitration Judgment, or approximately $180 million.

1  Excerpt of Record [Docket No. 44] at ER-FTB-0309 (lines 20-21),  Moreover,

2  Debtor explained that it was necessary for Google to receive payment prior to the

3  confirmation of the Plan, *see* ER-FTB-0309 (lines 19-28)-0310 (lines 1-11), and

4  emphasized in its papers and in open court the tax issues associated with the Main

5  Uber Payment.  ER-FTB-0310 (note 6); SER Exs. 5-9.

6  The Bankruptcy Court directed Debtor to file a motion to determine the tax

7  consequences of the Global Resolution under 11 U.S.C. § 505 ("Tax Motion").

8  The Tax Motion sought a determination that the Main Uber Payment would not

9  constitute gross income for Debtor, or, in the alternative, that the Plan was feasible

10  without reserving funds for taxes arising from the Uber Settlement Payment.  The

11  Taxing Authorities opposed the Tax Motion on jurisdictional and feasibility-related

12  grounds.  The FTB also argued that the Main Uber Payment constituted taxable

13  income, but the IRS did not; the IRS instead made the strategic choice of asking

14  the Bankruptcy Court to "rule on the jurisdictional question before the parties

15  commit to additional resources to determining the merits of the gross income

16  issue."  IRS ER at 219.

17  After filing the Tax Motion, Debtor filed the Plan and sought confirmation.

18  Much like the Settlement Motion, the Plan stated:

19
20  > If the Court does not grant the [Tax Motion], or
   > otherwise finds that Debtor or his estate may have
   > significant tax liability in connection with the Uber
   > Settlement Payment, Debtor may not be able to establish
21 > that the Plan is feasible at the Confirmation Hearing.

22  See IRS ER at 167.  The Plan stated that Debtor would pay or reserve for all

23  priority and administrative claims, *including all tax claims,* but did not include a

24  reserve for Uber's transfer to Google, *i.e.*, the Main Uber Payment.  ER-FTB-0717

25  (Soong Declaration describing reserve calculation).  In other words, the Settlement

26  Motion and the Plan made clear that the feasibility of the Plan depended on how

27  the Main Uber Payment was treated for tax purposes.

28  *///*

The Bankruptcy Court granted the Settlement Motion and the Tax Motion, and it approved the Plan. In the order granting the Settlement Motion ("Settlement Order"), the court instructed that "Uber shall pay the Main Uber Payment directly to Google and such payment shall be indefeasible, and not subject to avoidance for any reason, upon receipt." ER-FTB-0822. In an oral ruling on the Tax Motion, the Bankruptcy Court held that it had the authority to decide the Tax Motion, and that the Main Uber Payment was not gross income for either Debtor or his estate. It issued a written order granting the Tax Motion thereafter ("Tax Order"). The Bankruptcy Court also confirmed the Plan ("Confirmation Order"), rejecting the Taxing Authorities' arguments on the Plan's feasibility in doing so.

The Taxing Authorities appealed the Tax Order and the Confirmation Order, but not the Settlement Order. The Taxing Authorities sought a stay pending appeal of the Tax Order and the Confirmation Order, but the now-approved Global Resolution went unchallenged. Under the terms of the Global Resolution, Uber made the Uber Main Payment on or before May 20, 2022, as it was required to do. *Declaration of Tobias S. Keller in Support of Trust's Motion to Dismiss Appeals* at ¶ 4.

## SUMMARY OF ARGUMENT

1. The Bankruptcy Court correctly decided that it had the authority to issue the Tax Order and determine whether the Main Uber Payment constituted gross income. The Taxing Authorities effectively take the view that the Tax Order could not be issued until Debtor filed a tax return. There is no basis for that view under the plain text of 11 U.S.C. § 505(a), and the Ninth Circuit's interpretation of the authorizing statute. Section 505(a) requires only a live controversy necessitating a tax determination. Here, a live controversy arose when Debtor requested a determination about the tax consequences of the Main Uber Payment while seeking Plan confirmation. The controversy was sufficiently "imminent" because an event that the Taxing Authorities claimed to be taxable would arise

1   once the Main Uber Payment was approved and made.  Moreover, the feasibility

2   and confirmability of the Plan hinged on the requested determination, and the

3   Taxing Authorities confirmed the existence of a live controversy by attacking the

4   tax determination and Plan confirmation on feasibility grounds.

5         2.     The Bankruptcy Court correctly excluded the Main Uber Payment

6   from Debtor's gross income, and did not err—never mind clearly err—in finding

7   that the Main Uber Payment was sufficiently akin to insurance, such that it was

8   appropriate to exclude the Payment from Debtor's gross income.  At the outset, the

9   IRS waived any argument on the merits of the Tax Order, as it waived any

10  argument other than arguments about the Bankruptcy Court's authority under

11  11 U.S.C. § 505.  On the merits, the Bankruptcy Court was right:  Uber acted like

12  an insurer, and the Indemnification Agreement acted like insurance by distributing

13  risk between Uber and the Otto employees who were most vulnerable to a lawsuit

14  by Google.  The Taxing Authorities may quibble with the Bankruptcy Court's

15  determination, but mere disagreement is not clear error.  Moreover, the Bankruptcy

16  Court's tax determination may be upheld on a number of properly presented

17  alternative grounds:  (1) Debtor did not incur a tax benefit from the Main Uber

18  Payment, (2) the Payment was a working condition fringe, and (3) the Main Uber

19  Payment was a reimbursable employee expense.

20        3.     Most of the Taxing Authorities' arguments for vacatur of the

21  Confirmation Order are duplicative of the arguments for vacatur of the Tax Order.

22  The Taxing Authorities' remaining arguments against the Confirmation Order are

23  unavailing.  Despite the Taxing Authorities' attempts to persuade this Court

24  otherwise, the Plan included an adequate reserve for taxes other than the taxes

25  associated with the Main Uber Payment.  Moreover, the Bankruptcy Court

26  properly found that Debtor is committing his future income, and the Taxing

27  Authorities have identified no basis for clear error or an abuse of discretion in that

28  regard.  There is also no basis for the Taxing Authorities' argument that the Plan

1  does not provide a proper setoff for prepetition claims.  Finally, the Bankruptcy

2  Court correctly determined that the Plan Confirmation was *not* designed to avoid

3  taxes, and the Taxing Authorities offer no reason to depart from the deference

4  given to that determination.

5       For these reasons, and those set forth below, the Tax Order and the

6  Confirmation Order should be affirmed.

7  **ARGUMENT**

8  **I.**    **The Bankruptcy Court Properly Asserted Authority Over the Tax**

9      **Question.**

10      **A. The Bankruptcy Court Has the Unambiguous Power to Decide Tax**

11       **Questions.**

12       Section 505 of the Bankruptcy Code states that a bankruptcy court may

13  "determine the amount or legality of any tax, any fine or penalty relating to a tax,

14  or any addition to tax, whether or not previously assessed, whether or not paid, and

15  whether or not contested before and adjudicated by a judicial or administrative

16  tribunal of competent jurisdiction."  11 U.S.C. § 505(a)(1).  The Ninth Circuit has

17  made clear that this is a "broad" authorization, one that gives a bankruptcy court

18  the power not only to determine "bottom-line tax liability," but also to address

19  items that comprise such bottom-line tax liability.  *Cent. Valley AG Enters. v.*

20  *United States*, 531 F.3d 750, 759-60 (9th Cir. 2008).  The Bankruptcy Court's

21  actions here fit comfortably within that "broad" authorization:  the court was

22  presented with the question whether the Main Uber Payment gave rise to taxable

23  gross income for Debtor or Debtor's estate, and the court answered the question in

24  the negative.

25       Yet the Taxing Authorities propose three different interpretations of

26  section 505, none of which are supported by the plain text of the statute.  This

27  Court should reject all three of the Taxing Authorities' interpretations.

28  ///

First, the IRS takes the view that a court may only adjust "the full or final amount" of a tax, rather determine whether there is a taxable event at all.  The Ninth Circuit has already answered that question:  Section 505(a) gives the Bankruptcy Court the power to resolve "line items" necessary to determine the bottom-line tax liability.  *Cent. Valley*, 531 F.3d at 759-60. The authorities that the IRS cites to support this narrow construction each relates to procedural tax obligations, rather than line items that inform the amount of tax due.  *In re Grand Chevrolet, Inc.*, 153 B.R. 296 (C.D. Cal. 1993) (procedural question of whether the taxpayer may file consolidated returns); *Matter of Inter Urban Broad. of Cincinnati, Inc.*, 180 B.R. 153 (Bankr. E.D. La. 1995) (procedural question of whether the taxpayer may file as an S corporation); *In re GYPC, Inc.*, 2021 Bankr. LEXIS 2817, at *2 (Bankr. S.D. Ohio Oct. 5, 2021) (procedural question of whether amended tax returns may be filed).

Second, the Taxing Authorities argue that section 505(a) applies to "determine 'the amount of tax,'" which they construe as referring to a taxpayer's annual income tax.  IRS Tax Brief at 6; FTB Tax Brief at 12.  The upshot, the Taxing Authorities say, is that the Bankruptcy Court is powerless to act until a tax return has been filed.  Except section 505(a) does not say "the amount of tax," it says "the amount or legality of *any* tax."  The Taxing Authorities cannot read out the word "any" merely because it is inconvenient for their legal arguments.  *Orozco-Lopez v. Garland*, 11 F.4th 764, 776 (9th Cir. 2021) (noting that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind,'" and that, in order to "not be surplusage," "any" must refer to a "broader class").  Congress's use of the word "any" plainly indicates that the Bankruptcy Court would have to address many different types of "taxes."  Moreover, the plain text of the statute makes no mention of an income tax return.  The Ninth Circuit has already rejected the Taxing Authorities' view that bankruptcy courts cannot engage in "line item" review.  *E.g.*, *Cent. Valley*, 531

1   F.3d at 759-60.  Unsurprisingly, a number of courts have rejected the Taxing

2   Authorities' view that the Bankruptcy Court is empowered to act only after tax

3   season has come and gone.  *Grand Chevrolet,* 153 B.R. at 300 ("this preliminary

4   dispute may develop into a tax liability controversy and, at that point, *even if the*

5   *Trustee has yet to file a tax return*, section 505 will vest the Bankruptcy Court with

6   jurisdiction over it") (emphasis added); *In re Amoskeag Bank Shares, Inc.*, 215

7   B.R. 1, 3 (Bankr. D.N.H. 1997), *rev'd on other grounds*, 239 B.R. 653 (D.N.H.

8   1998) (directly rejecting argument by IRS "that there is no tax to determine until

9   and unless a tax return is filed"); *Goldblatt Bros., Inc.*, 106 B.R. 522, 533 (Bankr.

10  N.D. Ill. 1989) ("there is simply no firm authority to support the argument that

11  failure to invoke § 505(b) precludes this Court from hearing a dispute which is

12  within its jurisdiction under § 505(a)(1)").  Section 505(a) applies to "any tax," not

13  "income tax"—and this Court should reject the Taxing Authorities' attempt to

14  rewrite the statute, as the Bankruptcy Court correctly did.

15          Finally, the Taxing Authorities say section 505(a) cannot be used to render

16  decisions about forthcoming tax consequences absent a tax return.  Textually, that

17  argument is doubly problematic.  Section 505(a) applies "whether or not" a tax has

18  been "previously assessed."  That plain language cannot be squared with the

19  Taxing Authorities' view that section 505(a) cannot be invoked until a tax return

20  has been filed and overall tax liability has been "calculated."  IRS Tax Brief at 17,

21  FTB Tax Brief at 13.  And the Declaratory Judgment Act, which may be invoked

22  not just for past injuries, but "imminent" ones as well, *e.g.*, *Strike 3 Holdings LLC*

23  *v. Doe*, 849 F. App'x 183, 185 (9th Cir. 2021), specifically allows for a declaratory

24  judgment action involving "Federal taxes" in a "proceeding under section 505 or

25  1146 of Title 11."[6]  Courts have thus applied section 505 in circumstances where

26

27  [6] The IRS argues (IRS Tax Brief at 14) that the legislative history of the
    Declaratory Judgment Act suggests Congress intended for declaratory relief only

28  for section 505(b) and section 1146(b) proceedings.  But that is not what the text of
    the Declaratory Judgment Act says—the Act applies to all section 505 and section

1    tax liability might be incurred as a result of something that happens during the

2    bankruptcy proceedings (even post-confirmation), so long as there is a live dispute.

3    *Ogle v. IRS (In re Agway, Inc.)*, 447 B.R. 91, 95 (N.D.N.Y. 2011) (holding that the

4    bankruptcy court had jurisdiction to determine the tax issue that arose post-

5    confirmation"); *In re Popa*, 218 B.R. 420, 424-25 (Bankr. N.D. Ill. 1998)

6    (concluding that there was "sufficient immediacy" to "the issue of the liability of

7    taxes inexorably tied to a contested matter"), *aff'd*, 238 B.R. at 395; *In re Kilen*,

8    129 B.R. 538, 541 (Bankr. N.D. Ill. 1991).  There is nothing "hypothetical" about

9    the underlying event that the Taxing Authorities claim is taxable (IRS Tax Brief at

10   9, FTB Tax Brief at 16):  if the Court approved the Main Uber Payment, which

11   was presented contemporaneously with the Tax Motion, there was no question at

12   the time that the Main Uber Payment would be imminently made.  (And indeed,

13   now *has been* made.)  The Taxing Authorities claim that the Debtor owes taxes as

14   a result of that Main Uber Payment, making a claim for alleged tax liability

15   "imminent."

16          The IRS argues that reading section 505(a) broadly would swallow other

17   parts of the Bankruptcy Code whole, namely section 1146(b).  IRS Tax Brief at 12-

18   13.  But Congress often provides overlapping grants of authority, particularly when

19   there is a broad grant of authority, such as section 505(a), and a narrower grant of

20   authority, such as section 1146(b).  *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d

21   692, 697 (D.C. Cir. 2014).  In those instances, Congress enacts apparently

22   duplicative provisions "to make assurance double sure."  *Fla. Health Sciences Ctr.,*

23   *Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 520 (D.C. Cir. 2016).

24          In sum, section 505(a) clearly authorizes the Bankruptcy Court to render a

25   *prospective* determination regarding tax liabilities arising from the Main Uber

26   Payment.

27   ────────────

28   1146 proceedings.  Legislative history—particularly a few conclusory lines in a
     congressional report—cannot override that plain intent.

**B. <u>The Tax Order Resolved an Actual Controversy.</u>**

Section 505(a) and the Declaratory Judgment Act require an "actual controversy." 28 U.S.C. § 2201(a). The Tax Motion was squarely part of one— namely, the feasibility and confirmation of the Plan. Whether the Global Resolution could be approved and the Plan confirmed hinged on the outcome of the Tax Motion. Debtor made this crystal clear in advancing the Settlement Motion, the Tax Motion, and the Plan confirmation all simultaneously: as the Plan itself stated, "If the Court does not grant the [Tax Motion], or otherwise finds that Debtor or his estate may have significant tax liability in connection with the Uber Settlement Payment, Debtor may not be able to establish that the Plan is feasible at the Confirmation Hearing." IRS ER at 164. The Taxing Authorities recognized the live controversy by contesting both the Tax Motion and Plan confirmation, and now in contesting the Tax Order and the Confirmation Order.

Relying heavily on *In re UAL Corp.*, 336 B.R. 370 (Bankr. N.D. Ill. 2006), the Taxing Authorities nevertheless argue that the tax consequences of the Main Uber Payment are not yet ripe for judicial resolution because the "events have not yet taken place." But *UAL* did not involve a tax determination that was inextricably intertwined with the Bankruptcy Court's exercise of its core function of Plan confirmation.

*UAL* concerns the Bankruptcy Court's authority to "declare the tax consequences of *a proposed plan*," whereas this case does not. 336 B.R. at 376 (emphasis added). As this Court previously observed, this case concerns "the tax consequences of an actual settlement that had been executed." Docket No. 25 at 6. Proposed plans do not have the concreteness necessary to present a case or controversy ripe for declaratory judgment. "The plan-confirmation process … involves back and forth negotiations"; accordingly, proposed plans do not "alter[] the status quo and fix[] the rights and obligations of the parties." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 588 (2020). An executed settlement

1    approved by the Court, by contrast, does "alter[] the status quo," and is therefore

2    sufficiently concrete such that a contested tax-consequence determination would

3    not be an advisory opinion, despite the Taxing Authorities' assertions to the

4    contrary.  Second, unlike *UAL*, the tax issue here is not "based on facts that would

5    only arise *after* the estate has been terminated by confirmation of a plan."  *UAL,*

6    336 B.R. at 375.  The putatively taxable event is the Main Uber Payment, which

7    was approved with the order confirming the Plan (and closed long before the Plan

8    became effective), making it part and parcel of the Bankruptcy Court's resolution

9    of the administration of the bankruptcy estate, unlike *UAL*.  ER-FTB-0820-0822;

10   IRS ER, Ex. 20.

11          Thus, unlike *UAL*, whether the Main Uber Payment gave rise to a taxable

12   event was "inexorably tied to a contested matter then pending before the Court."

13   *Popa*, 218 B.R. at 424.  The determination was critical to the feasibility (and thus

14   confirmability) of the Plan, and thus, the issue of tax treatment "pose[d] a direct

15   threat to Mr. [Levandowski's] fresh start in bankruptcy," *In re Kilen*, 129 B.R. 538,

16   549 (Bankr. N.D. Ill. 1991), and also a threat to the repose afforded to the other

17   parties of the Uber Settlement Payment.  This was precisely the scenario for which

18   section 505(a) was intended:  to provide the bankruptcy courts with tax powers

19   when the exercise of those powers is necessary for the courts to perform their

20   responsibilities in bankruptcy.  *In re Schmidt*, 205 B.R. 394, 398 (Bankr. N.D. Ill.

21   1997) (section 505(a)'s purpose is to "avoid the delay of the conclusion of

22   administration of bankruptcy estates if left to another forum").

23          None of the Taxing Authorities' citations compel a contrary result—they all

24   either stand for the uncontroversial proposition that a declaratory judgment action

25   needs a live case or controversy or are distinguishable in other ways.  *E.g.*, *Grand*

26   *Chevrolet, Inc.*, 153 B.R. at 299-300 (declining declaratory jurisdiction because the

27   question raised was one about tax status, not tax liability—"[t]ax status may impact

28   tax liability, but the two are not a part of the same inquiry"); *Inter Urban Broad.*,

180 B.R. 153 (in case seeking advisory opinion on making a subchapter S tax election, the court agrees there is no "actual controversy between a taxpayer and the government as to the amount of a tax liability" and distinguishes a case in which 'the amount of the tax owed by the Unsecured Creditors' Committee was squarely before the court because it was contended that no tax was owed."); *Allis-Chalmers Corp. v. Goldberg (In re Hartman Material Handling Sys.)*, 141 B.R. 802, 813 (Bankr. S.D.N.Y. 1992) (declining a "general ruling on . . . post-confirmation tax effects" under section 505 where Debtor did "not request a specific ruling on a particular transaction"); *In re GYPC, Inc.*, 2021 Bankr. LEXIS 2817 (Bankr. S.D. Ohio Oct. 5, 2021) (citing *Grand Chevrolet* with approval: "Ultimately, this preliminary dispute may develop into a tax liability controversy and, at that point, even if the Trustee has yet to file a tax return, section 505 will vest the Bankruptcy Court with jurisdiction over it.").

Indeed, the leading treatise on bankruptcy law focuses not on the existence of a completed tax year but, instead, on the core question of whether an actual controversy exists.  11 *Collier on Bankruptcy* PTX 5.04 at 2[b] (discussing *Grand Chevrolet* and the absence of an actual controversy).  Unlike cases cited by the Taxing Authorities in which a court has found that there was no justiciable issue, courts and commentators cite with approval use of section 505 authority in the precise circumstance presented here—a Plan for which feasibility turns on a tax determination.  *See generally Schwartz v. Gardiner (In re Schwartz)*, 192 B.R. 90, 94 (Bankr. N.J. 1996); *Kilen v. United States (In re Kilen)*, 129 B.R. 538, 548 (Bankr. N.D. Ill. 1991)); Oei, *Rethinking the Jurisdiction of Bankruptcy Courts Over Post-Confirmation Federal Tax Liabilities: Towards a New Jurisprudence of 11 U.S.C. 505,* 19 Akron Tax J. 49, 64 (2004); Jacobs, *The Bankruptcy Court's Emergence as Tax Dispute Arbiter of Choice*, 45 Tax Law. 971, 977 and 1013-1016 (1992)); *see also* Haber, *Federal Tax Issues in Bankruptcy Reorganizations: What Role Should Bankruptcy Courts Have in Declaring the Federal Income Tax*

*Liability of Debtors and the Federal Income Tax Consequences of Chapter 11 Plans of Reorganization*, 3 ABI L.J. 407, 430-331 (Winter 1995) ("[T]he impact of the federal income tax consequences of the proposed reorganization plan is one of the 'related matters' that the bankruptcy court must consider in finding that confirmation of the plan will not likely be followed by the need for further financial reorganization.").

### C. Policy Rationales are Irrelevant and, in Any Case, Support the Exercise of the Bankruptcy Court's Authority on These Facts.

Lacking any support in the statute itself, the Taxing Authorities resort to policy considerations. The Taxing Authorities thus argue that policy requires that questions about tax liability be neatly tidied up and addressed at the end of the tax year, when addressing the return. (Strangely, both Taxing Authorities gesture at *California* tax policy, which should have no bearing on a *federal* court's jurisdiction.[7])

To the extent that policy is relevant to the Court's decision making at all, policy strongly *favors* the exercise of jurisdiction. The Taxing Authorities' desire for accounting and administrative convenience must give way to the policies *actually* animating section 505, which is to "relieve the honest debtor from the weight of oppressive indebtedness and permit them to start afresh." *In re Luongo*, 259 F.3d 323, 330 (5th Cir. 2001). Forcing Debtor to wait until after a return has been filed and all tax items have been neatly assorted would prejudice Debtor, to no great benefit of the Taxing Authorities.

The Bankruptcy Court correctly recognized as much. *See* ER-FTB-0770 (lines 15-18) ("If the Court had to wait for the conclusion of a tax year and the

---

[7] Moreover, a case decided in 1941, 37 years before section 505's enactment, about two lawsuits regarding tax liability for a single year does not have relevance here, where there has been only one judicial determination:  the Bankruptcy Court's. *Pope Estate Co. v. Johnson*, 43 Cal. App. 2d 170, 174 (1941).

1   submission of tax returns before addressing a motion under Section 505(a), the

2   delay and expense would make reorganization impossible.  That cannot be what

3   Congress intended.").  If any tribunal is best positioned to consider how

4   bankruptcy policy might be served by the issuance of a tax determination, it is that

5   court.

6        The Taxing Authorities also argue that "res-judicata principles" are offended

7   by the Tax Order.  It is difficult to see how.  The Order obviously does not disturb

8   a previously adjudicated tax determination, as section 505(a)(2) so prohibits.  And

9   any res judicata effect would be confined to the Main Uber Payment, not Debtor's

10  income tax more broadly.  It may be more convenient for the Taxing Authorities

11  for the tax liability associated with the Main Uber Payment to be determined after

12  a tax return.  But bankruptcy policy protects the debtor's interest in finality and a

13  "fresh start," not administrative convenience.  The Bankruptcy Court correctly

14  exercised its discretion to reject the Taxing Authorities' policy arguments.

15  **II.   The Bankruptcy Court's Tax Ruling Was Correct.**

16       **A.   The IRS Has Waived Its Merits Arguments on Whether the Main**

17       **Uber Payment Is Taxable Income**.

18       The IRS made a strategic choice:  it thought it could defeat the Tax Motion

19  on jurisdictional grounds, and chose to focus only on those grounds.  IRS ER at

20  219.  The FTB demonstrated that it was possible to raise substantive arguments

21  regarding the taxability of the Main Uber Payment in time for the Bankruptcy

22  Court to consider them.  The IRS could have moved to postpone the hearing on the

23  Tax Motion to develop its arguments.  *See* ER-FTB-0729 (lines 21-23) ("As to the

24  merits, only the California Franchise Tax Board has offered briefing on the

25  substantive arguments made in Mr. Levandowski's tax motion.  The Internal

26  Revenue Service alleges that it has not had sufficient time to oppose the

27  substantive arguments in the tax motion.  But I note for the record that the Internal

28  Revenue Service has not requested an extension of time to oppose the tax

motion.").  It could also have sought reconsideration.  The IRS did none of those things.  Instead, it chose to fight the Tax Motion on jurisdiction.

That strategic decision has consequences:  the IRS has waived all of its arguments on the merits regarding whether the Main Uber Payment is taxable income.  Indeed, the Bankruptcy Court expressly *found* waiver:

> The Internal Revenue Service has chosen not to respond to these arguments, contending that its counsel did not receive the tax motion in time to brief these issues. The Court notes that the Internal Revenue Service has never requested additional time to brief these issues, and the Court rejects the notion that the IRS's failure to act promptly after being properly served with the tax motion justifies further delay and the harm that would cause to Mr. Levandowski, Uber, Google, and Mr. Levandowski's other creditors. The IRS will have to live with the consequences of its dilatory conduct.

ER-FTB-0772 (lines 16-25).

The IRS cannot raise new arguments regarding the Tax Motion for the first time on appeal.  *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (appellate courts will not consider arguments that are not "properly raised in the trial courts" (citation and internal quotation marks omitted)).  It is bound by the consequences of its strategic choices.  *See Alloure, Inc. v. FA Cooperative, Inc.*, 438 F. App'x 571, 572 (9th Cir. 2011) ("strategic choice" in not raising argument before district court "does not constitute an extraordinary circumstance that justifies pursuing it for the first time on appeal").  This is not a case of accidental forfeiture:  the IRS knew what it was doing, and must now by abide by that decision.  *United States v. Pineda-Buenaventura*, 383 F. App'x 560, 563 (7th Cir. 2010) ("Waiver is an intentional, strategic decision not to assert an argument and precludes appellate review; forfeiture is an accidental or negligent omission and permits review for plain error.").

The IRS claims that its waiver should be excused because Debtor would not be prejudiced by the newly raised arguments.  The IRS recites the right circumstances when waiver should be excused:  (1) "the exceptional case where

1  review is necessary to prevent a miscarriage of justice or to preserve the integrity

2  of the judicial process, (2) when the issue arises while on appeal because of a

3  change in the law, or (3) when the issue is purely one of law and either does not

4  depend on the factual record developed below, or the pertinent record has been

5  developed."  IRS Tax Brief at 20 (quoting *WildWest Inst. v. Bull*, 547 F.3d 1162,

6  1172 (9th Cir. 2008)).  But it is wrong to suggest that any of these exceptions have

7  been met.  Bootstrapping off another party's arguments is not an exception to the

8  waiver rule.  Nor are the issues presented questions of law—as demonstrated

9  below, tax liability questions are fact intensive, so the IRS cannot credibly say this

10  is a "*pure* question of law."  IRS Tax Brief at 20.

**B.**      **The Bankruptcy Court Correctly Applied the Insurance Approach in Determining the Main Uber Payment Should Not Be Included in Gross Income.**

**1.**  **The Appeals Fundamentally Misstate the Nature of the Indemnity.**

16       The Taxing Authorities argue that the Indemnification Agreement is not

17  insurance because insurance generally does not cover willfully bad acts.  This

18  argument is a red herring because the Arbitration Judgment for which Debtor

19  sought indemnification was not based on any willfully bad acts.

20       In its arbitration demands, Google asserted the following claims:  breach of

21  contract (both demands), breach of fiduciary duty, fraud/deceit ("in order to

22  mislead Google into believing that he was a committed employee …"), tortious

23  interference with contract, and tortious interference with prospective economic

24  advantage.  *See* SER, Ex. 1 (Google Arbitration Demand).  There is no allegation

25  whatsoever that property or trade secrets were taken.  *Id.*  Nor did the Arbitration

26  Award, which forms the basis for the Arbitration Judgment, make any such

27  finding; in fact, the "disgorgement" to which the Taxing Authorities refer was

28  simply the measure of damages (compensation Google paid to Debtor) found by

1  the arbitration panel.  *See* SER, Ex. 2.  Indeed, counsel for Debtor made this

2  abundantly clear in argument before the Bankruptcy Court, and no evidence was

3  adduced to suggest otherwise.  ER-FTB-0763 (lines 14-20) ("this has nothing to do

4  with theft of trade secrets.").[8]

5      Instead, the evidence before the Bankruptcy Court indicates that Debtor's

6  agreement to allow his company to be acquired by Uber, a significant competitor

7  to Google, increased the risk that he and others would be sued.  Debtor was

8  therefore insistent that Uber assume that risk as part of the overall transaction.  *See*

9  SER at ER-Trust-0111 ("indemnification was of critical importance … According

10  to [Uber's representative], 'They wouldn't have done [the deal] without it.'").  It

11  was within this context that Uber agreed to be responsible for liabilities of all the

12  "Designated Employees" that Uber agreed to make the Main Uber Payment to

13  Google.

14      **2.  <u>The Main Uber Payment Was Not Gross Income to the Estate</u>.**

15      Uber's payment of the Main Uber Payment was a transfer to Google, not to

16  Debtor, and is not properly considered gross income to Debtor or Debtor's estate.

17  The only reason Uber is satisfying Google's claim is because Uber agreed in the

18  Indemnification Agreement to indemnify Debtor in the possible event that Debtor

19  was sued by Google and subsequently ordered to pay Google a judgment arising

20

21  [8]      The FTB cites California Insurance Code §533 for the proposition that

22  "willful acts" cannot be insured.  The issue was not briefed before the Bankruptcy
Court and thus should not be considered here.  *See Whittaker Corp. v. Execuair*

23  *Corp.,* 953 F.2d 510, 515 (9th Cir. 1992); *see also* ER-FTB-0778 (lines 6-8) ("The
Court declines to address or consider the arguments that the FTB raised for the first

24  time in oral argument today").  In any event, this provision does not apply to the
acts described in the Arbitration Award.  *See Office Depot Inc. v. AIG Specialty*

25  *Insurance Co.,* 722 Fed. Appx. 745 (9th Cir. 2018); *see also California Shoppers,*

26  *Inc. v. Royal Globe Ins. Co.,* 175 Cal. App. 3d 1 (1985).  Furthermore, the
classification of an arrangement as insurance for purposes of state or federal

27  insurance laws is not dispositive of whether the arrangement is treated as insurance

28  for income tax purposes.

1   from indemnified claims.  Nevertheless, the Taxing Authorities argue that Uber's

2   payment to Google should be treated as gross income to Debtor (a payment that

3   would, in the Taxing Authorities' view, be against Debtor), in addition to Google.

4   The result would have left Debtor unable to confirm the Plan, however, because

5   Google's insistence that the Main Uber Payment be "indefeasible" meant that

6   Debtor would be unable to pay those taxes from other assets of the estate.  *See* ER-

7   FTB-0717.

8          The Bankruptcy Court correctly found that this transfer from Uber to Google

9   was analogous to an insurance payment and therefore, was not income to Debtor—

10  there was no error, never mind *clear* error, in that finding.  Insurance payments to

11  third parties on behalf of policyholders in satisfaction of a judgment are not gross

12  income of policyholders. "When damages resulting from a taxpayer's tortious

13  behavior are paid by an insurance company, as in the case of an automobile

14  accident caused by the taxpayer's negligence, the payment is not taxed, even

15  though the taxpayer's liability to the victim is thereby discharged."  BITTKER &

16  LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶

17  5.8.1. (Thomson Reuters/Tax & Accounting, 2d/3d ed. 1993-2019, updated March

18  2022).  Even if the insurance company resists paying the driver *(e.g.* for an alleged

19  policy violation), but ultimately settles with the driver and pays the pedestrian's

20  bills (all without admitting to the validity of the underlying agreement), that

21  payment would still not be taxable to the insured party.[9]

22  _____

23  [9]      Each of the Taxing Authorities argues that the syllogism fails because
    certain insurance payments are *sometimes* includable in gross income.  IRS Tax
24  Brief at 24-25 ("it is debtor's burden to show it is not income"); FTB Tax Brief at
    24 (noting that insurance proceeds for "lost profits" are taxable).  This argument
25  was waived before the Bankruptcy Court.  ER-FTB-0772 (lines 16-25) (IRS
    waiver of all such arguments) and ER-FTB-0773 (lines 6-9) ("The FTB and Mr.
26  Levandowski do not dispute that insurance payments made by insurers to third
    parties on behalf of their insureds are not included in the insured's gross income for
27  tax purposes."); *see generally Louisiana-Pacific Corp.*, 909 F.2d at 1264 (9th Cir.
28  1990); *Bolker v. Comm'r*, 760 F.2d at 1042.  Moreover, the general point that

1    In considering the insurance analogy, the Court concluded that the Main

2    Uber Payment to Google did not give rise to gross income to Debtor or Debtor's

3    estate.  In doing so, it noted how closely the Uber indemnity hewed to traditional

4    insurance.  Citing *Amerco & Subsidiaries v. Comm'r*, 96 TC 18 (1991), *aff'd*

5    *Amerco, Inc. v. Comm'r*, 979 F.2d 162 (9th Cir. 1992), the Ninth Circuit held that

6    if there is no statute directly addressing whether a type of transaction is insurance,

7    courts are to apply commonly accepted notions of insurance.  The defining

8    characteristics of insurance transactions are: (1) the existence of "insurance risk,"

9    (2) risk shifting and distributing and, (3) in the absence of a statutory definition,

10   "insurance" is to be defined in its commonly accepted sense.  *Id.* at 38.  Each factor

11   supported the conclusion of the Bankruptcy Court. Therefore, the Bankruptcy

12   Court ruled that the Main Uber Payment did not give rise to gross income to

13   Debtor or his estate.

14   The Taxing Authorities' principal challenge is to the Bankruptcy Court's

15   finding that the Indemnification Agreement distributed risk.  IRS Tax Brief at 21-

16   25 ("As to the first two prongs …  it did not distribute risk"); FTB Tax Brief at 29

17   ("The Indemnification Agreement Lacks Risk Distribution").  That finding was

18   correct and, in any event, is entitled to clear-error deference.  Despite the Taxing

19   Authorities' attempts to argue otherwise, this was not a case where one party

20   simply agreed to assume the risk of another.  There was distributed risk:  Uber

21   indemnified five people, and Google sued only two.  Uber made a calculated

22   judgment that Google would not sue all five individuals covered by the indemnity,

23   and that judgment regarding risk distribution was proven right:  three of the five

24   "Diligenced Employees" were never sued.

25   _____

26   insurance payments that replace income can be treated as are gross income does
     not undermine the Bankruptcy Court's conclusion that Uber's payment is not like

27   the sort of insurance that could constitute gross income or explain why the
     Bankruptcy Court's factual determinations in this regard should be stripped of

28   deference.

1    The FTB suggests that to meet commonly accepted notions of insurance, an

2  insured must "generally" pay the insurer a financial premium and tries to fault

3  Debtor for not doing so.  FTB Tax Brief at 30.  But premiums are not required for

4  insurance arrangements to exist.  Take, for example, director and officer

5  indemnification.  No premiums are required for this form of insurance.  Instead,

6  most directors and officers "pay" by providing their services to the company; no

7  one can question that this is a form of insurance.  *See* ER-FTB-0777 (lines 11-15)

8  (rejecting argument that Tax Motion fails because Debtor "paid no premiums to

9  Uber").

10   The IRS also argues that Uber is not an insurer and was not acting like an

11  insurer.  IRS Tax Brief at 22 ("the arrangement does not resemble insurance in the

12  traditional sense").  This is wrong.  First, the Bankruptcy Court had an ample

13  factual basis for concluding that Uber *was* acting as an insurer (and therefore did

14  not err, let alone *clearly* err, in that respect).  Indeed, Uber considered itself to be

15  an insurer.  SER at ER-Trust-0135 (lines 6-24) (Uber witness confirms Uber was

16  acting as an insurance company).  As an insurance company would do using an

17  underwriter, Uber investigated the Diligenced Employees to try to understand the

18  risks it was undertaking.  *See, e.g.*, IRS ER at 123; ER-Trust-0138 (lines 5-16);

19  ER-Trust-0151 (line 2) - ER-Trust-0152 (line 7) (describing that Uber conducted

20  due diligence on Debtor, Otto and other employees of Otto and concluded that it

21  was not taking "undue risk of litigation").  And like an insurer, Uber had the right

22  to control the defense of any claim arising under the agreement.  IRS ER at 123

23  (¶ 2.2(b)).  One does not have to be in the business of offering insurance to be an

24  insurer.  *See Caylor Land & Dev., Inc. v. Comm'r*, 121 T.C.M. (CCH) 1205 (T.C.

25  2021) (whether something is insurance in the commonly accepted sense is "simply

26  a command to engage in analogical reasoning—there is an ordinary public

27  meaning of the word 'insurance' widespread in society that people ascribe to

28  contracts without much thought.  A court can then look at novel arrangements that

1  might or might not look like those contracts in various ways and pronounce

2  whether their differences with commonly held notions of insurance are important

3  in any particular case.").  Companies self-insure often, including indemnifying

4  directors and officers.  Moreover, tax courts have considered various factors to

5  identify whether an insurance arrangement exists, and none include a requirement

6  that the party offering the insurance be a "licensed insurer."  *See R.V.I. Guar. Co.*

7  *& Subsidiaries v. Comm'r*, 145 T.C. 209, 231 (2015).

8      The Bankruptcy Court carefully considered and weighed the evidence before

9  concluding that Uber's transfer of the Main Uber Payment to Google was not gross

10  income to Debtor or Debtor's estate under the facts and circumstances that were

11  presented.  The Bankruptcy Court's decision was correct, and there is no error—

12  never mind clear error—in the factual determinations supporting that conclusion.

13      **3.  <u>The Tax Order may be affirmed on several independent,</u>**

14          **<u>alternative grounds</u>.**

15      This Court may also affirm the Tax Order on several alternative bases

16  presented to, but not considered by, the Bankruptcy Court:  the Main Uber

17  Payment was not taxable (1) under the tax benefit rule; (2) because it was a

18  working condition fringe; and (3) because it was an expense reimbursement.  *Sully*

19  *v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013) (a court of appeals may affirm the

20  district court on any ground supported by the record).

21      **a.  <u>The Main Uber Payment Is Excludable from Gross</u>**

22          **<u>Income under the Tax-Benefit Rule</u>.**

23      Because Debtor did not receive any tax benefit from his deemed payment to

24  Google, the Main Uber Payment to Google is merely a recovery of an expense or

25  loss and should be excluded from Debtor's gross income.  This is a well-known

26  concept in tax law called the "tax benefit rule."[10]  Generally, the tax benefit rule

27

28  [10]     Despite the fact that Section 111 of the Internal Revenue Code of 1986, as
amended (the "Tax Code") partially codifies the tax benefit rule, Section 111 does

provides that the amount of an expense recovered shall be included in income in the year of recovery to the extent the expense resulted in a tax benefit to the taxpayer (*e.g.,* a reduction in the taxpayer's liability for taxes or taxes paid).  If the taxpayer did not receive a tax benefit when the expense was paid, then the taxpayer does not have to include an amount in income when the expense is later recovered. *See, e.g., Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370 (1983); *Estate of Backemeyer v. Commissioner*, 147 T.C. No. 17 (2016); *Elbaz v. Commissioner*, 109 T.C.M. 1229 (2015).[11]

Here, the Main Uber Payment, if it is income at all, is attributable to the expense incurred by Debtor as a result of the judgment Google secured against him.  Had Debtor made the payment to Google himself, that payment would generally be deductible either as a business expense (Section 162) or as a loss (Section 165), except that deductions under that are attributable to a trade or business consisting of the performance of services by a taxpayer as an employee were disallowed at the time of the Main Uber Payment.  *See* Section 67(g).  Debtor would be unjustly taxed at a time when he had no corresponding increase in

not set the limits to the rule. Rather, the tax benefit rule is judicially created, and the Court need not apply only the rule as set out in Section 111.  *See Hillsboro Nat. Bk. v. Commissioner*, 460 U.S. 370 (1983) ("[T]his Court has held, *Dobson v. Commissioner*, 320 U.S. 489, 505-506 (1943), and it has always been accepted since, that §111 does not limit the application of the exclusionary aspect of the tax benefit rule.  On the contrary, it lists a few applications and represents a general endorsement of the exclusionary aspect of the tax benefit rule to other situations within the inclusionary part of the rule.").  Rather, the principles of the rule control.

[11]     The IRS did not challenge this position.  The FTB did so on the limited ground that a taxpayer hoping to benefit from the rule must show that the loss and the recovery "straddle" two tax years, by showing the tax payer "received a tax benefit—such as an exclusion, deduction, or credit—in a prior year."  The Supreme Court expressly rejected that view.  *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 383 n.16 (1983) ("We find it difficult to believe that Congress placed such a premium on having a transaction saddle two tax years.").

1   wealth.  The tax benefit rule therefore applies since the Main Uber Payment merely

2   recoups a nondeductible loss and returns Debtor to the *status quo ante*; Debtor has

3   no corresponding increase in wealth, and therefore has no gross income as a result

4   of the Main Uber Payment.  This Court may affirm the Tax Order on that basis.

### b.  <u>The Main Uber Payment Is Excludable from Gross Income as a Working Condition Fringe Benefit.</u>

7   The Court should also consider the Main Uber Payment to be excludable

8   from gross income as a working condition fringe under Section 132(a)(3) of the

9   Tax Code.

10   Section 132(a)(3) excludes from gross income any fringe benefit that

11   qualifies as a working condition fringe.  Section 132(d) defines a "working

12   condition fringe" as "any property or services provided to an employee of the

13   employer to the extent that, if the employee paid for such property or services,

14   such payment would be allowable as a deduction under Section 162 or 167."[12]  To

15   qualify as a working condition fringe, the benefit must be provided to an employee

16   of the employer for specific or pre-arranged expenses.[13]  The Indemnification

17   Agreement meets this requirement.  Uber agreed to provide indemnity to persuade

---

[12]   In general, Section 67(g) denies deductions for miscellaneous itemized deductions, including Section 162 deductions for employees (for the relevant taxable years here), Congress's intent—revealed in the legislative history—is that this provision should permit employees to exclude working condition fringes from gross income.  *See* Joint Comm. on Taxation, General Explanation of P.L. 115-97, Part V.F. n. 310; *see also* IRS Publication 15-B (2022) (published after enactment of Section 67(g), this IRS publication does not limit application of the working condition fringe by reason of Section 67(g)).

[13]   Although Debtor is not presently employed by Uber, employment benefits can be provided post-termination for a prior employee.  See Rev. Rul. 92-69, 1992-2 C.B. 51.  The Main Uber Payment also qualifies as a working condition fringe because the Main Uber Payment is made pursuant to the Indemnification Agreement and is therefore a continuing service such that Debtor is considered employed for the purposes of Section 132(d).

1  Debtor to join Uber as an employee and, after the Google claim arose, Uber

2  accepted Debtor's tender under the Indemnification Agreement while Debtor was

3  employed by Uber.

4        An additional requirement to qualify as a working condition fringe is that the

5  hypothetical payment for a property or service is not deductible with respect to a

6  trade or business of an employee *other than* the employee's trade or business of

7  being an employee of the employer.  Treas. Reg. 1.132-5(a)(2)(i). [14]  For this

8  requirement to be met, the employer must derive a substantial benefit from the

9  payment that is distinct from the benefit that it would derive from the mere

10  payment of additional compensation.  Rev. Rul. 92-69.  Here, Uber derived a

11  substantial business benefit from providing the indemnity to Debtor beyond what it

12  could have merely included in Debtor's compensation.

13        First, the Indemnification Agreement allowed Debtor and the other

14  employees to focus on the business for Uber with the knowledge that Uber would

15  handle potential issues.  Uber later sold a part of that team for an ownership

16  interest in the Aurora Innovation, Inc. for a 26% interest in Aurora and Uber was

17  able to build Uber Freight (the Uber business unit based on Otto), which was

18  previously valued at $3.5 billion.  IRS ER at 110.  Second, other key Google

19  employees would not have joined Uber but for Debtor's recruiting, which Debtor

20  would not have done without the Indemnification Agreement.  Third, by

21  indemnifying Debtor, Uber helped to quickly close the Otto transaction and get

22  Otto employees for Uber.

23        Finally, the Main Uber Payment is payment of the judgment that was entered

24  based on the Arbitration Award and would be deductible under Section 162 if

25  Debtor had paid it himself and the miscellaneous itemized deduction rule did not

26

27  [14]     All references to "Treasury Regulations" herein are references to Section 26

28  of the Code of Federal Regulations.  For example, Treasury Regulation 1.132-5(a)(2)(i) is 26 CFR § 1.132-5.

1   apply.[15]  Section 162 broadly cover expenses incurred in connection with a trade or

2   business, and courts have held that such expenses include expenses for claims of

3   fraud, breach of contract, breach of loyalty, and breach of fiduciary duty, including

4   when those claims arise out of conduct connected with a person's duties as an

5   officer or employee.  For example, in *Scofield v. Commissioner*, the Tax Court

6   determined that a taxpayer could deduct a payment to settle claims against him that

7   originated in his conduct of his duties as an officer or employee.  T.C.M. (RIA)

8   1997-547.  *See also* Revenue Ruling 80-211, 1980-2 C.B. 57, Revenue Ruling 79-

9   208, 1972-2 C.B. 79.

10          Here, based on the foregoing, the Court may affirm the Tax Order on the

11  alternative ground that the Main Uber Payment is a working condition fringe

12  benefit under Section 132(a)(3) of the Tax Code, and is therefore properly

13  excluded from Debtor's gross income.

14                    **c.  <u>The Main Uber Payment Is Excludable from Gross</u>**

15                         **<u>Income as a Reimbursable Employee Expense</u>.**

16          The Main Uber Payment can also be excluded from Debtor's gross income

17  because it should be considered an employee expense of Debtor that he incurred on

18  Uber's behalf and that Uber is reimbursing.  Because the partial satisfaction of the

19  Arbitration Award is deemed paid by Debtor in connection with his performance

20  of services as an employee of Uber, and the indemnification payment by Uber is a

21  reimbursement under a reimbursement or other expense arrangement, Debtor

22  should be permitted to deduct his payment "above-the-line" (*i.e.* reduce his gross

23  income), rather than as an itemized deduction.  Further, because the

24  indemnification payment was paid pursuant to an "accountable plan," the amount

25  ///

26  ────────────────────

27  [15]     To determine whether a judgment or settlement is deductible, courts look to
    the "origin and character" of the claim.  *United States v. Gilmore*, 372 U.S. 39

28  (1963).

of the indemnification payment is excludable from wages and is not subject to withholding and payment of employment taxes.

Under Section 62(a)(2)(A), deductions for expenses paid or incurred by the taxpayer in connection with the performance by him of services as an employee under a reimbursement or other expense allowance arrangement with his employer are not itemized and may be deducted "above-the-line."  In addition, Section 62(c) provides that such an arrangement must (i) require the employee to substantiate expenses covered by the arrangement to the person providing the reimbursement and (ii) not permit the employee to retain any amount in excess of the substantiated expenses covered under the arrangement to be a "reimbursement or other expense allowance arrangement" for the purposes of Section 62(a)(2)(A).

The Indemnification Agreement and Main Uber Payment meet the three requirements to qualify as a reimbursement or other expense allowance arrangement.

*First*, the arrangement provides reimbursements only for business expenses allowable as deductions under certain sections of the Tax Code (including Section 162 and 165, described above) that are paid for or incurred by the employee in connection with the performance of services as an employee of the employer. Treas. Reg. Section 1.62-2(d).  The Indemnification Agreement and the Main Uber Payment meet this "business connection" requirement.  As explained above, the business expenses were incurred as part of Debtor's role in assisting Uber. Further, the Indemnification Agreement was crucial to Uber's efforts to hire and retain Debtor and other Google employees. But for the indemnity, Debtor would never have agreed to become an Uber employee or solicit Google employees for Uber's benefit.

*Second*, the arrangement must require each business expense to be substantiated to the payor.  The Main Uber Payment easily satisfies this

///

1  requirement.  Uber is aware of the nature of the indemnification payment by virtue

2  of its multiple years of litigating the issues in this case.

3      *Third*, the arrangement must require the employee to return to the payor any

4  amount paid under the arrangement in excess of substantiated expenses. Treas.

5  Reg. Section 1.62-2(f).  Because Uber will make the payment directly to Google,

6  there will be no "excess" for Debtor to return.  Thus, this requirement is also met.

7      Here, all of the conditions identified above demonstrate the Main Uber

8  Payment to be reimbursement of an expense incurred when Debtor worked on

9  behalf of Uber and recruited Google employees to join Uber, such that the Court

10  could find that Debtor would be permitted to deduct "above-the-line" without

11  increasing gross income.[16] The Court may therefore affirm the Tax Order on the

12  alternative ground that the Main Uber Payment is a reimbursement of an employee

13  expense under Section 62 of the Tax Code, and thus properly excluded from

14  Debtor's gross income.

15  **C.**   **Debtor Is Not Judicially Estopped from Raising Arguments**

16     **Relating to the Insurance Treatment of the Main Uber Payment**

17     **for Tax Purposes.**

18      The FTB argues that Debtor is judicially estopped from arguing that the

19  Main Uber Payment is entitled to the tax treatment afforded to insurance.  That

20  argument is forfeited.  *Louisiana-Pacific Corp.,* 909 F.2d at 1264 (9th Cir. 1990);

21

22  [16]      The FTB questioned whether the expense was in fact "compensation or

23  consideration."  It is clear from the record that it was not.  The Indemnification

24  Agreement requires Uber to reimburse Debtor for his "expenses" when Debtor is

  sued, and to pay any judgment against him if he loses the lawsuit.  IRS ER at 126-

25  30.  If the Indemnification Agreement were compensation intended to increase

26  Debtor's wealth, then it would lead to the absurd result that Debtor's compensation

  increases as his liability increases.  Instead, the Indemnification Agreement is more

27  appropriately characterized as a conditional reimbursement.  The Indemnification

28  Agreement was designed not to increase Debtor's wealth but to return him to the

  status quo.

1   *Bolker v. Comm'r*, 760 F.2d at 1042.  The FTB did not make that argument to the

2   Bankruptcy Court, and cannot make it here in the first instance.[17]

3           In any event, the FTB's estoppel argument fails on the merits.  Judicial

4   estoppel typically requires:  (1) a later position that is "clearly inconsistent" with

5   the earlier position, (2) "judicial acceptance" of the later, inconsistent position

6   "create[s] the perception that either the first or second court was misled," and

7   (3) "an unfair advantage or … an unfair detriment on the opposing party" if

8   estoppel does not occur.  *Harbor Breeze Corp. v. Newport Landing Sportfishing,*

9   *Inc.*, 28 F.4th 35, 40 (9th Cir. 2022).

10          None of those conditions is met here.  First, Debtor's positions are not

11  inconsistent.  The fact that Debtor distinguished indemnity from a regulated

12  insurance policy in the prior proceeding—and laws that are limited to such

13  regulated policies—does not establish those earlier arguments are "clearly

14  inconsistent" with Debtor's arguments relating to the Tax Motion.  *E.g.*, IRS ER at

15  100 (lines 16-17) (the Main Uber Payment is "analogous to an insurance payment

16  by an insurance company"), 102 (line 17) ("*like* any traditional 'D&O' insurance

17  policy", emphasis added), and 104 (line 16) ("Because the Indemnification

18  Agreement is analogous to an insurance policy …").  The Tax Motion never

19  argued that the Indemnification Agreement was an insurance policy issued by a

20  regulated insurer; Debtor's argument was (and is) that the transfer of the Main

21  Uber Payment to Google does not constitute income to Debtor for the exact reason

22  that insurance proceeds would have not been income to an insured.  Second, the

23  Bankruptcy Court was not persuaded to accept the merits of the arguments; rather,

24  it simply denied the motion to dismiss on the grounds that it could not rule on the

25  pleadings.  As here, Debtor explained that the Arbitration Award was based on

26

27  [17]    The FTB concedes that it has no idea how the Bankruptcy Court actually
    ruled.  *See* FTB Tax Brief at 33 ("In a sealed decision to which FTB lacks
28  access…")

1   entirely different theories and grounds from the criminal case that had been

2   commenced against him.  RJN-FTB-116 ("Uber's Attempt To Mischaracterize The

3   Final Award As Defining A Felony By Mr. Levandowski Should Be Rejected").

4   The Bankruptcy Court declined to conclude on the pleadings that Debtor was

5   prohibited from any sort of protection, be it indemnity or insurance.  An order

6   denying a motion to dismiss, without more, does not constitute acceptance of a

7   party's overall theory of the case.  Finally, the FTB was not placed at an unfair

8   disadvantage because of Debtor's issue-specific approach to insurance.  The FTB

9   was able to fully express its arguments on why it believed the Main Uber Payment

10  was not an insurance payment excludable from Debtor's gross income.  There is

11  therefore no basis for judicial estoppel.

12  **III.**    **The Confirmation Order Should Be Affirmed.**

13          **A.**    **The Tax Order Should Be Affirmed, Mooting Plan Objections.**

14          Several of the arguments of the Taxing Authorities are premised on the

15  assumption that the Tax Order must be reversed.  *See* IRS Confirmation Brief at 4-

16  7 (Arguments A-C); FTB Confirmation Brief at 14-16 (Argument I).  The Plan is

17  indeed premised (and the Confirmation Order finds) that the Main Uber Payment is

18  not taxable.

19          **B.**    **The Bankruptcy Court Did Not Clearly Err or Abuse Its**

20          **Discretion in Concluding that There Were Adequate Funds to Pay**

21          **Taxes Unrelated to the Main Uber Payment.**

22          The Taxing Authorities contend that the remaining reserve does not include

23  funds for the payment of taxes with administrative expense priority, but that is

24  wrong.  The only pertinent evidence, the declaration of Debtor's financial advisor,

25  confirmed that the post-Confirmation Trust would be able to meet "federal and

26  state tax obligations," except for those obligations arising from the Main Uber

27  Payment.  ER-FTB-0714-15.  The Bankruptcy Court certainly did not abuse its

28  discretion in confirming the Plan on the basis of this representation after issuing

the Tax Order, nor is there any basis to conclude that the court clearly erred in finding that adequate funds for the payment of taxes with administrative expense priority existed.  To the extent that the Taxing Authorities argue or suggest that the Plan does not provide for payment of taxes unrelated to the Main Uber Payment, that argument is plainly incorrect.[18]

**C.**     **There Is No Basis for the Taxing Authorities' Argument that Debtor Is Not Committing His Future Income to the Payment of Claims.**

The Plan provides that Debtor will, in his individual capacity, make the "Individual Commitment" pursuant to which he agrees to guarantee payment within three years, on a nondischargeable basis, $25 million against assets valued at $13.8 million.  *See* IRS ER at 156 (describing Debtor's obligation to fund the Individual Commitment); ER-FTB-0717 (valuation of assets with which to pay such commitment at $13.8 million).  Thus, the evidence shows that Debtor has committed all of his prospective income to paying claims.  *See id.* at ER-FTB-0715 (concluding that Debtor will be required to commit "more than his projected disposable income for the next five years" to fulfill his plan obligations).  The Confirmation Order contains an evidentiary finding that "the Plan requires Debtor to contribute earnings from personal services performed by Debtor after the commencement of the Case and other future income of Debtor, as is necessary for the execution of the Plan."  IRS ER at 473 (finding J(9)); *see also* ER-FTB-0786-87 (lines 24-2) ("I find that this argument is addressed adequately by Mr. Soong's

---

[18]     The IRS Confirmation Brief at 6:4-8, and at note 5, notes certain income was received, with the suggestion that it was unexpected and for which there was no reserve.  In fact, the "CLAT Settlement" yielded $7.2 million to the estate which, as Mr. Soong's declaration and attachment thereto indicates, was included in the analysis and for which a tax reserve was established.  The Confirmation Order separately confirms that the reserves are sufficient and is supported by the Soong Declaration.

1  declaration, which convinces me that [Debtor] is, in fact, contributing such portion

2  of his post-petition earnings as is necessary to effectuate the plan"). There is no

3  error, never mind clear error, with this aspect of the Plan Confirmation.

### D.   The Taxing Authorities' Right to Set Off Prepetition Claims Is Preserved.

6      The Taxing Authorities argue that their setoff rights, preserved under section

7  553, are not adequately protected. IRS Confirmation Brief at 8:14 to 10:7; FTB

8  Confirmation Brief at 16-19. They misapprehend the scope of section 553. The

9  right of setoff permits a creditor (here, the Taxing Authority) to offset "a mutual

10  debt owing by such creditor" (here, for instance, a tax refund) *if such debt "arose*

11  *before the commencement of the case*." 11 U.S.C. § 553; *Gardens Reg'l Hosp. &*

12  *Med. Ctr. Liquidating Tr. v. California (In re Gardens Reg'l Hosp. & Med. Ctr.)*,

13  975 F.3d 926, 933 (9th Cir. 2020); *compare* 11 U.S.C. § 362 (b)(26) (permitting

14  setoff of a tax refund *only* "for a taxable period that ended before" the case was

15  filed). Thus, if *on a prepetition basis* Debtor owed the Taxing Authorities

16  $500,000 and they owed Debtor a refund of $400,000, they could exercise its right

17  of setoff under section 553, extinguish their $400,000 obligation to Debtor, and

18  have a net claim against Debtor of $100,000. Conversely, if *on a prepetition basis*

19  Debtor owed the Taxing Authorities $400,000 and they owed Debtor a refund of

20  $500,000, they could exercise their right of setoff under section 553, extinguish

21  80% of the refund liability, and have a net obligation to Debtor of $100,000.

22      The Plan reserves rights of claimants to assert a setoff as part of the claims

23  resolution process set forth in Section X of the Plan. Thus, if a Taxing Authority

24  wishes to assert a right of setoff against a refund payable to Debtor *on a prepetition*

25  *basis* and thereby reduce its claim it is permitted to do so (subject to the Trustee's

26  right to challenge). Thus, the Taxing Authorities will be unable to identify a single

27  instance in which a right to set off a prepetition refund payable to the Trust against

28

1   the Trust's obligation to such Taxing Authority because such rights are preserved
2   under the Plan.

3   **E.**     **The Principal Purpose of the Plan Was Not the Avoidance of**
4           **Taxes.**

5           The IRS challenges the purpose of the Plan and, in particular, whether its
6   "principal purpose" is the avoidance of taxes.  Courts interpret "principal purpose"
7   narrowly, to mean the "most important purpose."  *In re Main St. AC, Inc.*, 234 B.R.
8   771, 775 (Bankr. N.D. Cal. 1999) (citing *In re Rath Packing*, 55 B.R. 528, 536
9   (Bankr. N.D. Iowa 1985)).  It is the IRS's burden to prove improper purpose.  *In re*
10  *Main St. AC*, 234 B.R. at 775.

11          The IRS failed to meet that burden.  The history of the Chapter 11 Case
12  leaves no doubt as to the reasons the Chapter 11 Case was filed, what occurred
13  during the two years that it was pending, the settlement negotiations and
14  economics, and the necessity for the Plan.  *See generally* IRS ER at 159-68.

15          The Bankruptcy Court flatly rejected the arguments the IRS now makes.
16  Indeed, the Confirmation Order states that "The principal purpose of the Plan is
17  neither the avoidance of taxes nor the avoidance of the application of section 5 of
18  the Securities Act of 1933."  IRS ER at 477 (finding J(28)); *see also* ER-FTB-0785
19  (lines 13-16) ("The IRS argues that the plan violates Section 1129(d) because its
20  principal purpose is the avoidance of taxes.  That is simply untrue, and I reject it
21  [and] overrule the objection.")  Its decision is supported by the evidentiary record,
22  known to the Bankruptcy Court after over two years of proceedings.  The
23  Bankruptcy Court correctly found—and thus did not clearly err—in finding that
24  the Plan was not designed to avoid taxes, and it acted well within its discretion to
25  confirm the Plan based upon this finding.

26  ///
27  ///
28  ///

## <u>CONCLUSION</u>

For the foregoing reasons, the Tax Order and the Confirmation Order should be affirmed.

Dated: October 24, 2022          **GOODWIN PROCTER LLP**

**KELLER BENVENUTTI KIM LLP**

By:   /s/ *Dara L. Silveira*
        Dara L. Silveira
        *Attorneys for the Appellees*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Bankruptcy, rule 8015(a)(7)(B)(i) the undersigned counsel for the Appellees hereby certifies that the Appellees' Omnibus Brief in Response to Opening Briefs of the United States and Franchise Tax Board [Tax and Confirmation Appeals] is printed in fourteen (14) point Times New Roman font and that based on the Microsoft Word computer word count function, excluding those parts of the brief not included in the word count by rule 8015(g), the text in the Appellee's Brief contains no more than 13,000 words.

*/s/ Dara L. Silveira*
Dara L. Silveira