**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California  94108
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

**GOODWIN PROCTER LLP**
BRETT M. SCHUMAN (Cal. Bar No. 189247)
(BSchuman@goodwinlaw.com)
JENNIFER BRIGGS FISHER (Cal. Bar No. 241321)
(JFisher@goodwinlaw.com)
Three Embarcadero
San Francisco, California 94111
Telephone: (415) 733-6000
Facsimile: (415) 677-9041

*Attorneys for Appellees*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>Reorganized Debtor. | Case Nos. 4:22-cv-02781-YGR;<br>4:22-cv-02783-YGR;<br>4:22-cv-02786-YGR; and<br>4:22-cv-02789-YGR<br>(Jointly Administered)<br><br>On Appeal from Bankruptcy Court Case No. 3:20-bk-30242-HLB |
| The United States of America, on behalf of the Internal Revenue Service, and California Franchise Tax Board,<br><br>Appellants,<br><br>v.<br><br>The Levandowski Residual Liquidation Trust, as successor to the Debtor in Possession, and Anthony S. Levandowski,<br><br>Appellees. | **APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD** |

1        Appellees Levandowski Residual Liquidation Trust and Anthony S. Levandowski hereby

2  submit these supplemental excerpts of record (the "SER") as an appendix pursuant to Rule

3  8018(b) of the Federal Rules of Bankruptcy Procedure.

| SER Exhibit | SER Pages | Document | Date | Bankruptcy Reference |
|---|---|---|---|---|
| 1. | 0001-0051 | Google Arbitration Demand | October 28, 2016 | Adversary Proceeding (Case No. 20-03050) Docket No. 1-7 |
| 2. | 0052-0123 | Corrected Final Award, JAMS Arbitration Case Reference No. 1100086069 (Redacted) | December 23, 2019 | Adversary Proceeding (Case No. 20-03050) Docket No. 16-1[1] |
| 3. | 0124-0143 | Deposition Transcript of Cameron Poetzscher (excerpts) | June 19, 2017 | Docket No. 948[2] |
| 4. | 0144-0153 | Deposition Transcript of Cameron Poetzscher (excerpts) | January 26, 2021 | Docket No. 948 |
| 5. | 0154-0157 | Supplemental Disclosures in Support of Motion Pursuant To 11 U.S.C. §§ 105(A) And 363(B) And Fed. R. Bankr. P. 9019 for Entry of Orders Approving (I) The Settlement Between the Debtor, Uber Technologies, Inc., and Google LLC; (II) The CLAT Settlement; (III) The Plan Support Agreement Between the Debtor and Google; and (IV) Granting Related Relief | March 1, 2022 | Docket No. 867 |

---

[1]      SER Exhibit 2 was filed in the Adversary Proceeding with redactions.  Appellee is moving concurrently herewith for this Court to accept the unredacted version of Exhibits 2 and 10 and the unsealed versions of Exhibits 7-9.

[2]      SER Exhibits 3 and 4 initially were filed under seal before the Bankruptcy Court; the withheld versions are included in the appellate record at IRS ER Exhibit 7.  The Debtor subsequently filed unredacted versions at Bankruptcy Docket No. 948.

| SER Exhibit | SER Pages | Document | Date | Bankruptcy Reference |
|---|---|---|---|---|
| 6. | 0158-0162 | Ex Parte Motion to Reinstate Hearing on Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019 for Entry of Orders (I) Approving Settlement Between the Debtor, Uber Technologies, Inc., and Google LLC; (II) the CLAT Settlement; (III) the Plan Support Agreement Between the Debtor and Google; and (IV) Granting Related Relief | March 1, 2022 | Docket No. 872 |
| 7. | 0163 | Transcript of March 3, 2022 Hearing (Sealed) | March 3, 2022 | n/a |
| 8. | 0164 | Transcript of March 10, 2022 Hearing (Sealed) | March 10, 2022 | n/a |
| 9. | 0165 | Transcript of March 11, 2022 Hearing (Sealed) | March 11, 2022 | n/a |
| 10. | 0166-0168 | Liquidation Analysis | March 29, 2022 | Docket No. 940-1 |

Dated:  October 24, 2022

**GOODWIN PROCTER LLP**
**KELLER BENVENUTTI KIM LLP**

By: /s/ *Dara L. Silveira*

Dara L. Silveira

*Attorneys for Appellees*

# Appellees' Exhibit 1

# Exhibit D

# Part 1 of 2

ER-Trust-0002

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)    Add more respondents on page 6

**RESPONDENT NAME** Anthony Scott Levandowski

**ADDRESS** 2330 Cowper Street

**CITY** Palo Alto     **STATE** CA     **ZIP** 94301

**PHONE**     **FAX**     **EMAIL** levandowski@gmail.com

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**     **STATE**     **ZIP**

**PHONE**     **FAX**     **EMAIL**

## FROM CLAIMANT    Add more claimants on page 7.

**CLAIMANT NAME** Google Inc.

**ADDRESS** 1600 Amphitheatre Parkway

**CITY** Mountain View     **STATE** CA     **ZIP** 94043

**PHONE**     **FAX**     **EMAIL**

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY** Robert Van Nest & Rachael Meny

**FIRM/ COMPANY** Keker & Van Nest LLP

**ADDRESS** 633 Battery Street

**CITY** San Francisco     **STATE** CA     **ZIP** 94111

**PHONE** 415-391-5400 **FAX** 4153977188 **EMAIL** rmeny@kvn.com

JAMS Demand for Arbitration Form     Page 2 of 7

ER-Trust-0003



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Arbitration Demand (Attachment A).

AMOUNT IN CONTROVERSY (US DOLLARS)

JAMS Demand for Arbitration Form                                             Page 3 of 7

ER-Trust-0004



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

##### ARBITRATION PROVISION LOCATION

The following relevant agreements contain arbitration provisions:

1. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment B, "Robots Agreement"), at Paragraph 9.

2. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment C, "510 Agreement"), at Paragraph 9.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING
##### REQUESTED LOCATION    Santa Clara, California

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
**See: Comprehensive Rule 16.1**

☐   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION
SIGNATURE   *[signature]*                    DATE   10/28/2016

NAME
(PRINT/TYPED)    Rachael E. Meny

---

JAMS Demand for Arbitration Form                                         Page 4 of 7

ER-Trust-0005



# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims initiated in California</u>.

## CONSUMER ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION as defined by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):*

☐ **YES**, this is a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ **NO**, this is not a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements

1. The contract is with a consumer party, as defined in these standards.
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.**

JAMS Demand for Arbitration Form                                                                      Page 5 of 7

ER-Trust-0006



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME

ADDRESS

CITY                                STATE                 ZIP

PHONE                FAX            EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                                STATE                 ZIP

PHONE                FAX            EMAIL

RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT NAME

ADDRESS

CITY                                STATE                 ZIP

PHONE                FAX            EMAIL

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                                STATE                 ZIP

PHONE                FAX            EMAIL

Case: 20-03050   Doc# 1-7   Filed: 07/16/20   Entered: 07/16/20 16:57:01   Page 6 of 25

ER-Trust-0007

 # Demand for Arbitration Form (continued)

### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY                                          STATE                    ZIP

PHONE                        FAX            EMAIL

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                                          STATE                    ZIP

PHONE                        FAX            EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY                                          STATE                    ZIP

PHONE                        FAX            EMAIL

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                                          STATE                    ZIP

PHONE                        FAX            EMAIL

---

ER-Trust-0008

# ATTACHMENT A

ER-Trust-0009



KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
RACHAEL E. MENY - #178514
rmeny@kvn.com
JENNIFER A. HUBER - #250143
jhuber@kvn.com
THOMAS E. GORMAN - #279409
tgorman@kvn.com
W. HAMILTON JORDAN - #295004
wjordan@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Claimant
GOOGLE INC.

BEFORE JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)

| | |
|---|---|
| GOOGLE INC.,<br><br>          Claimant,<br><br>     v.<br><br>ANTHONY LEVANDOWSKI,<br><br>          Respondent. | **CONFIDENTIAL**<br><br>**ARBITRATION DEMAND** |

ARBITRATION DEMAND

CONFIDENTIAL

1121952

ER-Trust-0010

## I.    INTRODUCTION

1.     Claimant Google Inc. ("Google") brings this arbitration demand against a former senior employee, Respondent Anthony Levandowski.  While Levandowski was still on Google's payroll, he breached his contractual obligations and duties to Google by building a company that would ultimately compete with Google's self-driving car project.  Levandowski's acts included, among other things, a campaign during his employment at Google to use Google's confidential information regarding the unique skills, experiences and compensation packages of Google employees and contractors to lure them from Google to a new, competing venture named OttoMotto LLC ("Otto").

2.     Levandowski assisted and/or developed competing companies during his time at Google even though his obligations to, and agreements with, Google prohibited him from taking such actions, including, among other things, by prohibiting him from soliciting Google employees and consultants to join another company during his employment at Google and prohibiting him from engaging in activities that would compete with Google.

3.     As one example of Levandowski's violations of these obligations and agreements, beginning at least in the late Summer or Fall 2015, Levandowski embarked on a campaign to unlawfully use confidential Google information to target and recruit valuable Google employees by soliciting them and inducing them to leave Google to join a different company in the self-driving space.  That company would ultimately become Otto.  Levandowski concealed his conduct from Google management, a concealment that allowed him to profit greatly.  Among other things, this concealment allowed Levandowski to ultimately collect over $120 million in incentive payments from Google for his supposed contributions to Google's self-driving car project—all while he was breaching his obligations to Google and building a company that would compete with Google.

4.     Google brings this demand to obtain damages for, and to put an end to, Levandowski's breaches of contract.

5.     This demand for arbitration is closely related to Google's concurrently-filed arbitration demand against both Respondent Levandowski and Otto co-founder and former

1
ARBITRATION DEMAND
**CONFIDENTIAL**

1121952

ER-Trust-0011

1  Google employee Lior Ron ("Joint Demand").  The Joint Demand asserts claims for breach of

2  contract and tortious acts that arise under, or relate to, the Google employment agreements

3  entered into by Levandowski and Ron.

4       6.    Google brings this separate demand under contracts that Levandowski signed in

5  2011 in connection with Google's purchase of two companies founded by Levandowski.  As set

6  forth in this demand, Levandowski has breached at least two of those contracts:  (1) a "Non-

7  Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's

8  Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and (2) a

9  "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510

10  Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

11       7.    Out of an abundance of caution, Google brings these claims as a separate,

12  confidential Demand because the Robots Agreement and 510 Agreement each contain a

13  confidentiality clause requiring Levandowski and Google to treat as confidential any disputes

14  arising out of those agreements.[1]

15  **II.**    **FACTUAL ALLEGATIONS**

16      **A.**    **Respondent Anthony Levandowski**

17       8.    Google hired Respondent Anthony Levandowski as an engineer in April 2007.

18  Towards the end of his tenure at Google, Levandowski managed the team of engineers on

19  Google's self-driving car project that developed Google's LiDAR sensors, sensors that are crucial

20  to Google's development of a self-driving car.  Levandowski abruptly resigned from Google on

21  January 27, 2016, without prior notice.  On information and belief, Levandowski is now a co-

22  founder, and employee, of Otto.

23      **B.**    **Respondent Anthony Levandowski's Purchase Agreements with Google**

24       9.    During his employment with Google, in October 2011, Respondent Levandowski

25  sold two companies to Google:  510 Systems, LLC and Anthony's Robots, LLC.  In return for

26

27    [1] Assuming that procedural distinctions in the arbitration agreements at issue can be reconciled

28  (including that with respect to confidentiality of the dispute), Google intends to seek consolidation of the Joint Demand and this Demand into a single arbitration proceeding.

2

**ARBITRATION DEMAND**

**CONFIDENTIAL**

1121952

ER-Trust-0012

1   receiving significant payments for these two companies, Levandowski promised that he would

2   not solicit Google employees and consultants for outside ventures during his employment with

3   Google and that he would not compete with Google.

4        10.    Google is informed and believes that Levandowski breached both the non-

5   competition and non-solicitation provisions contained in the Robots Agreement and 510

6   Agreement. Google has recently discovered that, during his continued employment with Google,

7   Levandowski became involved in several competing side businesses.

8        **C.**    **Odin Wave/Tyto Lidar**

9        11.    On information and belief, Levandowski's involvement in competing side

10  businesses which violated the Robots Agreement and 510 Agreement began by at least 2013.

11        12.    Google is now informed and believes that, during Levandowski's tenure at

12  Google, he was involved in competing side businesses, including enterprises known as Odin

13  Wave, LLC ("Odin Wave") and Tyto Lidar LLC ("Tyto").

14        13.    Odin Wave was incorporated in or around August 2012. The physical address

15  used for Odin Wave was 2201 Dwight Way in Berkeley, California. On information and belief,

16  2201 Dwight Way is owned by Levandowski.

17        14.    In July 2013, a Google hardware vendor contacted a Google employee to inform

18  him that, on information and belief, a company named Odin Wave had just submitted an order for

19  a custom-fabricated part that was similar to a part used by Google in its unique and proprietary

20  laser technology for self-driving vehicles.

21        15.    After receiving this call, two Google employees investigated Odin Wave and

22  discovered that there appeared to be several connections between Levandowski and Odin Wave.

23  Those connections included Odin Wave's location at 2201 Dwight Way. Levandowski was

24  questioned about his affiliation with Odin Wave in mid-2013 but denied having any ownership

25  interest in Odin Wave.

26        16.    Google is now informed and believes that, by February 2014, Odin Wave LLC

27  merged with an entity named Tyto Lidar LLC ("Tyto"). Public records list Ognen Stojanovski as

28

3

ARBITRATION DEMAND

**CONFIDENTIAL**

1121952

ER-Trust-0013

1   the manager of Tyto Lidar.  On information and belief, Stojanovski is friends with Levandowski

2   and worked with Levandowski on an early, self-driving vehicle prototype.

3           17.     On information and belief, Odin Wave/Tyto was developing LiDAR sensor

4   modules which can be used in self-driving vehicles.

5           18.     Google is now informed and believes that Levandowski had some involvement

6   with Odin Wave/Tyto since at least 2013 at the same time that he was working on Google's

7   development of LiDAR sensor modules.

8           19.     In or around Spring 2015, Google—seeing a potential overlap between Tyto's

9   technology and Google's development goals for self-driving technology—began investigating

10   whether to begin buying or using Tyto's products.

11           20.     Google also investigated whether to purchase Tyto.

12           21.     Levandowski participated in Google's investigation into Tyto's products and

13   business, including at least one site visit to Tyto headquarters.  Based on information and belief,

14   he was privy to Google's impressions of Tyto's products and process, including Google's

15   confidential opinion of Tyto's technology and the viability of Tyto's business.  Throughout this

16   process, Levandowski never disclosed a relationship with Tyto and its employees.  Based on

17   information and belief, Google now believes that Levandowski in fact had a relationship with

18   Tyto and its employees that conflicted with Levandowski's duties to Google.

19           22.     Google's interest in Tyto's products carried over into 2016, including beyond

20   Levandowski's departure from Google.

21           23.     Google is informed and believes that at least by May 18, 2016, Tyto Lidar LLC

22   had merged with Otto.

23       **D.     Otto**

24           24.     Google is also informed and believes that, in 2015, Levandowski began executing

25   a plan to compete with Google in the self-driving vehicle space, while he was still employed by

26   Google.

27

28

4

ARBITRATION DEMAND

**CONFIDENTIAL**

1121952

ER-Trust-0014

25.     Google is informed and believes that Levandowski's plan—which he hatched with Google colleague Lior Ron—included taking employees and consultants from Google, including employees and consultants with access to Google confidential information and trade secrets.

26.     Because Levandowski was believed to be a trusted agent of Google, Google shared confidential information with him about Google employees, including the employees' unique skills, work experiences, responsibilities, compensation, and work performance.  Prior to Levandowski's and Ron's resignations, on information and belief, Levandowski misused this confidential Google information, including while actively soliciting Google employees to leave for his competing venture, Otto.

27.     Google is informed and believes that, at the time Levandowski began taking steps to create a competing company and staff it with Google employees and contractors, Levandowski had not yet become eligible for, or received payment of, a substantial incentive payment related to his work on Google's self-driving car project.

28.     Google is informed and believes that, in approximately August 2015, Levandowski told some Google colleagues that he had been asked to "transfer a group of people" from Google's self-driving car project to a competing company.  Levandowski then attempted to solicit Google colleagues to leave Google and join Levandowski's efforts to "transfer" other employees to this competing company.

29.     In late Summer 2015, one of the managers of Google's self-driving car project heard rumors of Levandowski's on-going solicitation efforts and sought to terminate Levandowski for this disloyalty.  Google, however, could not confirm Levandowski's solicitation efforts at the time, and he was not terminated.

30.     On information and belief, Levandowski took steps to conceal his competing and solicitation activities from Google management, in part to ensure that he received payment of the substantial incentive payment from Google.  Indeed, Levandowski did not publicly release full details of his competing company until after he received the final payout of this incentive payment following his departure from Google.

5
ARBITRATION DEMAND
**CONFIDENTIAL**

1121952

ER-Trust-0015

31.     Google is informed and believes that, by Fall 2015, Levandowski had approached, and/or had begun working with, Ron to lay the foundation for their new competing company.  In Fall 2015, Levandowski and Ron settled on a name ("280 Systems") for their new company and took steps to bring this company to fruition.  That company—280 Systems—would later be renamed Otto.

32.     Google is also informed and believes that Levandowski's and Ron's efforts to develop a competing company persisted through late 2015 and into early 2016.  Google is informed and believes that, by approximately December 2015, Levandowski again began approaching Google employees about leaving Google and asking them to help start a new company focusing on self-driving vehicles.

33.     Google is informed and believes that, by January 2016, Levandowski had increased and expanded his solicitations of Google employees.  As part of these efforts, Levandowski made repeated efforts to solicit many of his direct reports to leave Google.  Levandowski's solicitations occurred both during the work day and outside of the work day, including at numerous times when Levandowski solicited individuals on the Google campus.  On at least some occasions, Levandowski also used his managerial role on Google's self-driving car project to solicit his direct reports during the private 1-on-1 meetings he held with various Google employees and to encourage his direct reports to leave Google during other meetings.

34.     Google is informed and believes that Levandowski took other steps to hide his efforts to set up a competing company from Google.  Levandowski's steps included, but are not limited to, instructing Google employees not to discuss Levandowski's business or recruitment efforts via company email or on other company systems.

35.     Google is informed and believes that, in January 2016, Levandowski and Ron also hosted at least two off-site meetings at Levandowski's Palo Alto home with the goal of persuading numerous Google employees to leave Google and join Levandowski and Ron's new venture.  Both Levandowski and Ron set up these meetings, attended them, and led them.  At least one such meeting occurred while Levandowski and Ron were Google employees, and both meetings occurred during Levandowski's employment at Google.

6
ARBITRATION DEMAND

**CONFIDENTIAL**

ER-Trust-0016

36. Google is informed and believes that Levandowski used these January 2016 meetings and solicitation efforts to encourage Google employees to depart Google and move to his competing venture.

37. On information and belief, acting in concert with a 280 Systems recruiter, Levandowski also sought to induce Google employees to sign written employment agreements that obligated them to quit Google and commence work immediately.

38. Google is informed and believes that Levandowski's and Ron's plan to develop a competing business included an effort to have the "entire" Laser Team on Google's self-driving car project to quit Google en masse in January 2016 and join Levandowski and Ron at their new venture. Levandowski encouraged a large group of Google employees to resign without prior notice, and upon specific day(s) designated by Levandowski and Ron.

39. Google is further informed and believes that Levandowski and Ron encouraged and/or assisted others, including both Google employees and third parties associated with 280 Systems/Otto, to solicit Google employees and contractors to leave Google for 280 Systems/Otto.

E. **Levandowski's Actions Caused Damage to Google.**

40. Levandowski's efforts to set up competing business(es) and to solicit Google employees and contractors to leave Google for his Otto business have harmed Google. This harm has included, but is not limited to, lost employees and contractors, recruiting and retention costs, and numerous other costs and damages.

41. For example, Levandowski's campaign to create a competing company named Otto and to solicit Google's employees and contractors to leave Google for Otto was a partial success. Beginning in January 2016, and continuing through at least September 2016, numerous employees and contractors have left Google to join Otto. Google is informed and believes that many—if not all—of these departures are attributable to the solicitation campaign that Levandowski initiated and spearheaded, with Ron, while he was a Google employee.

42. Google is also informed and believes that Levandowski's efforts to solicit employees and contractors from Google have continued following his departure from Google. Among other things, Levandowski provided information to Google employees about other Otto

7

ARBITRATION DEMAND

CONFIDENTIAL

agents who continued to solicit Google employees and contractors to leave and join Levandowski at his new company. As a result of Levandowski's actions, Google has spent significant time and money persuading Google employees and contractors to reject Levandowski's solicitation efforts. Google ultimately has been able to convince numerous employees and contractors to stay with Google, but only after devoting significant time and resources to this effort and, in some instances, providing incentives to stay.

43.    Google has incurred significant costs to search for and obtain replacements for the Google employees and contractors who have left for employment at Otto.

**F.    Levandowski and Ron Sell Otto to Uber**

44.    Given the unique training, experience, and skills of Google's employees and contractors in the self-driving space, Levandowski's campaign to lure employees and contractors away from Google enabled Levandowski and Ron to rapidly grow and profit from their new, competing venture.

45.    Google is informed and believes that Uber acquired Otto in Summer 2016. Uber reportedly paid approximately $680 million up front for the several month old company, plus a stream of future compensation. Uber recently announced that Levandowski will be in charge of Uber's self-driving-car project, and Uber has presented Levandowski as the new face of that competing project in a series of media interviews.[2]

46.    Google is informed and believes that Levandowski was able to jumpstart his Otto business, and able to obtain such a lofty acquisition price for Otto, only because of Levandowski's breaches as described in this Statement of Claims, including his taking key talent from Google's self-driving project, and such other conduct as may be established at hearing.

---

[2] *See, e.g.*, https://newsroom.uber.com/rethinking-transportation/ ("Anthony Levandowski, Otto's co-founder, will now lead our combined self-driving efforts ...."); https://www.theguardian.com/technology/2016/aug/19/self-driving-car-anthony-levandowski-uber-otto-google ("Uber just announced that self-driving cars will start pick up passengers later this month in Pittsburgh. And the man leading the project ...? Anthony Levandowski."); http://www.bloomberg.com/news/features/2016-08-18/uber-s-first-self-driving-fleet-arrives-in-pittsburgh-this-month-is06r7on ("When the Otto acquisition closes, likely this month, Otto co-founder Levandowski will assume leadership of Uber's driverless car operation.").

Case: 20-03050   Doc# 1-7   Filed: 07/16/20   Entered: 07/16/20 16:57:01   Page 17 of 25

ER-Trust-0018

## FIRST CAUSE OF ACTION

### Breach of Contract

47.    Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

48.    Levandowski and Google entered into numerous valid contracts in connection with Google's purchase of two companies owned by Levandowski.  Levandowski has breached at least two of those contracts:  (1) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and, (2) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510 Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

49.    Google fully performed its obligations under these Agreements.

50.    Levandowski breached his obligations under the Robots Agreement and the 510 Agreement in in numerous ways, including but not limited to:

Non-Solicitation Agreements

51.    During his employment at Google, Levandowski was prohibited by contract from soliciting Google employees or consultants to leave Google or terminate their provision of services to Google.

52.    By entering the Robots Agreement, Levandowski promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to leave Google or to take away other employees or consultant.  This obligation applied until the end of Levandowski's employment with Google.

53.    Under the 510 Agreement, Levandowski also promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to engage in a competing business.  This obligation also applied until the end of Levandowski's employment with Google.

9

ARBITRATION DEMAND

CONFIDENTIAL

1121952

ER-Trust-0019

54. Levandowski breached the non-solicitation obligations set forth in the 510 Agreement and Robots Agreement during his employment with Google.

55. Levandowski's breaches of his non-solicitation obligations caused significant harm to Google, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees, and causing Google to pay retention bonuses to fend off his solicitation efforts.

Non-Competition Agreements

56. The Robots Agreement and 510 Agreement each also prohibit Levandowski from competing with Google for at least two years following Google's purchase of 510 Systems and Anthony's Robots, which occurred on October 7, 2011.

57. The Agreements further provide that if Levandowski breaches his non-competition obligations, the two-year term of those obligations "shall be extended by the period of the duration of such breach."

58. In particular, the 510 Agreement bars Levandowski from "directly or indirectly . . . engag[ing]" in any "Competing Business Purpose," which is defined as any "business or enterprise (including research and development), operations, activities or services that (i) are related to the design, development, manufacture or commercialization [of] positioning, navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics technologies, or (ii) provides the products and services of [Google] as such exist or are contemplated as of the Closing date."

59. The 510 Agreement also bars Levandowski from any involvement with any person "or business that engages or participates in a Competing Business Purpose," including a prohibition on Levandowski from being or becoming "an officer, director, member, stockholder, owner, affiliate, salesperson, co-owner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to [that person or business], or to otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of [that person or business]."

10

**ARBITRATION DEMAND**

**CONFIDENTIAL**

ER-Trust-0020

60.     The Robots Agreement contains similar restrictions, but defines a "Competing Business Purpose" as any "business or enterprise (including research and development), operations, activities or services that . . . are related to the design, development, manufacture or commercialization of autonomous vehicles or any technologies for use in autonomous vehicles."

61.     Google is informed and believes that Levandowski breached all of these non-competition obligations during their initial two-year terms through his improper moonlighting activities, including—but not limited to—his involvement in Odin Wave/Tyto.

62.     Google is informed and believes that Levandowski was in continuous breach of these agreements beginning before October 7, 2013 and continuing at least throughout his employment at Google.

63.     Google is also informed and believes that Levandowski was in further breach of these non-competition obligations as a result of his Otto-related activities, which began by at least August 2015.

64.     Levandowski's breaches of his contractual non-competition obligations harmed Google in numerous ways, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees, and causing Google to pay retention bonuses to fend off his solicitation efforts.

**III.     STATEMENT OF REMEDIES SOUGHT**

WHEREFORE, Claimant Google respectfully requests the following relief:

1.      Judgment in Google's favor and against Levandowski on all causes of action alleged herein;

2.      For damages in an amount to be proven at an arbitration hearing;

3.      For injunctive relief;

4.      For prejudgment and post-judgment interest; and

5.      For such other and further relief as the Arbitrator may deem to be just and proper.

11
. ARBITRATION DEMAND

CONFIDENTIAL

1121952

ER-Trust-0021

Dated: October 28, 2016

KEKER & VAN NEST LLP

By:   */s/ Rachael E. Meny*
ROBERT A. VAN NEST
RACHAEL E. MENY
JENNIFER A. HUBER
THOMAS E. GORMAN
W. HAMILTON JORDAN

Attorneys for Claimant
GOOGLE INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12

ARBITRATION DEMAND

CONFIDENTIAL

ER-Trust-0022



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

**TO RESPONDENT** (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)                    Add more respondents on **page 6**.

| | |
|---|---|
| RESPONDENT NAME | Anthony Scott Levandowski |
| ADDRESS | 2330 Cowper Street |

| CITY | Palo Alto | STATE | CA | ZIP | 94301 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | levandowski@gmail.com |
|---|---|---|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/COMPANY

ADDRESS

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

**FROM CLAIMANT**                                              Add more claimants on **page 7**.

| | |
|---|---|
| CLAIMANT NAME | Google Inc. |
| ADDRESS | 1600 Amphitheatre Parkway |

| CITY | Mountain View | STATE | CA | ZIP | 94043 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Robert Van Nest & Rachael Meny |
|---|---|
| FIRM/COMPANY | Keker & Van Nest LLP |
| ADDRESS | 633 Battery Street |

| CITY | San Francisco | STATE | CA | ZIP | 94111 |
|---|---|---|---|---|---|

| PHONE | 415-391-5400 | FAX | 4153977188 | EMAIL | rmeny@kvn.com |
|---|---|---|---|---|---|

---

ER-Trust-0023



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Arbitration Demand (Attachment A).

AMOUNT IN CONTROVERSY (US DOLLARS)

ER-Trust-0024



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

### ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach two copies of entire agreement.**

#### ARBITRATION PROVISION LOCATION

The following relevant agreements contain arbitration provisions:

1. Google/Levandowski Project Chauffeur Development Team Offer Amendment Letter (Attachment B, "Project Chauffeur Letter") and Exhibit B thereto, which is an At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement, at Paragraph 14.

2. Google/Levandowski At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement (Attachment C, "2009 Levandowski Employment Agreement"), at Paragraph 15.

3. Google/Ron At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement (Attachment D, "Ron Employment Agreement"), at Paragraph 12.

### RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.**

### REQUEST FOR HEARING

REQUESTED LOCATION   Santa Clara, California

### ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
See: **Comprehensive Rule 16.1**

☐   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

### SUBMISSION INFORMATION

SIGNATURE   *Rachael E. Meny / R. Glen*            DATE   10/28/2016

NAME
(PRINT/TYPED)   Rachael E. Meny

---

JAMS Demand for Arbitration Form                                              Page 4 of 7

ER-Trust-0025



# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims initiated in California</u>.

## CONSUMER ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION as defined by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*:

☐ **YES**, this **is** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ **NO**, this **is not** a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000    ☐ $100,000 to $250,000    ☐ More than $250,000    ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

ER-Trust-0026

# EXHIBIT D

# Part 2 of 2

ER-Trust-0027



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

**RESPONDENT NAME** Lior Ron

**ADDRESS** 427 Tennyson Avenue

**CITY** Palo Alto      **STATE** CA      **ZIP** 94301-3838

**PHONE**      **FAX**      **EMAIL** lioron@gmail.com

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

**RESPONDENT NAME**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

ER-Trust-0028



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY                    STATE             ZIP

PHONE          FAX          EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                    STATE             ZIP

PHONE          FAX          EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY                    STATE             ZIP

PHONE          FAX          EMAIL

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                    STATE             ZIP

PHONE          FAX          EMAIL

---

JAMS Demand for Arbitration Form                                    Page 7 of 7

ER-Trust-0029

# ATTACHMENT A

ER-Trust-0030

1   KEKER & VAN NEST LLP
    ROBERT A. VAN NEST - #84065
2   rvannest@kvn.com
    RACHAEL E. MENY - #178514
3   rmeny@kvn.com
    JENNIFER A. HUBER - #250143
4   jhuber@kvn.com
    THOMAS E. GORMAN - #279409
5   tgorman@kvn.com
    W. HAMILTON JORDAN - #295004
6   wjordan@kvn.com
    633 Battery Street
7   San Francisco, CA 94111-1809
    Telephone:    415 391 5400
8   Facsimile:    415 397 7188

9   Attorneys for Claimant
    GOOGLE INC.

10

11              BEFORE JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)

12

13  GOOGLE INC.,

14              Claimant,                       **ARBITRATION DEMAND**

15          v.

16  ANTHONY LEVANDOWSKI and
    LIOR RON,

17              Respondents.

18

19

20

21

22

23

24

25

26

27

28

ARBITRATION DEMAND

ER-Trust-0031

## I.   INTRODUCTION

1.      Claimant Google Inc. ("Google") brings this arbitration demand against two former, senior employees, Respondents Anthony Levandowski and Lior Ron (collectively "Respondents"). While Levandowski and Ron were still on Google's payroll, they breached their contractual obligations and duties to Google by building a company that would ultimately compete with Google's self-driving car project. Levandowski's and Ron's acts included, among other things, a campaign during their employment at Google to use Google's confidential information regarding the unique skills, experiences and compensation packages of Google employees and contractors to lure them from Google to a new, competing venture, named OttoMotto LLC ("Otto").

2.      Respondents' obligations to, and agreements with, Google prohibited them from taking such actions, including, among other things, by prohibiting them from soliciting Google employees and consultants to join another company (both during and for one year following their employment), prohibiting them from engaging in activities that conflicted with their obligations to Google, and prohibiting them from taking actions that created a potential or actual conflict of interest with Google.

3.      As one example of Respondents' violations of these obligations and agreements, beginning at least in the late Summer or Fall 2015, Levandowski and Ron individually and collectively embarked on a campaign to unlawfully use confidential Google information to target and recruit valuable Google employees by soliciting them and inducing them to leave Google to join a different company in the self-driving space. That company would ultimately become Otto. Levandowski and Ron concealed their conduct from Google management, a concealment that allowed them each to profit greatly. Among other things, this concealment allowed Levandowski to ultimately collect over $120 million in incentive payments from Google for his supposed contributions to Google's self-driving car project—all while he was breaching his obligations to Google and building a company that would compete with Google.

1

ARBITRATION DEMAND

ER-Trust-0032

4.      Google brings this demand to obtain damages for, and to put an end to, Respondents' breaches of contract; their unlawful, unfair, and tortious interference with Google's employment relationships; their breach of the duty of loyalty and the duty of a fiduciary; and related torts arising from Respondents' efforts to unlawfully compete with Google and to solicit Google's personnel.

## II.      FACTUAL ALLEGATIONS

### A.      Respondents Anthony Levandowski and Lior Ron.

5.      Google hired Respondent Anthony Levandowski as an engineer in April 2007. Towards the end of his tenure at Google, Levandowski managed the team of engineers on Google's self-driving car project that developed Google's LiDAR sensors, sensors that are crucial to Google's development of a self-driving car. Levandowski abruptly resigned from Google on January 27, 2016, without prior notice. On information and belief, Levandowski is now a co-founder, and employee, of Otto.

6.      Google hired Respondent Lior Ron in April 2007. After Ron spent five years as a product lead for Google's Maps division and then did a several-year stint at a related company, Ron returned to Google in October 2014 to serve as a high-level advisor on Google mapping-related initiatives. Ron abruptly resigned from Google on January 13, 2016, without any prior notice. On information and belief, Ron is a co-founder of Otto.

7.      Over the course of their employment with Google, Respondents signed contracts with Google promising, among other things, not to undertake any competitive or disloyal acts while employed by Google, not to engage in businesses or investments that created conflicts of interest or any appearance of conflicts, and not to solicit Google employees for outside ventures.

8.      Over the course of their employment with Google, Respondents also agreed to comply with Google's Code of Conduct. Under the Code, Respondents were required to comply with numerous obligations, including obligations to: (a) avoid taking actions that would create any conflicts of interest or any circumstances that might reasonably create an appearance of a conflict of interest; (b) not start a competing company; (c) not take any employment, advisory position or board seats with certain Google competitors or business partners; (d) not use Google's

2

ARBITRATION DEMAND

ER-Trust-0033

1  confidential information for improper purposes; and, (e) take certain steps before accepting any

2  board seat with an outside company.

3      9.      At all times relevant to this demand, Respondents Levandowski and Ron were

4  acting in concert and conspired with and provided assistance to each other in connection with the

5  unlawful conduct alleged herein.  Each Respondent ratified or agreed to accept the benefits of the

6  other's conduct.

7      **B.    Odin Wave/Tyto Lidar.**

8      10.     Google is now informed and believes that, during Levandowski's tenure at

9  Google, he was involved in competing side businesses, including enterprises known as Odin

10  Wave, LLC ("Odin Wave") and Tyto Lidar LLC ("Tyto").

11     11.     Odin Wave was incorporated in or around August 2012.  The physical address

12  used for Odin Wave was 2201 Dwight Way in Berkeley, California.  On information and belief,

13  2201 Dwight Way is owned by Levandowski.

14     12.     In July 2013, a Google hardware vendor contacted a Google employee to inform

15  him that, on information and belief, a company named Odin Wave had just submitted an order for

16  a custom-fabricated part that was similar to a part used by Google in its unique and proprietary

17  laser technology for self-driving vehicles.

18     13.     After receiving this call, two Google employees investigated Odin Wave and

19  discovered that there appeared to be several connections between Levandowski and Odin Wave.

20  Those connections included Odin Wave's location at 2201 Dwight Way.  Levandowski was

21  questioned about his affiliation with Odin Wave in mid-2013 but denied having any ownership

22  interest in Odin Wave.

23     14.     Google is now informed and believes that, by February 2014, Odin Wave LLC

24  merged with an entity named Tyto Lidar LLC ("Tyto").  Public records list Ognen Stojanovski as

25  the manager of Tyto Lidar.  On information and belief, Stojanovski is friends with Levandowski

26  and worked with Levandowski on an early, self-driving vehicle prototype.

27     15.     On information and belief, Odin Wave/Tyto was developing a LiDAR sensor

28  modules which can be used in self-driving vehicles.

3

ARBITRATION DEMAND

ER-Trust-0034

16.     Google is now informed and believes that Levandowski had some involvement with Odin Wave/Tyto since at least 2013 at the same time that he was working on Google's development of LiDAR sensor modules.

17.     In or around Spring 2015, Google—seeing a potential overlap between Tyto's technology and Google's development goals for self-driving technology—began investigating whether to begin buying or using Tyto's products.

18.     Google also investigated whether to purchase Tyto.

19.     Levandowski participated in Google's investigation into Tyto's products and business, including at least one site visit to Tyto headquarters. On information and belief, he was privy to Google's impressions of Tyto's products and process, including Google's confidential opinion of Tyto's technology and the viability of Tyto's business. Throughout this process, Levandowski never disclosed a relationship with Tyto and its employees. Based on information and belief, Google now believes that Levandowski in fact had a relationship with Tyto and its employees that conflicted with Levandowski's duties to Google.

20.     Google's interest in Tyto's products carried over into 2016, including beyond Levandowski's departure from Google.

21.     Google is informed and believes that at least by May 18, 2016, Tyto Lidar LLC had merged with Otto.

### C.     Otto

22.     Google is informed and believes that, in 2015, Respondents Levandowski and Ron began executing a plan to compete with Google in the self-driving vehicle space, while they were still employed by Google.

23.     Google is informed and believes that Respondents' plan included taking employees and consultants from Google, including employees and consultants with access to Google confidential information and trade secrets.

24.     Because Levandowski and Ron were believed to be trusted agents of Google, Google shared confidential information with them about Google employees, including the employees' unique skills, work experiences, responsibilities, compensation, and work

ER-Trust-0035

1   performance. Prior to Levandowski's and Ron's resignations, on information and belief,

2   Respondents misused this confidential Google information, including while actively soliciting

3   Google employees to leave for their competing venture, Otto.

4       25.     Google is informed and believes that, at the time Levandowski began taking steps

5   to create a competing company and staff it with Google employees and contractors, Levandowski

6   had not yet become eligible for, or received payment of, a substantial incentive payment related to

7   his work on Google's self-driving car project.

8       26.     Google is informed and believes that, in approximately August 2015,

9   Levandowski told some Google colleagues that he had been asked to "transfer a group of people"

10  from Google's self-driving car project to a competing company. Levandowski then attempted to

11  solicit Google colleagues to leave Google and join Levandowski's efforts to "transfer" other

12  employees to this competing company.

13      27.     In late Summer 2015, one of the managers of Google's self-driving car project

14  heard rumors of Levandowski's on-going solicitation efforts and sought to terminate

15  Levandowski for this disloyalty. Google, however, could not confirm Levandowski's solicitation

16  efforts at the time and he was not terminated.

17      28.     Under his employment agreements, Levandowski was required to avoid any

18  potential conflict of interest, consult with his supervisors about any potential conflict, and to

19  avoid any activities that conflicted with his employment at Google. Levandowski not only failed

20  to disclose his conflicting activities, but on information and belief, he took steps to conceal his

21  competing and solicitation activities from Google management, in part to ensure that he received

22  payment of the substantial incentive payment from Google. Indeed, Levandowski did not

23  publicly release full details of his competing company until after he received the final payout of

24  this incentive payment following his departure from Google.

25      29.     Google is informed and believes that, by Fall 2015, Levandowski had approached,

26  and/or had begun working with, Ron to lay the foundation for their new competing company. In

27  Fall 2015, Levandowski and Ron settled on a name ("280 Systems") for their new company and

28

ER-Trust-0036

1   took steps to bring this company to fruition. That company—280 Systems—would later be

2   renamed Otto.

3       30.    Google is also informed and believes that Respondents' efforts to develop a

4   competing company persisted through late 2015 and into early 2016. Google is informed and

5   believes that, by approximately December 2015, Levandowski again began approaching Google

6   employees about leaving Google and asking them to help start a new company focusing on self-

7   driving vehicles.

8       31.    Google is informed and believes that, by January 2016, Respondents had increased

9   and expanded their solicitations of Google employees. As part of these efforts, Levandowski

10  made concerted and repeated efforts to solicit most, if not all, of his direct reports to leave

11  Google. Levandowski's solicitations occurred both during the work day and outside of the work

12  day, including at numerous times when Levandowski solicited individuals on the Google campus.

13  On at least some occasions, Levandowski also used his managerial role on Google's self-driving

14  car project to solicit his direct reports during the private 1-on-1 meetings he held with various

15  Google employees and to encourage his direct reports to leave Google during other meetings.

16      32.    Google is informed and believes that Respondents took steps to hide their efforts

17  to set up a competing company from Google. Respondents' steps included, but are not limited to,

18  instructing Google employees not to discuss Respondents' business or recruitment efforts via

19  company email or on other company systems.

20      33.    Google is informed and believes that, in January 2016, Respondents Levandowski

21  and Ron also hosted at least two off-site meetings at Levandowski's Palo Alto home with the goal

22  of persuading numerous Google employees to leave Google and join Respondents' new venture.

23  Both Levandowski and Ron set up these meetings, attended them, and led them. At least one

24  such meeting occurred while both Levandowski and Ron were Google employees, and both

25  meetings occurred during Levandowski's employment at Google.

26      34.    Google is informed and believes that Respondents used these January 2016

27  meetings and solicitation efforts to encourage Google employees to depart Google and move to

28  their competing venture.

ER-Trust-0037

35.     On information and belief, acting in concert with a 280 Systems recruiter, Respondents also sought to induce Google employees to sign written employment agreements that obligated them to quit Google and commence work immediately.

36.     Google is informed and believes that Respondents' plan to develop a competing business included an effort to have the "entire" Laser Team on Google's self-driving car project quit Google *en masse* in January 2016 and join Respondents at their new venture. Respondents encouraged a large group of Google employees to resign without prior notice, and upon specific day(s) designated by Levandowski and Ron.

37.     Google is further informed and believes that Levandowski and Ron encouraged and/or assisted others, including both Google employees and third parties associated with 280 Systems/Otto, to solicit Google employees and contractors to leave Google for 280 Systems/Otto.

**D.      Levandowski and Ron Hid Their Wrongful Acts upon Departure from Google.**

38.     On January 13, 2016, Ron resigned from Google, effective immediately, and without any prior notice.

39.     On January 15, 2016, Ron signed an "Exit Certification" and provided it to Google. In this Exit Certification, Ron agreed that he had "followed the terms" of Google's employment agreement, including its prohibition on soliciting Google employees while employed at Google. Google is informed and believes that Ron's certification was false or misleading when it was made on January 15, 2016.

40.     In this Exit Certification, Ron also stated that, "as of the date you sign this letter" he had advised Google of "all facts of which you are aware" that he believed might be a violation of Google's Code of Conduct. Ron also stated that he was not aware of any other current violations of Google's Code of Conduct. Google is informed and believes that Ron's certification was false or misleading when it was made.

41.     On January 27, 2016, Levandowski resigned from Google, effective immediately, and without any prior notice.

7

ARBITRATION DEMAND

ER-Trust-0038

42.     During his departure interview, Levandowski denied that he had solicited any Google employees to leave.  Google is informed and believes that this representation was false or misleading when it was made.

43.     At or around the time of his departure, Levandowski was also asked what he was planning to do next.  In response, and notwithstanding his duty to disclose, Levandowski described potential future projects or endeavors that would not compete with Google's self-driving car project.  Google is informed and believes that this these representations were false or misleading when they were made.

44.     Shortly following his departure interview, Levandowski re-contacted the Google employee who had conducted his departure interview.  During this discussion, Levandowski informed the Google employee that other Google employees were contacting Levandowski about his departure but Levandowski assured the Google employee that he was not soliciting any of these employees to leave Google.  Google is informed and believes that this this representation was false and misleading when it was made.

**E.      Respondents' Actions Caused Damage to Google.**

45.     Respondents' efforts to set up competing business(es) and to solicit Google employees and contractors to leave Google for their Otto business have harmed Google.  This harm has included but is not limited to lost employees and contractors, recruiting and retention costs and numerous other costs and damages.

46.     For example, Respondents' campaign to create a competing company named Otto and to solicit Google's employees and contractors to leave Google was a partial success. Beginning in January 2016, and continuing through at least September 2016, numerous employees and contractors have left Google to join Otto.  Google is informed and believes that many—if not all—of these departures are attributable to the solicitation campaign that Respondents' initiated and spearheaded while they were Google employees.

47.     Google is also informed and believes that Respondents' efforts to solicit employees and contractors from Google have continued following their departures from Google. Among other things, Respondents have assisted other Otto agents to solicit Google employees

8
ARBITRATION DEMAND

ER-Trust-0039

1   and contractors to leave and join Respondents at their new company.  As a result of Respondents'

2   actions, Google has spent significant time and money persuading Google employees and

3   contractors to reject Respondents' solicitation efforts.  Google ultimately has been able to

4   convince numerous employees and contractors to stay with Google, but only after devoting

5   significant time and resources to this effort and, in some instances, providing incentives to stay.

6       48.     Google has incurred costs to search for and obtain replacements for the Google

7   employees and contractors who have left for employment at Otto.

8   **F.    Respondents Sell Otto to Uber**

9       49.     Given the unique training, experience, and skills of Google's employees and

10   contractors in the self-driving space, Respondents' campaign to lure employees and contractors

11   away from Google enabled Respondents to rapidly grow and profit from their new, competing

12   venture.

13       50.     Google is informed and believes that Uber acquired Otto in Summer 2016.  Uber

14   reportedly paid approximately $680 million up front for the several month old company, plus a

15   stream of future compensation.  Uber recently announced that Levandowski will be in charge of

16   Uber's self-driving-car project, and Uber has presented Levandowski as the new face of that

17   competing project in a series of media interviews.[1]

18       51.     Google is informed and believes that Respondents were able to jumpstart their

19   Otto business, and able to position themselves to obtain such a lofty acquisition price for Otto,

20   only because of Respondents' unfair and unlawful conduct described in this Statement of Claims,

21   including their taking key talent from Google's self-driving project, and such other conduct as

22   may be established at hearing.

23

24

---

25   [1] *See, e.g.*, https://newsroom.uber.com/rethinking-transportation/ ("Anthony Levandowski, Otto's co-founder, will now lead our combined self-driving efforts ....");

26   https://www.theguardian.com/technology/2016/aug/19/self-driving-car-anthony-levandowski-uber-otto-google ("Uber just announced that self-driving cars will start pick up passengers later

27   this month in Pittsburgh. And the man leading the project ...? Anthony Levandowski.");
http://www.bloomberg.com/news/features/2016-08-18/uber-s-first-self-driving-fleet-arrives-in-

28   pittsburgh-this-month-is06r7on ("When the Otto acquisition closes, likely this month, Otto co-founder Levandowski will assume leadership of Uber's driverless car operation.").

9
ARBITRATION DEMAND

ER-Trust-0040

III.   **CAUSES OF ACTION**

## FIRST CAUSE OF ACTION

### Breach of Contract

52.     Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

53.     Levandowski and Google entered into an "At-Will Employment, Confidential Information, Invention Agreement and Arbitration Agreement," which was executed in May 2009 ("Levandowski 2009 Employment Agreement").  Levandowski's receipt of a substantial incentive payment in connection with Google's self-driving car project was contingent upon Levandowski's agreement to an At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement ("Levandowski 2012 Employment Agreement").

54.     Lior Ron and Google entered into an "At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement" on November 5, 2014. ("Ron Employment Agreement").

55.     Both Respondents also agreed, as part of their Employment Agreements, to comply with Google's Code of Conduct.

56.     Google fully performed its obligations under these Agreements.

57.     Respondents breached their obligations under the Levandowski Employment Agreements, the Ron Employment Agreement, and Google's Code of Conduct in numerous ways, including but not limited to:

Non-Solicitation Agreements

58.     Respondents Levandowski and Ron were (and are) prohibited by contract from soliciting Google workers to leave Google.

59.     By entering the Levandowski Employment Agreements, Levandowski agreed not only to abide by the Google Code of Conduct but also not to "directly or indirectly solicit, induce, recruit or encourage any of [Google's] employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of [Google]," either for himself "or for any other person or entity."

10

ARBITRATION DEMAND

ER-Trust-0041

60.     By entering the Ron Employment Agreement, Lior Ron promised not only to abide by the Google Code of Conduct but also not to "directly or indirectly solicit any Google's employees to leave their employment."

61.     Ron and Levandowski breached their Employment Agreements by, among other things, soliciting Google employees to leave Google.

62.     Levandowski's and Ron's breaches of their non-solicitation obligations have enriched Respondents at Google's expense and have caused significant harm to Google, including by causing a loss of key employees and contractors, causing Google to expend resources to recruit, replace, and train new employees, and causing Google to pay retention bonuses to fend off Respondents' solicitation efforts.

<u>Non-Competition Agreements</u>

63.     Respondents Levandowski and Ron were prohibited by contract during their employment from competing with, or taking any acts disloyal to, Google.

64.     By entering the Levandowski Employment Agreements, Levandowski agreed not to engage in any employment, occupation, or consulting directly related to "the business in which [Google] is now involved or becomes involved during the term of my employment." Levandowski also agreed not to engage in "any" activities that "conflict with" his obligations to Google. He also agreed to abide by the Google Code of Conduct, which required that he act with Google's "best interest" in mind and to avoid "personal gain . . . at the expense" of Google.

65.     By entering the Ron Employment Agreement, Ron promised not to "engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved . . . ." Ron also promised not to take any actions "that conflict with my obligations to Google" without Google's permission. He also agreed to abide by the Google Code of Conduct, which required that Ron avoid conflicts of interest and act in Google's best interest. All of these obligations remained in effect until Ron's departure from Google.

66.     Levandowski and Ron breached the non-competition obligations of their Employment Agreements by developing a competing company while still employed at Google;

11
ARBITRATION DEMAND

ER-Trust-0042

1    by collecting information from Google with plans to use it for the benefit of a Google competitor;

2    and by soliciting Google employees to leave their employment for a competing company.

3         67.     Levandowski's and Ron's breaches of their contractual non-competition

4    obligations have enriched Respondents at Google's expense and have harmed Google, including

5    by causing a loss of key employees and contractors, causing Google to expend resources to

6    recruit, replace, and train new employees; and causing Google to pay retention bonuses to fend

7    off Respondents' solicitation efforts.

8         <u>Confidentiality Agreements</u>

9         68.     Respondents Levandowski and Ron were prohibited by contract—both during and

10    following their tenures at Google—from disclosing or misusing confidential Google information

11    acquired during the course of their employment.

12         69.     By entering into the Levandowski Employment Agreements, Levandowski

13    promised to hold Google's confidential information in the strictest confidence.  He agreed not to

14    use or disclose any Google confidential information unless for Google's benefit or with Google's

15    permission.

16         70.     Ron likewise promised—as part of his Employment Agreement—not to disclose

17    or use Google confidential information unless for Google's benefit or with Google's permission.

18         71.     Google is informed and believes that Levandowski and Ron breached their

19    contractual confidentiality obligations by invoking their knowledge of confidential Google salary

20    and compensation information to make targeted and individualized job offers to Google

21    employees.

22         72.     Google is informed and believes that Levandowski further breached his

23    contractual confidentiality obligations by relying upon confidential Google information

24    concerning the quality and desirability of Tyto Lidar LLC's products and processes and the

25    viability and value of its business—all gleaned from Google's own due diligence into Tyto—in

26    acquiring Tyto on Otto's behalf.

27         73.     Levandowski's and Ron's breaches of their confidentiality obligations have

28    enriched Respondents at Google's expense and have harmed Google, including by causing a loss

12

ARBITRATION DEMAND

ER-Trust-0043

of key employees and contractors, causing Google to pay retention bonuses to fend off

Respondents' solicitation efforts and causing Google to expend resources to recruit, replace, and

train new employees.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties and/or Duties of Loyalty

74.     Claimant Google hereby incorporates by reference each of the allegations in the

preceding paragraphs as though fully set forth here.

75.     As a manager at Google, Levandowski owed Google fiduciary duties, including

but not limited to, duties of loyalty, candor, and care.

76.     As a Senior Advisor to Google's high-priority mapping initiatives, Ron owed

Google fiduciary duties, including but not limited to, duties of loyalty, candor, and care.

77.     Additionally, Levandowski and Ron each owed a duty of loyalty to Google due to

their status as trusted agents of their principal, Google.

78.     Through the acts alleged in this Statement of Claims, and such other acts as may

be established at hearing, Levandowski and Ron each breached their duty of loyalty to Google,

including by taking steps to assist and build competing companies during their tenure as Google

employees; by soliciting Google employees to leave their employment for a competing company;

by, on information and belief, encouraging other Google employees to breach their agreements

with Google; and by misusing confidential Google information for their own benefit and for the

benefit of what would ultimately become Otto.

79.     Levandowski's and Ron's breaches of the duty of loyalty harmed Google,

including by causing Google to expend resources to recruit, replace, and train new employees and

causing Google to pay retention bonuses to fend off Respondents' solicitation efforts.

80.     These breaches also unjustly enriched Levandowski and Ron, who were

compensated handsomely during—and as a result of—their disloyal acts.  Respondents' unjust

enrichment includes, but is not limited to, Levandowski's receipt of a substantial monetary

incentive payment from Google and, on information and belief, Respondents' receipt (and future

13

ARBITRATION DEMAND

ER-Trust-0044

receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680 million.

81.    Respondents performed the foregoing acts, conduct, and omissions fraudulently, maliciously, and oppressively, with the intent and design to damage Google. By reason of this conduct, Google is entitled to recover punitive damages in an amount to be determined.

### THIRD CAUSE OF ACTION

#### Fraud-Deceit

82.    Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

83.    Through the acts alleged in this Statement of Claims, Levandowski concealed material facts from Google and/or made affirmative misrepresentations to Google. Levandowski undertook a long-ranging plan to build up a company to compete with Google, and he covertly waged a disloyal campaign to persuade Google employees and contractors to join him—including via 1-on-1 work meetings on the Google campus and secret meetings held off-campus.

84.    Levandowski was under contractual and fiduciary obligations to disclose these material facts, which he instead intentionally concealed. For example, in connection with his exit interview, Levandowski both concealed and made affirmative misrepresentations concerning his conduct in soliciting Google employees to leave the company for his competing venture. And during the months preceding his departure, Levandowski made numerous misrepresentations to his direct supervisors at Google concerning his work at Google, including that he was fully "committed" to Google, that he was "loyal" to Google, and that he had no intention of leaving Google.

85.    Google is informed and believes that Levandowski intended to induce Google's reliance on his concealment in order to mislead Google into believing that he was a committed employee and to sustain his employment long enough for Levandowski to continue collecting a generous salary, long enough to collect substantial monetary incentive payments according to his compensation plan, and long enough to execute his unlawful campaign of solicitation and competition.

ER-Trust-0045

86.     Google is informed and believes that Respondent Levandowski also either aided and abetted Ron's fraud, and/or that he conspired with Ron and intended for the fraud to be committed, and that he therefore incurred tort liability.

87.     Through the acts alleged in this Statement of Claims, Ron concealed material facts from Google and/or made affirmative misrepresentations to Google.  Ron was under contractual and fiduciary obligations to disclose these material facts, which he instead intentionally concealed.  For example, on information and belief, Ron concealed his efforts to build a company to compete with Google, and concealed his participation in a disloyal campaign to persuade Google employees and contractors to join him—including via secret meetings held off-campus. Ron also made affirmative misrepresentations or material omissions in the Exit Certification he provided to Google upon departure, including but not limited to the fact that he had advised Google of all facts that violated Google's Code of Conduct and that he was not aware of any violations of Google's Code of Conduct.

88.     Google is informed and believes that Ron intended to induce Google's reliance on his concealment and affirmative misrepresentations in order to mislead Google into believing that he was a committed employee and to sustain his employment long enough for Ron to continue collecting a generous salary, and long enough to execute his unlawful campaign of solicitation and competition.

89.     Google is informed and believes that Respondent Ron either aided and abetted Levandowski's fraud, and/or that he conspired with Levandowski and intended for the fraud to be committed, and that he therefore incurred tort liability.

90.     Google justifiably relied on Levandowski's and Ron's deception by continuing their at-will employment and awarding them substantial compensation, incentive payments, and bonuses, all under the impression that they were loyal employees and agents.

91.     As a result of Levandowski's and Ron's actions, Google sustained damages in an amount to be determined at an arbitration hearing.

92.     As a result of conduct alleged herein, Respondents have been and will be unjustly enriched in an amount to be proven at an arbitration hearing.  For example, Respondents have

ER-Trust-0046

1  been unjustly enriched by receiving compensation and business opportunities that rightly belong

2  to Google.  Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt

3  of substantial monetary incentive payments from Google and, on information and belief,

4  Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition

5  of Otto for a reported $680 million.

6      93.    Levandowski and Ron performed the foregoing acts, conduct, and omissions

7  fraudulently, maliciously, and oppressively, with the intent and design to damage Google.  By

8  reason of this conduct, Google is entitled to recover punitive damages in an amount to be

9  determined.

10  **FOURTH CAUSE OF ACTION**

11  **Tortious Interference with Contract**

12      94.    Claimant Google hereby incorporates by reference each of the allegations in the

13  preceding paragraphs as though fully set forth here.

14      95.    On information and belief, Respondent Ron was aware of Levandowski's

15  contractual obligations, including but not limited to, the obligations not to solicit and not to

16  compete.

17      96.    On information and belief, Respondent Levandowski was aware of Ron's

18  contractual obligations, including but not limited to, the obligations not to solicit and not to

19  compete.

20      97.    On information and belief, Respondent Ron induced Levandowski's contractual

21  breaches, including but not limited to, his breaches of his non-solicitation and non-competition

22  obligations.

23      98.    On information and belief, Respondent Levandowski induced Ron's contractual

24  breaches, including but not limited to, his breaches of his non-solicitation and non-competition

25  obligations.

26      99.    Respondent Ron's intentional conduct disrupted Levandowski's contractual

27  obligations and was a substantial factor in causing harm to Google.

28

16
ARBITRATION DEMAND

ER-Trust-0047

100.    Respondent Levandowski's intentional conduct disrupted Ron's contractual obligations and was a substantial factor in causing harm to Google.

101.    As a result of conduct alleged herein, Respondents have been and will be unjustly enriched in an amount to be proven at an arbitration hearing.  For example, Respondents have been unjustly enriched by receiving compensation and business opportunities that rightly belong to Google.  Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt of substantial incentive payments from Google and, on information and belief, Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition of Otto for a reported $680 million.

102.    Respondents performed the foregoing acts, conduct, and omissions fraudulently, maliciously, and oppressively, with the intent and design to damage Google.  By reason of this conduct, Google is entitled to recover punitive damages in an amount to be determined.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

103.    Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

104.    Google had economic relationships with each of its solicited employees and contractors that, if they had continued, would have benefited Google.

105.    Respondents knew of these relationships but solicited the employees and contractors—including Google employees Don Burnette and Claire Delaunay, among many others—to leave Google and join a venture that would ultimately become Otto with the intent of disrupting their economic relationship with Google.  Respondents engaged in wrongful conduct by soliciting Google employees while still employed at Google and encouraging other Google employees to violate the duty of loyalty.  In concert with Otto's recruiter, Respondents encouraged a group of Google employees to quit *en masse* and with little notice, which they understood, or had reason to know would cause disruption and harm to Google's business.

106.    As a direct result of this wrongful conduct, on information and belief, numerous employees and contractors thus far have terminated their economic relationships with Google and

17

ER-Trust-0048

1   currently work for Otto. Respondents' tortious acts caused damages to Google in an amount to be

2   proven at the arbitration hearing.

3       107.    As a result of conduct alleged herein, Respondents have been and will be unjustly

4   enriched in an amount to be proven at an arbitration hearing. For example, Respondents have

5   been unjustly enriched by receiving compensation and business opportunities that rightly belong

6   to Google. Respondents' unjust enrichment includes, but is not limited to, Levandowski's receipt

7   of substantial monetary incentive payments from Google and, on information and belief,

8   Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition

9   of Otto for a reported $680 million.

10      108.    Respondents performed the foregoing acts, conduct, and omissions fraudulently,

11  maliciously, and oppressively, with the intent and design to damage Google. By reason of this

12  conduct, Google is entitled to recover punitive damages in an amount to be determined.

13                          **SIXTH CAUSE OF ACTION**

14  **Unlawful Conduct and Unfair Competition under California Business and Professions Code**
    **§ 17200 *et seq.***

15

16      109.    Claimant Google hereby incorporates by reference each of the allegations in the

17  preceding paragraphs as though fully set forth here.

18      110.    As alleged above, Respondents have engaged in unlawful, unfair, and/or

19  fraudulent business practices within the meaning of California Business and Professions Code

20  § 17200.

21      111.    Respondents undertook the acts described in this Statement of Claims, and such

22  other acts as may be established at hearing, with the intent to injure Google and gain an unfair

23  competitive advantage.

24      112.    The natural, probable, and foreseeable result of Respondents' conduct has been

25  and will continue to be to injure Google's business, including but not limited to its self-driving

26  car project, to impose substantial expenses on Google to counteract that conduct, and to injure

27  and damage Google in other ways.

28      113.    The above acts, unless restrained, threaten to and will irreparably injure Google's

business, goodwill, and reputation, through the disclosure of its confidential information.

18

ARBITRATION DEMAND

ER-Trust-0049

1   Accordingly, Google is entitled to appropriate injunctive relief against further acts of unfair

2   competition by Respondents.

3       114.   As a proximate and direct result of Respondents' unlawful conduct, Google has

4   suffered and will continue to suffer substantial actual losses, and Respondents' have been unjustly

5   enriched in amounts for which Google is entitled to restitution.

6       115.   Google is entitled to restitution in the amount, at a minimum, of the salary,

7   benefits, incentive payments, and bonuses paid to Levandowski and Ron during the course of

8   their unlawful, unfair, and/or fraudulent conduct.

9       116.   Unless enjoined, Respondents will continue to engage in these unlawful, unfair,

10   and/or fraudulent acts, conduct, and omissions, which have resulted, and will continue to result in,

11   irreparable injury to Google.

12   **SEVENTH CAUSE OF ACTION**

13   **Unjust Enrichment**

14       117.   Claimant Google hereby incorporates by reference each of the allegations in the

15   preceding paragraphs as though fully set forth here.

16       118.   As a result of the illegal and wrongful conduct alleged herein, Respondents have

17   been and will be unjustly enriched in an amount to be proven at an arbitration hearing.

18       119.   Specifically, Respondents have been unjustly enriched by receiving compensation

19   and business opportunities that rightly belong to Google.

20       120.   Respondents' unjust enrichment includes, but is not limited to, Levandowski's

21   receipt of over $120 million in incentive payments from Google and, on information and belief,

22   Respondents' receipt (and future receipt) of compensation in connection with Uber's acquisition

23   of Otto for a reported $680 million.

24       121.   Respondents should be required to disgorge and return to Google all the ill-gotten

25   gains that they illegally and wrongfully obtained at the expense of Google, in an amount to be

26   determined at trial, and a constructive trust should be imposed thereto.

27   **IV.   STATEMENT OF REMEDIES SOUGHT**

28       WHEREFORE, Claimant Google respectfully requests the following relief:

19
ARBITRATION DEMAND

ER-Trust-0050

1.   Judgment in Google's favor and against Respondents on all causes of action alleged herein;

2.   For damages in an amount to be proven at an arbitration hearing;

3.   For restitution and disgorgement of Respondents' unjust enrichment;

4.   For the imposition of a constructive trust;

5.   For injunctive relief;

6.   For punitive damages;

7.   For restitution under Business and Professions Code § 17200;

8.   For reasonable attorneys' fees and costs of suit incurred herein as allowed by law and contract;

9.   For prejudgment and post-judgment interest; and

10.   For such other and further relief as the Arbitrator may deem to be just and proper.

Dated: October 28, 2016                          KEKER & VAN NEST LLP


                                        By:   /s/ Rachael E. Meny
                                              ROBERT A. VAN NEST
                                              RACHAEL E. MENY
                                              JENNIFER A. HUBER
                                              THOMAS E. GORMAN
                                              W. HAMILTON JORDAN

                                              Attorneys for Claimant
                                              GOOGLE INC.

20

ARBITRATION DEMAND

ER-Trust-0051

# Appellees' Exhibit 2

ER-Trust-0052

# EXHIBIT A

ER-Trust-0053

**JAMS ARBITRATION**
**CASE REFERENCE NO 1100086069**

GOOGLE, LLC,

      Claimant

         and

ANTHONY SCOTT LEVANDOWSKI        **CORRECTED FINAL AWARD**

And

LIOR RON,

      Respondents

| Counsel for Claimant | Counsel for Respondents |
|---|---|
| Keker & Van Nest LLP<br>633 Battery Street<br>San Francisco, CA 94111<br><br>Robert A. Van Nest<br>Rachael E. Meny<br>Jennifer A. Huber<br>Thomas R. Gorman<br>W. Hamilton Jordan<br>Jo W. Golub<br>Ben Berkowitz<br>Reid Mullen<br>Molly Caldwell Villagra | ***Attorneys for Respondent Anthony Levandowski***<br><br>Goodwin Procter LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>Neel Chatterjee<br>Brett M. Schuman<br>Rachel M. Walsh<br>Andrew Ong<br><br>***Attorneys for Respondent Lior Ron***<br><br>Taylor & Patchen LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>Stephen E. Taylor<br>Jonathan A. Patchen<br>Cheryl A. Cauley<br>Karan S. Dhadialla<br>Daniel P. Martin |

ER-Trust-0054

| Arbitrators | | |
|---|---|---|
| Hon. James Ware (Ret.), Chair<br>2 Embarcadero Center<br>Suite 1500<br>San Francisco, CA 94111 | Hon. Read Ambler (Ret.)<br>160 W. Santa Clara Street,<br>Suite 1600<br>San Jose, CA 95113 | Alexander L. Brainerd, Esq.<br>2 Embarcadero Center,<br>Suite 1500<br>San Francisco, CA 94111 |
| **Place of Arbitration** | JAMS Dispute Resolution Center<br>2 Embarcadero Center<br>San Francisco, California 94111 | |
| **Date of Arbitration Hearing** | April 30, 2018 and May 1-4, 7-11, 2018 | |
| **Case Manager** | Josephine Care | |
| **Date of Interim Award** | March 26, 2019 | |
| **Date of Final Award** | December 6, 2019 | |
| **Date of Corrected Final Award** | December 23, 2019, *nunc pro tunc* as of December 6, 2019 | |

Case: 20-03050   Doc# 16-1   Filed: 07/31/20   Entered: 07/31/20 18:27:01   Page 3 of 71

ER-Trust-0055

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................1

II.     PROCEDURAL HISTORY ..................................................2

        A.      Arbitration Agreements and Demands for Arbitration......................3

        B.      Definitive Statement of Claims and Defenses .............................5

        C.      Pre-hearing Motions .................................................6

                1.      Disclosure and Discovery Motions ........................7

                2.      Fifth Amendment Privilege Issues ........................7

                3.      Stroz Materials .......................................8

                4.      Evidentiary Stipulations ..............................10

                5.      Request for Adverse Presumption ......................10

        D.      The Arbitration Hearing .............................................10

        E.      Post-Hearing Proceedings ...........................................12

                1.      Disposition of Unaddressed Claims .....................12

                2.      Disposition of Unaddressed Counterclaims ...............15

                3.      Disposition of Unaddressed Affirmative Defenses ..........16

                4.      Reopening of Hearing .................................17

                5.      Disposition of Motion for Evidentiary Sanctions ..........18

                6.      Supplemental Submissions .............................19

                7.      Interim Award.........................................19

III.    FACTS ...................................................................20

        A.      Respondents' Employment with Google ...............................20

        B.      Employment Agreements .............................................21

                1.      Non-competition Provision .............................21

                2.      Non-solicitation Provision .............................22

                3.      Confidential Information Provision ......................22

                4.      Code of Conduct ......................................22

iii

ER-Trust-0056

| | C. | Project Chauffeur | .25 |
| | D. | Google's Acquisition of 510 Systems and Anthony's Robots | .26 |
| | E. | The Chauffeur Bonus Plan | .30 |
| | F. | Odin Wave/Tyto LiDAR | .31 |
| | G. | 280 Systems/Otto | .34 |
| | H. | Solicitation of Google Employees | .38 |
| | I. | Resignations from Google | 40 |
| | J. | Uber's Acquisition of Otto | .41 |
| | K. | Second Bonus Payment and Announcement of Uber Acquisition | .41 |
| IV. | | ANALYSIS OF LIABILITY ISSUES | 42 |
| | A. | First Claim: Breach of Duty of Loyalty | 42 |
| | | 1. Essential Elements of the Claim | .42 |
| | | 2. Actions by Respondents | .44 |
| | | a. Tyto LiDAR, LLC | 45 |
| | | b. Otto | .47 |
| | | c. Soliciting of Google Employees | .48 |
| | | d. Negotiations to Sell Otto to Uber | 51 |
| | | 3. Defenses | .53 |
| | | a. Synthetic Equity Defense | .53 |
| | | b. Affirmative Defenses | .56 |
| | | 1. Statute of Limitations | 57 |
| | | 2. No Proof Google Would Have Terminated | .59 |
| | | 3. Voluntary Payment | .60 |
| | | 4. Waiver | 62 |
| | B. | Second Claim: Breach of Fiduciary Duty | .64 |
| | | 1. Essential Elements of the Claim | 64 |
| | | 2. Levandowski's Status | .65 |

iv

ER-Trust-0057

C. Third Claim: Breach of Contract ............................................. 66
    1. 2011 Acquisition Agreements ....................................... 66
        a. Relevant Provisions of Agreements .......................... 67
        b. Actions by Levandowski ..................................... 67
        c. Affirmative Defenses ........................................ 68
            1. Invalidity of Non-competition Provision .............. 68
            2. Invalidity of Non-solicitation Provision .............. 75
    2. Employment Agreements ............................................ 81
        a. Provisions of the Agreements ................................ 81
        b. Actions by Levandowski and Ron ............................ 82
        c. Affirmative Defenses ........................................ 84
            1. Invalidity .......................................... 84
            2. Consent Decree ..................................... 85
D. Fourth Claim: Unfair Competition ........................................ 86
    1. Essential Elements of the Claim ..................................... 86
    2. Actions by Levandowski and Ron .................................. 87
V. ANALYSIS OF REMEDIES ........................................................ 87
A. The Available Remedies ................................................... 87
    1. Breach of Duty of Loyalty .......................................... 88
        a. Disgorgement of Compensation ............................. 88
        b. Retention Bonuses .......................................... 89
        c. Competitive Harm Damages ................................. 90
    2. Breach of Contract ................................................ 91
    3. Unfair Competition ............................................... 91
B. Respondent Levandowski ................................................. 92
    1. Monetary Compensation ........................................... 93
    2. Stock and Stock Options .......................................... 93

Case: 20-03050   Doc# 16-1   Filed: 07/31/20   Entered: 07/31/20 18:27:01   Page 6 of 71

ER-Trust-0058

|   | 3. | Retention Bonuses ................................................ 94 |
|   | 4. | Competitive Harm Damages ........................................95 |
|   | 5. | Mitigation of Damages ............................................99 |
| C. |   | Respondent Ron ................................................... 100 |
| D. |   | Principal Amounts Awardable ..................................... 101 |
| VII. |   | RESOLUTION OF REMAINING ISSUES.................................... 102 |
| A. |   | Interest......................................................... 102 |
|   | 1. | Legal Standard ................................................... 102 |
|   | 2. | Interest on Disgorgement Damages................................. 102 |
|   | 3. | Interest on Retention Bonus Damages ............................. 105 |
| B. |   | Attorney Fees ................................................... 106 |
|   | 1. | Prevailing Party................................................. 106 |
|   |   | a. | Google v. Levandowski ...................................... 107 |
|   |   | b. | Google v. Levandowski and Ron ............................. 112 |
|   |   | c. | 998 Offer .................................................. 117 |
|   | 2. | Attorney Fees Awardable.......................................... 117 |
|   |   | a. | Adjustment.................................................. 119 |
|   |   | b. | Allocation................................................. 120 |
|   | 3. | Costs ........................................................... 121 |
|   | 4. | Taxes ........................................................... 121 |
| VIII. |   | FINAL AWARD ..................................................... 123 |

Case: 20-03050   Doc# 16-1   Filed: 07/31/20   Entered: 07/31/20 18:27:01   Page 7 of
71

ER-Trust-0059

THE UNDERSIGNED ARBITRATORS (the "Panel"), having been designated in accordance with the arbitration agreements between and among the parties, as modified by the Stipulation and Order dated April 14, 2017, and having examined the allegations, submissions and proof of the parties, find, conclude and issue this Final Award. The Panel confirms that in reaching its decision in this arbitration, the Panel has fully taken into consideration all the written and oral submissions of the parties, as well as the entirety of the evidence (whether documentary, testimonial, expert or otherwise) that has been presented by the parties, whether or not expressly referred to in this Final Award.

## I.   INTRODUCTION

In this arbitration, Claimant Google LLC ("Google") seeks disgorgement of salary and bonuses, damages and other relief from two of its former employees, Respondent Anthony Scott Levandowski ("Levandowski") and Respondent Lior Ron ("Ron"). Google claims that Levandowski and Ron breached their duty of loyalty, committed other tortious conduct and breached various contracts they had with Google. Google's claims arise from acts allegedly committed by Levandowski and Ron that harmed Google's self-driving vehicle program, known as Project Chauffeur, in which Google sought to be first-to-market with technology that would allow a vehicle to operate without a driver or human intervention.

Google started Project Chauffeur in 2009. It heavily invested money for facilities, research and engineering. Project Chauffeur eventually grew into an independent subsidiary, Waymo LLC, employing over 600 employees. Google alleges that while Respondent Levandowski was its employee working on autonomous vehicle control technology for Project Chauffeur, he secretly formed, funded and directed an outside competitive company to develop the same or similar technology. Google alleges that Respondent Ron joined Levandowski in competing against Google and that together they

1

ER-Trust-0060

solicited other Google employees to join their newly formed company and secretly

negotiated to sell critical autonomous vehicle technology to Uber Technologies

Inc.,("Uber"), Google's primary competitor.  Uber came to believe that acquiring

Levandowski and Ron's company, populated as it was by a team of ex-Chauffeur employees,

would give Uber a competitive leap in the competition with Google.  Uber proposed that

Levandowski and Ron sell their company to Uber, and they agreed.  They resigned their

employment with Google and sold their company to Uber for consideration arguably worth

$680 million if certain milestones are met.

      As an incentive to the founding employees, Google created a bonus plan.  During the

course of their employment, Google paid Levandowski over ███████ in salary and

bonuses ███████████████ .  As relief for Respondents' conduct, Google seeks

disgorgement of a portion of Respondents' salary and bonuses, and over ███████ in

damages for retention bonuses and for competitive harm, plus attorney fees and costs.

      Levandowski and Ron deny that their conduct was improper, disloyal, or unlawful.

They allege that as "at-will" employees they were free to leave Google and to use their

knowledge and skills to pursue autonomous vehicle development elsewhere.  They assert

that all of their conduct complied with California law as well as their contractual

obligations to Google.

## II.  PROCEDURAL HISTORY

      At the commencement of these proceedings the parties elected to use the JAMS

CaseAnywhere Docketing System.  The System compiles, records and serves notice of all

submissions.  The System and all submissions are accessible to the parties and provides a

chronological record of these proceedings.  Below, the Panel summarizes some of the

procedural history.

2

ER-Trust-0061

### A.     Arbitration Agreements and Demand for Arbitration

On October 28, 2016, Google, Inc., now renamed Google LLC ("Google"), submitted to JAMS a "Demand for Arbitration" naming Anthony Scott Levandowski as the sole Respondent. (JAMS Ref. No. 1100086032.) On the same day, Google submitted a second "Demand for Arbitration" jointly naming Levandowski and Ron as Respondents. (JAMS Ref. No. 1100086069.) Attached to Google's Demands were contracts between Google and Levandowski and between Google and Ron in which they agreed to arbitrate any dispute arising out of their contractual relationships.

After the Demands were submitted and the cases were opened by JAMS, counsel for the parties notified the JAMS Case Administrator that the parties wished to have the proceedings conducted by a panel of three arbitrators. In due course, and in accordance with the procedure agreed to by the parties, the following neutrals were designated by JAMS to serve as the Panel: The late Honorable Steven A. Brick (Ret.), Chair,[1] the Honorable Edward Panelli (Ret.); and the Honorable James Ware (Ret.) The composition of the Panel was approved by the parties.

On March 10, 2017, with Judge Brick presiding, the Panel conducted the first in a series of in-person case management conferences with counsel for the parties. The Panel noted the submission of the two arbitration Demands; that Respondents had submitted initial responses to the Demands;[2] and that Respondent Levandowski had submitted a

---

[1] The Panel remains saddened by Judge Brick's untimely death. The care, attention and leadership that he contributed to this matter set the cooperative tone and clear direction that the Panel continued to follow.

[2] As discussed below, during the course of the proceedings, the parties submitted amended claims and affirmative defenses.

ER-Trust-0062

counterclaim.  The Panel determined and the parties stipulated that all of the issue raised by the claims, counterclaims and defenses were arbitrable.

The attention of the Panel was drawn to the fact that attached to the two Demands were five written contracts in which the parties to the contracts had agreed to binding arbitration of all disputes arising out of each contract.  However, the arbitration agreements differed in the procedures to be applied.  The parties advised the Panel that they were preparing a stipulation to consolidate the two arbitration cases into a single proceeding and to use a single set of procedural rules to govern the consolidated proceedings.

On April 13, 2017, counsel for the parties entered into a stipulation to consolidate the two cases and to a single set of procedures.  The stipulation was also signed by each party.  Pursuant to the stipulation, on April 14, 2017, the Panel issued Scheduling Order Number 2 that, *inter alia*, ordered:  (1) that the two cases be consolidated for all purposes; (2) that to the extent the terms of the stipulation differed from or conflicted with the provisions of the arbitration agreements, that the stipulation operated as an amendment or modification of any such conflicting provision; (3) that the JAMS Employment Arbitration Rules shall apply to the consolidated proceedings; (4) that the JAMS Minimum Standards of Procedural Fairness would apply to the arbitration, except for the following three specifically enumerated situations:  (a) Google would bear all JAMS costs, case management fees and professional fees for the arbitrators' services for the consolidated proceedings; (b) the parties retained all rights and obligations regarding prevailing party and attorney fees for any issues related to the Google v. Levandowski arbitration; and (c) the parties have the same post-arbitration review rights as are stated in the respective underlying agreements and applicable law.  Paragraph 8 of Scheduling Order No. 2 also provided that the Panel

4

ER-Trust-0063

would issue an interim award pursuant to JAMS Rule 24, and that the question of attorneys' fees and costs would be addressed in a Final Award.  The parties also stipulated that the Panel should apply the substantive law of California to the consolidated proceedings.

### B.    Definitive Statement of Claims and Defenses

Google's Demand against Respondent Levandowski, alone, alleged a single cause of action for breach of contract related to Google's purchase of 510 Systems and Anthony's Robots.  Google's initial and amended Demands for Arbitration against Levandowski and Ron, jointly, alleged seven claims styled as "causes of action."[3]  In their initial response, Respondents denied the substantive claims, jointly asserted eight affirmative defenses[4] and alleged three counterclaims.[5]

At the direction of the Panel, on November 6, 2017, Google submitted a Definitive Statement of Claims and Defenses for the now consolidated case.  Google's Definitive Statement of Claims alleged the same individual claim against Levandowski, and the same joint claims against Levandowski and Ron that were contained in its initial and in its amended Demands.

Respondents' Definitive Statement of Responses did not include counterclaims. Respondents incorporated by reference their original Response.  In addition to the eight

---

[3] First Cause of Action - Breach of Contract; Second Cause of Action - Breach of Fiduciary Duties and /or Duties of Loyalty; Third Cause of Action - Fraud-Deceit; Fourth Cause of Action - Tortious Interference with Contract; Fifth Cause of Action - Tortious Interference with Prospective Economic Advantage; Sixth Cause of Action - Unlawful Conduct and Unfair Competition; Seventh Cause of Action - Unjust Enrichment.

[4] First Affirmative Defense - Failure to State a Claim; Second Affirmative Defense - Improper Restraint of Competition and Employee Freedom; Third Affirmative Defense - Waiver; Fourth Affirmative Defense - Estoppel; Fifth Affirmative Defense - Unclear Hands; Sixth Affirmative Defense - Statute of Limitations; Seventh Affirmative Defense - Laches; and Eighth Affirmative Defense - Mitigation.

[5] Violation of the California Labor Code, Breach of Contract and Unfair Competition in Violation of California Business and Professions Code.

ER-Trust-0064

affirmative defenses originally alleged, Respondents alleged an additional fourteen affirmative defenses for a total of twenty-two affirmative defenses.[6]

When a seat on the Panel became vacant due to the untimely and unfortunate death of Judge Brick, the JAMS administrative process was initiated to fill the vacancy.  On June 23, 2017, in Scheduling Order Number 4, the Panel acknowledged that Alexander L. Brainerd, Esq. was chosen to fill the vacancy.  The parties stipulated to the appointment by JAMS of Justice Panelli as Panel Chair.

On March 9, 2018, for personal reasons unrelated to the case, Justice Panelli voluntarily stepped down from the Panel.  On March 12, 2018, under the JAMS administrative process, the parties stipulated to the appointment by JAMS of the Honorable Read Ambler (Ret.) to the Panel.  With the stipulation of the parties, Judge Ware was appointed by JAMS as the Panel Chair.

### C.  Pre-hearing Motions

During the course of pre-hearing proceedings, the parties submitted multiple motions.  The index of "Motions" in the CaseAnywhere System, lists over 170 entries.  Some

---

[6] First Affirmative Defense - Failure to State a Claim; Second Affirmative Defense - Improper Restraint of Competition and Employee Freedom; Third Affirmative Defense - Waiver; Fourth Affirmative Defense - Estoppel; Fifth Affirmative Defense - Unclean Hands; Sixth Affirmative Defense - Statute of Limitations; Seventh Affirmative Defense - Laches; Eighth Affirmative Defense - Mitigation; Ninth Affirmative Defense - CUTSA Preemption; Tenth Affirmative Defense - Economic Loss Doctrine; Eleventh Affirmative Defense - Voluntary Payment Doctrine; Twelfth Affirmative Defense - Lack of Standing; Thirteenth Affirmative Defense - Failure to Exercise Due Diligence; Fourteenth Affirmative Defense - Accord and Satisfaction; Fifteenth Affirmative Defense - Misrepresentation; Sixteenth Affirmative Defense - Unconstitutionality of Punitive Damages; Seventeenth Affirmative Defense - Offset; Eighteenth Affirmative Defense - Parol Evidence and Integration; Nineteenth Affirmative Defense - Assumption of Risk; Twentieth Affirmative Defense - No Actual Injury; Twenty-First Affirmative Defense - Lack of Causation; and Twenty-Second Affirmative Defense -Res Judicata/Collateral Estoppel.

ER-Trust-0065

of the motions implicated third parties. With the consent of the parties, the Panel permitted third parties to address those motions.

For all noticed motions, the Panel provided the parties with written orders explaining its reasoning. Below, the Panel briefly summarizes some of the pre-hearing motions and Orders.

### 1.   Disclosure and Discovery Motions

Numerous motions were filed asking the Panel to enforce JAMS Rule 17 regarding the disclosure of information:

May 12, 2017 – Order granting Google's motion to compel Levandowski to comply with disclosure obligations under Rule 17;

May 13, 2017 – Order granting Google's motion to compel Ron to comply with Rule 17 disclosure obligations;

July 13, 2017 – Order denying Levandowski's motion for order prohibiting Google from introducing evidence at the hearing relating to Google's trade secrets;

August 21, 2017 – Order granting Ron's motion to compel production of performance-related information under Rule 17;

January 9, 2018 – Order granting Google's request to take certain depositions;

January 19, 2018 – Order granting Levandowski's request to take certain depositions.

### 2.   Fifth Amendment Privilege Issues

During pre-hearing proceedings, Levandowski refused to respond to some disclosure and discovery requests on the ground that he was privileged to refuse to respond under the attorney-client and self-incrimination privilege provided by the Fifth

7

ER-Trust-0066

Amendment to the United States Constitution.[7]  Various motions were filed that involved Levandowski's assertion of his Fifth Amendment privilege against self-incrimination.  The Panel sustained Levandowski's privilege assertion as to testimonial responses.

On April 13, 2018, after pre-hearing discovery had closed, Google submitted a motion for evidentiary sanctions against Levandowski for his invocation of the Fifth Amendment.  Levandowski filed a cross-motion to bifurcate the arbitration hearing and to allow him to make a limited waiver of his Fifth Amendment privilege.  Levandowski also offered to reopen discovery to allow him to submit to a deposition on questions congruent with his proposed limited waiver.  On April 24, 2018, the Panel denied Levandowski's motion to testify as to any subject matter as to which a Fifth Amendment privilege was asserted during pre-hearing discovery.  In light of that ruling, Levandowski's motions to bifurcate and to reopen discovery were denied as unnecessary.

### 3.   Stroz Materials

During pre-hearing proceedings, Google proffered evidence that on February 22, 2016, after Respondents had resigned their employment with Google, Respondents had executed a final term sheet with Uber under which Uber would buy Respondents' equity in Otto and would indemnify Respondents for "bad acts" committed by Respondents.  The

---

[7] During a portion of the time of these proceedings a civil action was pending in the United States District Court for the Northern District of California entitled, Waymo LLC v. Uber Technologies, Inc., Ottomotto LLC; and Otto Trucking LLC. No. C 17-00939 WHA.  In that action Waymo alleged, *inter alia*, misappropriation of trade secrets.  Waymo alleged that to start Ottomotto ("Otto") and Otto Trucking, Levandowski had downloaded over 14,000 confidential files concerning the same autonomous vehicle technology that is involved in these arbitration proceedings.  During the proceedings in the U.S. District Court, the trial judge referred Levandowski's conduct to the U.S. Attorney.  Thereafter, in both the federal proceedings and in this arbitration, Levandowski consistently asserted a Fifth Amendment privilege.

ER-Trust-0067

term sheet provided that prior to signing final acquisition and indemnity documents, Uber

would conduct due diligence. As part of its due diligence, Uber retained a firm named Stroz

Friedberg to conduct an investigation that involved attestations by certain employee of

Otto about his or her conduct. In doing so, Stroz Friedberg had obtained statements from

Levandowski and others and produced a report (for convenience referred to as the "Stroz

Materials"). Google further proffered that in the Waymo Litigation,[8] Google had made a

motion to compel Uber to produce a copy of the Stroz Materials and Uber had objected to

production on the grounds that the materials were privileged materials and were protected

as work-product. The District Judge ultimately found against Uber and the Stroz Materials

were produced in the federal case, a copy of which was filed in the public docket.

On September 22, 2017, Google moved the Panel to compel Uber to produce the

Stroz Materials for this arbitration. On October 24, 2017, the Chair of the Panel granted

Google's motion. On appeal to the full Panel, a majority of the Panel affirmed that ruling.

Uber appealed the Panel's Order to the Superior Court, Judge Kahn, presiding.

On January 16, 2018, Judge Kahn issued an Order vacating the Panel's discovery

order, ruling that the Stroz Materials were privileged, and that Google could not compel

production of them from Uber. Google appealed Judge Kahn's order to the California Court

of Appeals. Pending a decision on the appeal, the parties stipulated to wall-off the Stroz

Materials from these proceedings.

Concurrently, some of the Stroz Materials had been disclosed to Google by

Levandowski. On January 23, 2018, Levandowski sought to claw back an unredacted

version of his Stroz interview memorandum that he had voluntarily produced. When

---

[a] See fn. 7.

9

ER-Trust-0068

Google refused to agree to the clawback, Levandowski made a motion to allow the clawback. On March 18, 2018, the Panel granted Levandowski's motion and ordered the clawback. Levandowski later realized that he had produced other Stroz Materials that had not been the subject of the clawback motion; those materials had been listed on Google's list of proposed exhibits. A motion *in limine* to exclude those materials was granted by the Panel.

Google's appeal of Judge Kahn's order was still pending when the arbitration hearing commenced and concluded. Based on the pending appeal, the Stroz Materials were not received in evidence during the hearing. Although some of the Stroz Materials were on the public docket, none of the members of the Panel accessed or read the material.

### 4. Evidentiary Stipulations

During pre-hearing proceedings, during and after the merits hearing, and in post-hearing submissions, the parties submitted evidentiary stipulations. All of these stipulations were accepted by the Panel.

### 5. Request for Adverse Presumption

In pre-hearing motions, Google argued that Respondents failed to retain relevant information and documents and engaged in spoliation. Google requested the Panel to sanction Respondents by applying an adverse inference. The matter was taken under submission and reserved for decision after hearing all evidence.[9]

### D. The Arbitration Hearing

In pre-arbitration conferences the parties requested the Panel to schedule 10 days for the hearing. They stipulated to the division of the scheduled-time between and among

---

[9] See discussion at section II(E)5 *infra.*

10

ER-Trust-0069

them. During the hearing the parties kept track of how each used the time and coordinated the presentation of witnesses to maximize their time. The Panel commends the parties for their diligent use of the allotted time.

Prior to the hearing, the parties submitted pre-hearing briefs. The arbitration hearing commenced on April 30, 2018 and continued on May 1-4 and May 7-11, 2018 at the JAMS Resolution Center in San Francisco. As arranged by the parties, a stenographer recorded the proceedings.

At each hearing, the parties were represented by their counsel of record. During the hearing, third-party witnesses were called. Occasionally, counsel for a third-party witness attended the hearing during a client's testimony. Documentary and demonstrative exhibits were accepted into evidence at the hearing.

The following witnesses testified at the hearing:

| Witnesses Who Testified In-Person | |
|---|---|
| 1.   DMITRI DOLGOV | 16. ALEX COOPER |
| 2.   DON HARRISON | 17. CHRIS URMSON |
| 3.   IONUT IORDACHE | 18. MICHIELE RODERICK |
| 4.   SEBASTIAN THRUN, PhD | 19. JOHN KRAFCIK |
| 5.   STACY SULLIVAN | 20. MICHAEL XING |
| 6.   LAILA MATTOS, PhD | 21. CAMERON POETZSCHER |
| 7.   CHELSEA BAILEY | 22. LIOR RON |
| 8.   PIERRE-YVEZ DROZ | 23. COLIN SEBERN |
| 9.   DON BURNETTE | 24. TRAVIS KALANICK |
| 10. RHIAN MORGAN | 25. CLAIRE DELAUNAY |
| 11. NINA QI | 26. GAETAN PENNECOT |
| 12. DREW ULRICH | 27. SCOTT RYVOLA |
| 13. BRENT SCHWARZ | 28. ZACHARY MORRISS |
| 14. JAMES HASLIM | 29. AARON CRUM |
| 15. OGNEN STOJANOVSKI | 30. SOREN JUELSGARRD |
| | 31. NATHANIEL FAIRFIELD |
| Witnesses Who Testified via Video Conference | |
| 32. BRYAN SALESKY | |
| Witnesses Who Were Tendered and Accepted as Experts | |
| 33. JOHN MONTEGUDO | |
| 34. MATTHEW MARX, PHD | |

11

ER-Trust-0070

| 35. ERIK LAYKIN |
| 36. BRIAN DURRELL |
| 37. JOHN HARTOG |
| 38. DOUGLAS KIDDER |
| 39. ANDREW METRICK, PhD |
| 40. JOSEPH SHAW |
| 41. JAMES MALACKOWSKI |
| Witnesses Whose Deposition Testimony Was Submitted Into the Record[10] |
| 42. MATTHEW BLATTMACHR |
| 43. SASHA ZBROZEK |
| 44. TODD STEINER |
| 45. ANDREW BARTON-SWEENEY |
| 46. JOHN BARES |
| 47. LARRY PAGE |
| 49. DAVID LAWEE |

### E.  Post-Hearing Proceedings

Following the hearing, the parties submitted opening post-hearing briefs.  In the post-hearing briefs, an issue arose with respect to whether one or more of Google's claims that had not been specifically addressed had been withdrawn and, if so, the implication of any withdrawal.  During its consideration of that issue, the Panel noted that it had not ruled on the status of withdrawn counterclaims and that there were affirmative defenses that had not been specifically addressed.  The Panel now states its dispositions regarding all unaddressed claims, counterclaims and affirmative defenses.

### 1.  Disposition of Unaddressed Claims

On April 26, 2018, Google submitted a Pre-hearing Brief.  In a section entitled "Preview of Claims," Google did not discuss four of its originally filed causes of actions against Levandowski and Ron (grouped together for reference as the "subject tort claims"):

---

[10] In the deposition transcripts the parties highlighted the offered testimony.  In some instances, there were objections to deposition testimony.  All objections to deposition testimony were resolved during deliberations of the Panel.

12

ER-Trust-0071

(1) fraud; (2) tortious interference with contract; (3) tortious interference with prospective economic advantage; and (4) the Second Cause of Action of the Amended Joint Demand for breach of fiduciary duty against Respondent Ron.[11]  During the hearing, Google did not present evidence or argument on the subject tort claims.

In its post-hearing brief, Respondents argued that Google had waived the subject tort claims.  Respondents requested a partial award in their favor with respect to the subject tort claims.[12]  In an August 7, 2018, letter to the Panel, Google contended that the four claims had not been waived but had been withdrawn.  In an August 10, 2018, letter to the Panel, Respondents contended that Google's failure to address the subject tort claims should not be regarded as a "withdrawal" because Google failed to comply with the notice requirement of JAMS Rule 13(b).  Respondents reiterated their request for a partial award in their favor on the claims that Google was no longer pursuing.  Respondents also requested that Google be estopped from relying on these claims to support its damages theories.  On August 14, 2018, Google submitted a letter to the Panel objecting to Respondents' request for a partial award on the ground that because the Panel had not heard evidence on the withdrawn claims, no award was appropriate.  In addition, Google pointed out that no partial award was rendered when Respondent Levandowski withdrew

---

[11] The subject tort claims were the Third, Fourth, and Fifth Causes of Action of the Amended Joint Demand and a part of the Second Cause of Action of the Amended Joint Demand as to Respondent Ron.  The Second Cause of Action contains allegations that Respondent Ron breached Fiduciary Duties and/or Duties of Loyalty.  Google's reference to withdrawing its breach of fiduciary duty claim against Respondent Ron leads the Panel to conclude that Google did not withdraw its allegations in the Second Cause of Action for breach of loyalty against Levandowski and Ron.

[12] "Google's brief no longer alleges fraud, tortious interference with contract, or tortious interference with prospective economic advantage against either Respondent, nor does it allege breach of fiduciary duty against Ron.  Those claims have been waived, and Respondents should be issued a partial award in their favor as to those claims."  (Resp. Post-Hrg. Brief at 3, n.1.)

ER-Trust-0072

his counterclaims.  As to the effect of the withdrawn claims on damages, Google argued that

the withdrawn claims should have no impact on the remaining tort claims for breach of

duty of loyalty and breach of fiduciary duty or on contract damages.

The Panel noted that the letters regarding the subject tort claims were outside of the

post-hearing briefing schedule that the Panel had ordered.  However, the Panel determined

to take up the dispute.  On August 14, 2018, the Panel directed the parties to submit formal

briefs on the issue of "whether Rule 13(b) applies, whether it was 'effectively' complied

with and the effect of the procedural history on the disposition of the subject claims."  On

August 24, 2018, formal briefs were submitted, and the Panel took the matter under

submission for decision.  The Panel now states its disposition.

JAMS Rule 13(b) provides a party with a conditional unilateral right to withdraw a

claim without prejudice:

> A Party that asserts a claim or counterclaim may unilaterally withdraw that
> claim or counterclaim without prejudice by serving written notice on the
> other Parties and the Arbitrator.  However, the opposing Parties may, within
> seven (7) calendar days of service of such notice, request that the Arbitrator
> condition the withdrawal upon such terms as he or she may direct.

Google's pre-hearing brief did not expressly state that the subject tort claims were

being withdrawn without prejudice.  Indeed, the subject tort claims were not discussed at

all.  Thus, the Panel finds that the pre-hearing brief did not satisfy Rule 13(b) as notice of

withdrawal without prejudice.  However, the Panel proceeds to determine if the four claims

should be dismissed as withdrawn *with* prejudice.

In his opening statement, Google's counsel stated:

> And the bad acts included all the types of claims that we're presenting here:
> breach of fiduciary, breach of the duty of loyalty, breach of the obligation not
> to solicit breach of the obligation not to compete.  These were all the things
> that they demanded Uber indemnify them for.
> * * *

14

ER-Trust-0073

> So, as a result, we're asking for three forms of relief.  First, the compensation paid to those two while they were disloyal; second damages for the valuable team of engineers that were taken without compensation from Google; and, third, damages for the cost of retaining people.  (Tr. 15-16.)[13]

In its August 24, 2018 brief, Google stated that it is "willing to agree that it will not" pursue the withdrawn tort claims in the future.  Although the JAMS Employment Rules apply to this case, by analogy, Section 581(d) of the California Code of Civil Procedure provides:

> Except as otherwise provided in subdivision (e), the court shall dismiss the complaint, or any cause of action asserted in it, in its entirety or as to any defendant, with prejudice when upon the trial and before the final submission of the case, the plaintiff abandons it.  Cal. Code Civ. Proc. § 581(d).

Accordingly, the Panel finds that the subject tort claims were abandoned by Google and accordingly, dismisses them with prejudice.

### 2.    Disposition of Unaddressed Counterclaims

On May 12, 2017, Levandowski submitted a "Notice of Dismissal of Counterclaims without Prejudice."[14]  Respondent Ron took the position that he had not submitted any counterclaims.  At a hearing on June 9, 2017, "to remove any doubt," Ron's counsel agreed to dismiss any counterclaims without prejudice.[15]

Section 581(d) of Cal. Civ. Proc. also applies by analogy to Levandowski's counterclaims that were dismissed without prejudice on May 12, 2017.  The Panel now orders those counterclaims dismissed with prejudice *nunc pro tunc*.

---

[13] "Tr." refers to the reporter's transcript of the hearing.

[14] Google requested that the Panel impose conditions for acceptance of Levandowski's dismissal of his Counterclaims.  On June 27, 2017, the Panel denied the conditions requested by Google.  The Panel set a deadline for Levandowski to decide whether to allege counterclaims.  Levendowski did not submit counterclaims before the expiration of the Panel's deadline.

[15] See June 27, 2017 Order.

ER-Trust-0074

### 3.   Disposition of Unaddressed Affirmative Defenses

During the hearing and in their post-hearing brief, Respondents did not address

some of their affirmative defenses.  Therefore, the Panel summarily dismisses the following

affirmative defenses as not having been addressed or proved by Respondents:

| As Listed in Definitive Response | Name of Defense |
|---|---|
| Fifth Affirmative Defense | Unclean Hands |
| Seventh Affirmative Defense | Laches |
| Ninth Affirmative Defense | CUTSA Preemption |
| Tenth Affirmative Defense | Economic Loss Doctrine |
| Twelfth Affirmative Defense | Lack of Standing[16] |
| Thirteenth Affirmative Defense | Failure to Exercise Due Diligence[17] |
| Fourteenth Affirmative Defense | Accord and Satisfaction[18] |
| Fifteenth Affirmative Defense | Misrepresentation |
| Sixteenth Affirmative Defense | Unconstitutionality of Punitive Damages |
| Seventeenth Affirmative Defense | Offset |
| Eighteenth Affirmative Defense | Parole Evidence and Integration |
| Nineteenth Affirmative Defense | Assumption of Risk |
| Twentieth Affirmative Defense | No Actual Injury[19] |
| Twenty-First Affirmative Defense | Lack of Causation[20] |
| Twenty-Second Affirmative Defense | Res Judicata/Collateral Estoppel |

With respect to the remaining affirmative defenses, as the Panel discusses each of

Google's remaining claims, the Panel will address any applicable defenses that apply to

each of them.

---

[16] This was alleged as an affirmative defense.  The Panel regards it as a negating defense, meaning an allegation that Google cannot prove an essential element of a claim.  It was not advanced as a separate defense in post-hearing briefing.  To the extent it was subsumed in another defense, it was considered by the Panel when the Panel addressed said defense.
[17] As an affirmative defense, Respondents prosecuted a claim that Google was not entitled to disgorgement of salary or bonus payments on the grounds that they were voluntary payments or constituted waiver.  This unaddressed affirmative defense has elements in common with one or more affirmative defenses that were addressed.  The dismissal of this affirmative defense has no effect on affirmative defenses that were prosecuted or addressed.
[18] See fn. 17.
[19] See fn. 16.
[20] Id.

ER-Trust-0075

### 4.   Reopening of Hearing

On August 14, 2018, the Panel issued an Order that stated, "[o]n August 25, 2018, all the briefs on outstanding issues will have been submitted. Thus, the Panel will declare the hearing closed as of that date; the 90-day clock for the Panel to render a Partial Final Award commences on August 25, 2018." As noted above, the parties had stipulated to issuance of an interim award. The JAMS Rules do not set a fixed deadline for issuance of an interim award. Thus, this declaration of timing was an error. On September 26, 2018, the Panel re-opened the hearing, *sua sponte*, to correct this Order and to confirm that the Panel would issue an Interim Award.

During the reopened proceedings, Google asked the Panel to extend the scope of the re-opened hearing to allow submission of Stroz-related evidence. While that request was taken under submission, the California Supreme Court denied Uber's request to review the Court of Appeal's decision reversing the Superior Court's reversal of the Panel's prior decision finding the Stroz-related materials not privileged and therefore admissible in these proceedings. Because that decision was now final, Google suggested that the Panel might wish to review the Stroz Materials as part of its consideration of Google's request.

In a December 19, 2018 Notice of Intended Decision Regarding the Stroz Materials, on behalf of the Panel, Judge Ware explained that, while the Stroz Materials were highly relevant to the subject of the arbitration proceedings, the "Panel is not disposed to receive submission of the Stroz Materials without reopening the evidentiary hearing. If the Panel were to admit the materials, fairness dictates that Respondents be allowed to present rebuttal evidence. Currently, there is not a motion by either party to reopen the evidentiary hearing before the Panel. Accordingly, the tentative decision of the Panel is to deny

17

ER-Trust-0076

Google's request to submit the Stroz Materials into evidence." The Panel thereafter invited the parties to comment on its Tentative Decision.

On December 27, 2018, the parties submitted their comments. Specifically, the parties explained that they agreed, based on the Panel's tentative decision, that there was no need to reopen the evidentiary hearing. Google therefore withdrew its request to submit the Stroz Materials into evidence. In essence, this meant that Levandowski withdrew his request to testify at any subsequent hearing about the Stroz-related materials.

### 5.   Disposition of Motion for Evidentiary Sanctions

In its post-hearing brief, Google repeated its motion that the Panel apply an evidentiary sanction against Respondents for destruction of evidence. We now address and dispose of that motion.

The Panel received testimony and documents that Respondents instructed individuals to destroy correspondence, cell phone texts and call records.[21] All of the instructions were given before Google initiated these arbitration proceedings.

Google's request is based on a general presumption that Respondents' practices resulted in the destruction of information that is now unavailable. Improper pre-arbitration conduct can be the basis of sanctions when it is done in anticipation of litigation. See Williams v. Russ, 167 Cal. App. 4th 1215, 1223 (2008). Levandowski's instructions on the destruction of communications was received in evidence. We have weighed that evidence, along with all of the other evidence in the case. The Panel declines

---

[21] See e.g., Exhs. 589, 1023, 1043.

18

ER-Trust-0077

to apply an adverse evidentiary inference as a sanction. Therefore, Google's motion is denied.

### 6.   Supplemental Submissions

During the deliberations of the Panel, the parties have submitted to the Panel letter briefs discussing "new authority" in support of their positions. Those material were considered by the Panel in making an Interim Award.

### 7.   Interim Award

On March 26, 2019, pursuant to JAMS Rule 24(d), and the stipulation of the parties, the Panel made the following Interim Award:

> 1. As relief under its First Claim for Breach of the Duty of Loyalty, its Third Claim for Breach of Contract and its Fourth Claim for Unfair Competition, Claimant Google LLC is awarded the following:
>    a.   From Respondent Anthony Scott Levandowski, separately, the principal sum of ███████ as disgorgement of compensation; and
>    b.   From Respondent Lior Ron, separately, the principal sum of ███████ for disgorgement of compensation.
>    c.   From Respondent Anthony Scott Levandowski and Respondent Lior Ron, jointly and severally, the additional principal sum of ███████ for retention bonus damages.
>
> 2. As relief under its Second Claim for Breach of Fiduciary Duty, Claimant Google LLC is not awarded any money damages against Respondent Anthony Scott Levandowski.

In Section VI(3) of the Interim Award the Panel reserved for subsequent proceedings considerations of whether to adopt the Interim Award as the Final Award, liability for and the award of pre-award interest, attorney fees, costs, professional fees and JAMS administrative fees. In post-Interim Award briefs, the parties addressed these and other issues.

Google submitted a Declaration by Douglas Kidder. Among other matters, Kidder declared that the amount the Panel awarded to Google for disgorgement of compensation

19

ER-Trust-0078

did not conform to the actual compensation Respondents received.[22]  There was no

objection to Kidder's calculation.  On December 6, 2019, the Panel issued a Final Award.  In

the Final Award, the Panel modified its findings of compensation paid by Google to

Respondents to conform to Kidder's calculations.  In addition, the Final Award

incorporated non-substantive changes requested by the parties.

On December 12, 2019, pursuant to JAMS Rule 24(j), Google moved the Panel to

correct the Final Award on the grounds that the Panel made computation errors.  On

December 17, 2019, Respondents submitted separate Responses.

III.   **FACTS**

The following is a statement of the facts found by the Panel to be true and necessary

to this Final Award.  To the extent that these facts, and all other facts recited in this Final

Award, differ from any party's position, that is the result of determinations by the Panel as

to credibility, relevance, burden of proof considerations, and the weighing of evidence, both

oral and documentary.

A.   **Respondents' Employment with Google**

Levandowski and Ron were both employees of Google.  Levandowski joined Google

in 2007 and remained continuously employed by the company until he resigned on January

27, 2016.  From 2009 until his departure from the company, Levandowski was part of

Chauffeur, Google's project to develop and bring to market a self-driving vehicle.  For much

of his time with Chauffeur, Levandowski was in charge of an engineering team that was

developing laser technology known as LiDAR that was critical to the success of the project.

20

ER-Trust-0079

Ron was first employed at Google between 2007 and 2011.  In 2011, he left Google and went to work for Motorola.  Ron returned to Google in the fall of 2014 and worked as a project manager on projects unrelated to Chauffeur until he resigned on January 13, 2016.

████████████████████████████████

█████████████████████████████████████

████████

**B.**     **Employment Agreements**

Levandowski and Ron each signed employment contracts that defined the terms and conditions of their employment with Google.  During the course of his employment, Levandowski signed superseding employment contracts.[25]  The provisions of each of the employment contracts were substantively identical.   The following were the pertinent provisions of the employment agreements:

**1.**     **Non-competition Provision**

**a.**     **Levandowski**

I agree that other than as set forth in Sections 2 and 3 of the Side Agreement, I will not engage in any other employment, occupation, or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities, including, but not limited to, employment outside of the Company, membership on Boards of Directors or Advisory Boards other than the Company's, personal investments or establishing, maintaining or servicing business relationships with family or friends that conflict with my obligations to the Company.  (Exh. 120.)

**b.**     **Ron**

---

[23] Through Douglas Kidder, Google presented a summary chart of Levandowski's compensation.  (Kidder Expert Report, Feb. 16, 2018 at 7.)  His compensation records were also received in evidence.
[24] Kidder Expert Report, Feb. 16, 2018 at 11.
[25] See e.g., Exh. 38.

21

**ER-Trust-0080**

During my employment with Google, I will not engage in any other employment or other activities or services directly related to the business in which Google is now involved, becomes involved, or has plans to become involved or that conflict with my obligations to Google without seeking and receiving permission in advance from Google's Ethics and Compliance team. (Exh. 325.)

2.    **Non-solicitation Provision**

a.    **Levandowski**

I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, whether for myself or for any other person or entity.  (Exh. 120.)

b.    **Ron**

To the fullest extent permitted under applicable law, during my employment with Google and for twelve months immediately following its termination for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of Google's employees to leave their employment.  (Exh. 352.)

3.    **Confidential Information Provision**

a.    **Levandowski**

I understand that, as a result of my employment with the Company, I will obtain extensive and valuable Confidential Information belonging to the Company.  I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose . . . without written authorization . . . any Company Confidential Information except under a non-disclosure agreement . . . . (Exh. 120.)

b.    **Ron**

During and after my employment with Google, I will hold in strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of google Confidential Information (whether disclosed to me in anticipation of or during my employment by Google), and I will not (i)

22

ER-Trust-0081

use Google Confidential Information for any purpose other than for the
benefit of Google in the scope of my employment, or (ii) disclose Google
Confidential Information to any third party without the prior written
authorization. (Exh. 352.)

### 4.    Code of Conduct

In their employment contracts, Respondents agreed to adhere to the terms of

Google's Code of Conduct:

I acknowledge that I have read the Company's Code of Conduct, which is
available on the Company's public website and can be found by clicking
"About Google" and looking on the 'Investor Relations' page of the site. I
agree to adhere to the terms of the Code of Conduct and to report any
violations of the Code. (See Exhs. 120, 352.)[26]

Multiple versions of the Code of Conduct were received in evidence,[27] along with a

document entitled "Employee Communications Guidelines."[28] In substance, the Code of

Conduct contained ethical guidelines and a requirement that an employee must disclose

and obtain approval for potential conflicts of interest from his or her manager and from the

Ethics and Compliance Office of Google:[29]

When you are in a situation in which competing loyalties could cause you to
pursue a personal benefit for you, your friends or your family at the expense
of Google or our users, you may be faced with a conflict of interest. All of us
should avoid conflicts of interest and circumstances that reasonably present
the appearance of a conflict.

When faced with a potential conflict of interest, ask yourself:

Would this activity create an incentive for me, or be perceived by
others to create an incentive for me, to benefit myself, my friends or
my family, or an associated business at the expense of Google?

Would this activity harm my reputation, negatively impact my ability

---

[26] The quoted language is from Levandowski's employment contract. There is a no
substantive difference from this wording in Ron's employment contract.

[27] See Exhs. 13, 125.

[28] Exh. 322.

[29] We refer to this provision as the "Disclosure and Approval Provision." See section
IV(C)(2)(b) infra.

ER-Trust-0082

to do my job at Google, or potentially harm Google?

Would this activity embarrass Google or me if it showed up on the front pages of a newspaper or a blog?

If the answer to any of these questions is "yes," the relationship or situation is likely to create a conflict of interest, and you should avoid it.

If you are considering entering into a situation that creates a conflict of interest, don't. If you are in a situation that may create a conflict of interest, or the appearance of a conflict of interest, review the situation with your manager and Ethics & Compliance.

Avoid making personal investments in companies that are Google competitors or business partners when the investment might cause, or appear to cause, you to act in a way that could harm Google.

Finally, do not start your own business if it will compete with Google.

Company information that leaks prematurely into the press or to competitors can hurt our product launches, eliminate our competitive advantage and prove costly in other ways. Our responsibilities extend beyond not revealing confidential Google material – we must also:

> properly secure, label and (when appropriate) dispose of confidential Google material;

> safeguard confidential information that Google receives from others under non-disclosure agreements; and

> take steps to keep our trade secrets and other confidential intellectual property secret.

The Code of Conduct contained a prohibition against disclosure of confidential

information:

> Google's "confidential information" includes financial, product and user information. Make sure that confidential company material stays that way; don't disclose it outside of Google without authorization.

> We collect and store personal information from employees around the world. Access this data only in line with local law and Google internal policies, and keep it secure according to those standards. (Exh. 13.)

24

ER-Trust-0083

Levandowski and Ron were aware of their obligations to comply with these contractual provisions, including Google's conflict of interest policies. Google provided training on conflict of interest issues, and during his employment with Google, Levandowski disclosed several potential conflict issues to Google's management and sought management's guidance and approval.[30]

### C.     Project Chauffeur

In 2009, Google launched a project to develop hardware and software for self-driving vehicles that it called Project Chauffeur. Because it was considered to be unique, revolutionary, and if successful, would introduce world-wide structural change, Project Chauffeur was considered a "moonshot" project.

Dr. Sebastian Thrun was the original Director of Project Chauffeur. He, together with a few other members of Google's Street View Project were designated as founding members of Chauffeur. Levandowski was one of the founding members. The project eventually grew into an independent subsidiary, Waymo LLC, with over 675 employees.

Levandowski was eventually placed in charge of an engineering team that was developing LiDAR sensors, a vital component of self-driving technology. Google had determined that it needed to develop a proprietary sensor and the success of that effort was critical to the overall success of Chauffeur.

LiDAR stands for light detection and ranging. A LiDAR sensor sends out a beam of light into the surrounding environment. When the light hits an object, it will bounce back and the sensor, together with related technology, will measure the qualities of the return signal to determine the size, shape and distance of the object. In operation, the LiDAR

---

[30] See e.g., Exh. 1541.127.

ER-Trust-0084

sensor beams or pulses at a rate of up to millions of pulses per second and by using a mirror the light may be disbursed in a 360 degree pattern around the vehicle. Through the storage and processing of the return signals, the vehicle obtains a comprehensive understanding of the world around it.

In implementing self-driving technology, a LiDAR sensor can perform two critical functions: mapping and perception. First, a sensor can be used to create a comprehensive base map of the static environment in which the vehicle will operate. For example, a LiDAR sensor, together with related technology, can be used to create a map of every street, building and fixed object in San Francisco. The second application of a LiDAR sensor, sometimes referred to as perception, is to become the eyes and ears of the vehicle by dynamically detecting what is going on around the vehicle while it is moving through a previously mapped environment. In this application, the sensor in concert with other technology will detect on a real time basis the presence of other vehicles, pedestrians, temporary obstacles and any other danger or impediment so that the vehicle may drive safely to its destination.

Google uses the same LiDAR sensor for both mapping and perception. Accordingly, Google invested significant time, energy and resources to assemble the LiDAR sensor team that Levandowski led. The LiDAR team was of vital importance to Project Chauffeur and to its ability to compete with Uber and other companies trying to develop self-driving technology.

### D.  Google's Acquisition of 510 Systems and Anthony's Robots

At or shortly after the time he joined Google, Levandowski formed two companies, 510 Systems LLC ("510"), formed on May 11, 2007, and Anthony's Robots LLC ("AR"),

26

ER-Trust-0085

formed on June 12, 2008.[31]  Pursuant to Google's requirement that employees disclose their outside business activities so as to avoid conflicts, Levandowski disclosed these outside interests to Google officials.[32]  Levandowski represented to Google officials that upon joining the Google Street View Project, he retained his ownership interest in 510 but had "left" active involvement in 510.[33]

Because a significant part of 510's business was the development of LiDAR technology, when he joined Project Chauffeur, Levandowski's ownership of 510 and AR continued to be a contentious issue between him and Google's management.  Levandowski licensed the AR technology to Google and signed a side agreement confirming that he would not engage in any outside activities that competed with Google.  However, in addition, Google decided that it wanted to develop a proprietary LiDAR sensor and also determined that 510's technology and engineering team would significantly advance that effort.  Accordingly, in 2010, Google decided to buy the two companies and entered into extensive negotiations with Levandowski for their acquisition.

After a lengthy period of negotiations, on July 28, 2011, Google signed binding merger and acquisition agreements with 510 and AR.  The two agreements contained integration clauses and cited "Aggregate Acquisition Consideration" of ███████ for 510

---

[31] Exh. 374.

[32] Exh. 5.

[33] "510 Systems is a robot and software engineering firm that has done business with ███ since 2004.  In 2005 ███ and 510 Systems bulid [sic] a ███████ which now operate [sic] around the world. ███████ Darpa Grand Challenge that is now at the [S]mithsonian. ... 510 [S]ystems builds software for ███ that provides the synchronization of the GPS, encoder, lasers and IMU signals.  Upon joining [Google], I left 510 [S]ystems and disclosed this to Sebastian, my manager.  510 Systems receives revenue from ███ for a variety of work, including work relating to the ███ that [G]oogle buys from ███" (Exh. 1.)

ER-Trust-0086

and ████ for AR. The transactions closed in October of 2011.

As a result of the acquisition, Google acquired all of 510's and AR's technology, business, and "business promise," including the LiDAR technology developed by 510. That technology included ████████████████████ ████████ known as ████████ ███ ████ . After the acquisition, Google ████████████████ including the development and sale of the ████████ . While it ████ any effort to develop the ████ system, Google did ████████████ for about a year and still ████████████████ . The ████ sensor developed by 510 and still employed by Google is ████████████

As part of the acquisition and merger agreements with both 510 and AR, Levandowski and Google entered into Non-Competition and a Non-Solicitation Agreements (the "2011 NCNS Agreements"). As the managing member of the two LLCs, Levandowski personally agreed:

> During the Non-Competition Period (as defined below), Member [Levandowski] shall not (other than in connection with his or her provision of services as an employee or consultant to any Parent Entity (as defined below), without prior written consent of Parent [Google], directly or indirectly: (a) Engage, anywhere in the Restricted Territory (as defined below), in any Competing Business Purpose (as defined below); (b) be or become an officer, director, member, stockholder, owner, affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of any Person or business that engages or participates in a Competing Business Purpose in the Restricted Territory; or (c) contact, solicit or communicate with any Person known to Member to be a customer of any Parent Entity or any former customer of the Company in connection with a Competing Business Purpose (whether or not such Member has had personal contact

28

ER-Trust-0087

with such Person). (Exhs. 107, 108.)

The 2011 NCNS Agreements defined the following relevant terms:

"Competing Business Purpose" means any business or enterprise (including research and development), operations, activities or services that (i) are related to the design, development, manufacture or commercialization or positioning, navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics technologies, or (ii) provides the products and services of the Company as such exist or are contemplated as of the Closing Date.

"Non-Competition Period" means the period commencing on the Closing Date and ending on the two (2) year anniversary of the Closing Date.

Term and Severability of Covenants: If Member breaches any covenant set forth in Section 2 or Section 3 hereof, the term of such covenant shall be extended by the period of the duration of such breach . . . . (Exhs. 107, 108.)

In the 2011 NCNS Agreements, Levandowski agreed to the following non-solicitation provision:

Member further agrees that Member shall not during the period commencing on the Closing Date and ending of the later of the two (2) year anniversary of the Closing Date or the termination of Member's employment with or provision of consulting services to any Parent Entity (the "Non-Solicitation Period"), directly or indirectly, without the prior written consent of Parent: (a) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage, any Former Company Employee (as described below) or any other employee or consultant of any Parent Entity, to leave his or her employment or service with any Parent Entity or take away employees or consultants; or (b) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage any Former Company Employee or any other employee or consultant of any Parent Entity to engage in any activity in which Member would, under the provisions of Section 2 hereof, be prohibited from engaging. "Former Company Employee" means any current employee or consultant of the Company who accepts an offer of employment with any Parent Entity. (Exhs. 107, 108.)

ER-Trust-0088

### E.   Chauffeur Bonus Plan

In 2012, Google created a bonus plan that it called the Project Chauffeur Bonus Program (the "Chauffeur Bonus Plan" or the "Plan") and made it available to certain senior members of Project Chauffeur.  The Chauffeur Bonus Plan had two primary purposes:  to retain critical members of the Project Chauffeur team and to incentivize their efforts to increase the value of the Chauffeur project.

During the development of the Chauffeur Bonus Plan, Google's management discussed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆.  At one point, consideration was given to ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  However, the final 510 and AR acquisition documents and the final Chauffeur Bonus Plan documents do not recite or confirm that any part of Levandowski's allocation in the Chauffeur Bonus Plan was given as consideration for the sale of 510 and AR.



On January 1, 2012, Levandowski received a letter from Google giving him the option of continuing under Google's regular bonus program or becoming a participant in the Chauffeur Bonus Plan.  Levandowski was advised that if he elected to participate in the Chauffeur Bonus Plan, he would be eligible to receive an initial allocation of ▆▆▆▆▆▆, which was ▆▆▆ of the original valuation of the Plan.  The January 1, 2012 letter also recited that the existence of the Chauffeur Bonus Plan, the terms set forth in the letter and the Project Chauffeur technology were all confidential and could not be disclosed to any third party.  Levandowski was also advised that if he elected to become a participant in the Plan, he would have to sign a new employment agreement with the company.

On February 24, 2012, Levandowski elected to participate in the Plan, and on the

ER-Trust-0089

same day, he signed a new at-will Employment, Confidential Information, Invention Assignment and Arbitration Agreement. The new employment agreement contained provisions regarding confidentiality, conflicting activities, non-solicitation and Google's Code of Conduct that were substantially identical to those in his earlier employment contracts.

Each participant in the Chauffeur Bonus Plan received an initial allocation upon election to participate in the plan. As noted above, Levandowski's allocation was ████████, or ████ of the Plan. However, the Plan has a vesting schedule which provides that each participant's interest vests in ████████████████████ ████████. Accordingly, Levandowski's interest in the Plan did not fully ████ until ████ ████████. If for any reason a participant in the Chauffeur Bonus Plan ████████ Google, the participant ████████████████████████ ████████████████. Under the Plan, if a participant leaves Google, any final payment due under the Plan would not be paid until six months after the date of departure.

While the Chauffeur Bonus Plan had an original valuation of ████████, Google was required to ████████████████████. At the time of Levandowski's departure from Google in January 2016, the Chauffeur Bonus Plan was valued at ████ ████. The payouts under the Chauffeur Bonus Plan were scheduled to occur in ████ ████████. Levandowski received his first payment of ████████ on December 31, 2015.

### F.   Odin Wave/Tyto LiDAR

Without disclosing it to Google, beginning in the spring of 2012, Levandowski took steps to create a LiDAR company that initially he called Odin Wave. The company's name was later changed to Tyto LiDAR. For ease of reference in this Final Award, the company,

31

ER-Trust-0090

both before and after its name change, will be referred to as Tyto LiDAR or Tyto.

On April 1, 2012, Levandowski reached out to James Haslim ("Haslim"), a prior acquaintance and engineer with significant experience in LiDAR technology, regarding the possibility of joining a startup company dedicated to the development of a LIDAR sensor. After an initial meeting in early April, Haslim expressed great interest in joining what he understood to be Levandowski's company.

Sometime during the same month of April 2012, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ who was interested in creating a startup company to develop a low-cost LiDAR sensor for high definition mapping and other applications, met with Levandowski to explore his idea with him. On May 29, 2012, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



The original business plan for

ER-Trust-0091

the company 

To the extent that the loans were paid off, the money used to retire those loans was received from a holding company known as ▮▮▮▮▮▮▮▮▮▮

Tyto LiDAR was created to develop a high-accuracy mapping LiDAR sensor that would cost significantly less than competing sensors already on the market. After several years of development, Tyto LiDAR eventually produced its Owl sensor, which was a high-accuracy mapping sensor that Tyto LiDAR intended for various non-self-driving applications, including transportation infrastructure mapping, linear assets mapping and historical preservation. However, by 2015, Tyto LiDAR was attempting to market its technology to self-driving companies including Uber and Zoox. By that time, ▮▮▮▮▮▮ believed there was a huge opportunity for Tyto LiDAR's technology to be used in creating

33

ER-Trust-0092

the base maps necessary to implement self-driving technology. In April of 2016, Tyto LiDAR was sold to Otto, which as discussed below, was a self-driving company that had been formed by Levandowski and Ron.

At no time before he left Google did Levandowski ever advise Google of his involvement with Tyto LiDAR. To the contrary, when asked whether he had any financial interest in the company, Levandowski denied that did and he did not offer any information concerning his participation in Tyto LiDAR. In May of 2015, Google evaluated Tyto's LiDAR sensors for possible purchase and even gave some consideration to buying the company. That evaluation was led by one of Google's engineers, Alex Cooper ("Cooper"). Cooper became aware of Levandowski's expertise in the field of LiDAR sensors and sought his assistance in evaluating Tyto LiDAR's technology and products. As part of that evaluation, Levandowski attended a meeting between the Google team and Tyto LiDAR. At no time during the Tyto LiDAR evaluation, including Google's meeting with Tyto LiDAR, did Levandowski disclose to Cooper or any other Google employee his involvement with Tyto LiDAR.

### G.     280 Systems/Otto

In May of 2015, Levandowski reached out to Uber CEO Travis Kalanick ("Kalanick") to ostensibly discuss their common interest in robots, which was Levandowski's catch-all phrase for a wide range of technology, including self-driving cars. At that time, Uber was heavily investing in, and aggressively pursuing, a self-driving technology program. In fact, Kalanick had declared that self-driving or autonomous vehicle technology was existential for Uber. That initial contact evolved into a series of contacts between Levandowski and various Uber employees, and in mid-July of 2015, Levandowski advised Uber that he was considering leaving Google and taking most of his team with him. This possibility was of

34

ER-Trust-0093

extreme interest to Uber because Kalanick believed that Google was ahead of Uber in the development of self-driving technology and that most of the talented engineers and scientists dedicated to that technology worked for Google.

In September of 2015, Levandowski and Ron, who were both dissatisfied with their roles at Google, began to brainstorm various alternatives to their situations. Those alternatives included trying to convince Google to implement an aggressive to market strategy for Project Chauffeur, to set up a new company within the Google system, or to start a new company outside of Google. The alternative of establishing a new company outside of Google became the primary focus of their activities in the fall of 2015, as they started to implement a plan to form a new company, 280 Systems ("280"), which would focus on self-driving technology, initially applied to trucks. 280 later changed its name to Ottomotto LLC ("Otto").[34] In furtherance of their plan, Levandowski and Ron started to look for financing and hired the law firm of Fenwick & West to assist in the formation of the company. They also created a preliminary business plan that identified certain key Google employees that would be part of the original team and that also included a list of Google employees to recruit.

In the fall of 2015, Levandowski and Ron entered into extensive negotiations with Uber, Google's primary competitor in the self-driving space, regarding a commercial relationship with Otto. They met with Uber's senior management in corporate development, including Cameron Poetzscher ("Poetzscher"), Nina Qi ("Qi") and Brian

---

[34] Levandowski and Ron considered several names for their company. Initially, they referred to the company as Full Throttle. However, at the time it was incorporated on January 13, 2016, the company was known as 280 Systems LLC. The company name was later changed to Ottomotto LLC. The Company was generally referred to by the parties as "Otto" during these proceedings.

ER-Trust-0094

McClendon ("McClendon").  At times, they also met with John Bares ("Bares"), who was in charge of developing Uber's self-driving technology.  By September 30, 2015, Uber had circulated a proposed term sheet that provided that Uber would become a significant investor in and commercial partner of Otto, which was referred to as "NewCo" during the negotiations, and that Otto would provide Uber with a low-cost laser designed for high resolution, fully autonomous usage in self-driving cars.

Negotiations continued during October of 2015.  On October 22, 2015, a new term sheet was circulated that provided that Uber would become a major commercial partner in Otto and that Otto would build LiDAR sensors for self-driving or autonomous usage and provide them to Uber on an exclusive basis.  Concurrent with these negotiations were discussions between Uber and Levandowski and Ron concerning how Otto would be staffed.  Uber was told that Otto would be comprised of a team of approximately 25 individuals from Google.  Levandowski also told Uber that he was recruiting from the most experienced, founding members of Project Chauffeur.

On ▮▮▮▮▮▮▮▮▮, as Levandowski and Ron continued their secret negotiations with Uber, the ▮▮▮▮▮▮ of Levandowski's Initial Allocation under the Chauffeur Bonus Plan ▮▮▮.  At that time, the value of the Chauffeur Bonus Plan was set at ▮▮▮▮▮▮.  On November 20, 2015, the valuation of the Chauffeur Bonus Plan ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.  On December 31, 2015, not knowing of Levandowski's formation of Otto and his negotiations with Uber, Google made the first Chauffeur Bonus Plan payment to Levandowski in the amount of ▮▮▮▮▮▮.

In late December 2015 or early January of 2016, Uber's senior management determined that instead of concluding the pending commercial deal to purchase LiDAR sensors from Otto, it was in Uber's best interest to acquire the company.  Accordingly, at

36

ER-Trust-0095

that time the negotiations between Levandowski and Ron and Uber shifted to the acquisition of Otto. Those negotiations intensified in January of 2016 with numerous conversations and meetings between the parties. The basic structure of the deal being negotiated was that Uber would acquire Otto and the owners of Otto would receive a payment primarily in Uber RSUs (restricted stock units) that would be paid pursuant to a schedule of milestones that related to the progress being made in the development of the self-driving technology. Accordingly, two of the principal deal points under negotiation were the milestones and the number of RSUs that Otto would receive when it was sold to Uber.

On January 8, 2016, Ron personally delivered to Uber a revised set of proposed milestones. By January 12, Poetzscher believed that the parties were very close to signing a term sheet. On January 13, Ron resigned from Google and Otto was formally incorporated. On January 14, the Uber team met with Levandowski and provided him with detailed milestones and a detailed compensation structure. On January 27, 2017, Levandowski resigned from Google, and his employment terminated on that day.

On February 22, 2016, a term sheet was executed by Uber, Levandowski and Ron for the sale of Otto to Uber. The term sheet provided that Uber would acquire 100% of Otto in exchange for $592 million in Uber RSUs, to be paid out pursuant to established milestones. The term sheet also required Otto to provide Uber with at least 25 employees before the transaction would close. This was a critical term for Uber, as it always saw the value of the transaction to be the team of scientists and engineers skilled in self-driving technology that it would acquire. Bares, Uber's engineer in charge of its autonomous driving program, wrote to Uber's senior management:

> Wanted to weigh in on the value of the team to Uber AV. The nexus of this

37

ER-Trust-0096

group represents a couple of very significant things to our AV efforts. First Anthony and his close team have developed several generations of mid- and long range laser(s) that we now believe critical to AV's autonomy (day and night).  Not only do they have several generations of experience but also know how to improve on next-gen devices that they would build for us.  We have yet to find anyone else in the world with this know how.  Our next best choice is to build a team internally and we can do that but probably with a 2-4 year lag on what these guys can do.  Second, just rubbing shoulders with them and having them advise us all over AV has a decent chance of saving Uber at least a year off the race to large-scale AV deployment.  (Exhibit 730.)

Bares also believed that in the market for a talented group of self-driving engineers, its "per head price" was increasing dramatically and there was a premium to be paid to acquire a team of engineers.

Consistent with Bares's assessment of the value of Levandowski's team, the primary method used by Uber to value the Otto transaction was to establish a per-member value for the team.  At the time of the February term sheet, that value was being calculated in terms of Uber basis points and the average value for each member of the team was determined to be at least $5 million.  Uber at one time proposed to offer Levandowski a full basis point for each Google employee he successfully recruited, while it would only pay half as much for a non-Google recruit.

### H.   Solicitation of Google Employees

As part of their plan to use Otto to compete with Google, in the fall of 2015, Levandowski and Ron began a targeted campaign to recruit certain Google employees working in Project Chauffeur and other Google projects to join their new company. Levandowski and Ron created a list of Google employees to recruit, ranked according to their criticality and commitment to their new company.  Levandowski, and sometimes Ron, conducted a series of secret meetings with other Google employees to discuss the plans for Otto and to encourage them to join the company.  Some were one-on-one meetings on the

38

ER-Trust-0097

Google campus during working hours.   Other meetings took place off campus.

After Respondents' negotiations to sell Otto to Uber had begun, they began to focus their efforts on obtaining firm commitments from the Google employees they were recruiting to form the new company.  On January 12, 2016 and again on January 25, two recruitment meetings were held at Levandowski's home.  During their meetings, Respondents outlined their plans for Otto and encouraged the attendees, many of whom were Google employees, to join their company.  In addition to Levandowski and Ron, the following Project Chauffeur employees[35] and others attended one or both meetings:



| # | |
|---|---|
| 1. | Don Burnette, Trajectory Optimizer (planner) |
| 2. | Brian Cullinane |
| 3. | Claire Delaunay, Software Engineer |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | Gaetan Pennecot, Laser Designer (optics and manufacturing) |
| 12. | |
| 13. | Brian Torcellini, Lead Testing Operations Manager |
| 14. | , Mechanical Engineer |
| 15. | David Weikersdorfer |
| 16. | |
| 17. | Michael Tocce |
| 18. | |
| 19. | , Hardware Engineer |
| 20. | , Software Engineer |
| 21. | , Sweeney, Software Engineer |

---

[35] A job description or duty is included if the Panel received evidence in which it was disclosed.

ER-Trust-0098

At the second meeting on January 25, 2016, all of the attendees were required to declare whether they were "in or out" in terms of leaving Google and joining the new company. Attendees were asked to sign non-disclosure agreements so that if asked they would be contractually bound not to disclose the solicitation. Within a day of that meeting, Otto employment agreements were circulated to the Google employees for signatures. This timing was consistent with Respondents' strategy to have all the Google employees resign and walk out of Google together with Levandowski on January 27, 2016.

In an attempt to allay any fears the Google employees might have regarding leaving Google, Levandowski and Ron falsely told them that Otto was going to focus on self-driving technology for trucks and that Google's top management, including its CEO, Larry Page, was aware of their new company and was not concerned. Levandowski and Ron never told the departing Google employees, who thought they were joining a self-driving startup company, that they were in the final stages of selling Otto to Uber.

### I.    Resignations from Google

On January 13, 2016, Ron resigned his employment at Google. Levandowski resigned from Google on January 27, 2016. On that same day, Poetzscher reported internally that Uber believed it had a tentative deal with Levandowski and Ron for the acquisition of Otto in which the owners of Otto would receive 100 basis points of Uber Restricted Stock Units ("RSUs") to be paid out pursuant to agreed upon milestones. As of that date, the value of the RSUs was $680 million.

Google was not aware of Respondents' negotiations with Uber. During his January 27, 2016 exit interview, Levandowski told Google's HR employee, Chelsea Bailey ("Bailey")

ER-Trust-0099

that he might possibly start a new company involving self-driving trucks.[36]  During that interview, Levandowski also falsely denied that he had made any attempt to recruit Google employees.  In a follow-up meeting with Bailey and another Google employee, Stacy Sullivan, Levandowski denied soliciting any Google employee and stated that he was not sure what he was going to do next.  However, in the seven months between Levandowski's resignation from Google and the close of the Uber acquisition of Otto, approximately 29 Google employees and contractors left Google to join Otto.

### J.    Uber's Acquisition of Otto

On April 11, 2016, the final and binding merger agreement for Uber's acquisition of Otto was signed.  On that same day, Uber acquired an option to purchase Otto's related company, Otto Trucking.  Pursuant to the terms of the final agreement, Levandowski and Ron were required to bring a team of at least 25 engineers and other technical individuals to Uber.  In return, Uber agreed to pay up to $542 million in Uber RSUs, which were to be paid out pursuant to agreed-upon milestones.

Another important provision of the agreement required Uber to indemnify Levandowski and Ron for their "Bad Acts."  This provision was proposed by Levandowski and Ron and they required the indemnity in order to close the transaction.  Under the terms of the indemnity, Uber was required to indemnify Levandowski and Ron under defined circumstances for liability arising from breaches of their employment contracts with Google and breaches of their fiduciary duties and duties of loyalty.  Qi and Poetzscher, who both had extensive experience with mergers and acquisitions, testified that they had never encountered such an indemnity provision in any other deal they had negotiated.

### K.    Second Bonus Payment and Announcement of Otto Acquisition

---

[36] Exh. 3452.

41

ER-Trust-0100

The closing of the acquisition was kept secret for a period of time because Levandowski expected a second payment from the Chauffeur Bonus Plan. The Plan provided that upon termination of employment, a participant had to wait six months plus one day before any outstanding vested allocation would be paid. In Levandowski's case, that date would be July 28, 2016. Levandowski wanted the acquisition kept secret to minimize the prospect that Google would withhold payment based on the transaction. In accordance with Levandowski's wishes, Uber waited to announce its acquisition until after Levandowski received his final Chauffeur Bonus Plan payout.

On July 28, 2016, Google paid Levandowski █████████ under the Chauffeur Bonus Plan.[37] On August 18, 2016, Uber issued a public announcement of its acquisition of Otto for a reported $680 million.[38]

On October 28, 2016, Google initiated this arbitration.

## IV.   ANALYSIS OF LIABILITY

This Final Award resolves all of the substantive claims and affirmative defenses submitted for determination. The Panel organizes its analysis of Google's claims into four claims: breach of duty of loyalty; breach of fiduciary duty; breach of contract; and unfair competition. In resolving each claim, we also resolve all related defenses and affirmative defenses associated with them.

### A.   FIRST CLAIM: BREACH OF THE DUTY OF LOYALTY

Google claims that Levandowski and Ron, individually and jointly, breached the duty of loyalty each owed to Google.

---

[37] Exh. 604.
[38] Exh. 1236.

42

ER-Trust-0101

### 1.   Essential Elements of the Claim

An employee, while employed, owes undivided loyalty to his employer.  Fowler v. Varian Assoc., Inc. 196 Cal. App. 3d 34, 41(1987).  In general, an employee breaches the duty of loyalty when the employee's actions are "inimical to the best interests of the employer."  Huong Que. Inc. v. Luu, 150 Cal. App. 4th 400, 414 (2007) (quoting Stokes v. Dole Nut Co. 41 Cal. App. 4th 285 (1995)).  Whether an employee's actions are "inimical to the best interests of the employer" is more of a factual, rather than legal question.  To state a claim for breach of duty of loyalty, a claimant must plead: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach.  Id. at 410.

California courts apply principles of agency and hold that, just as an agent must refrain from competing with the principal during the employment, an employee must refrain from competing with the employer and from taking action on behalf of or otherwise assisting the employer's competitors.  See e.g., Rest.3d, Agency, § 8.04.  Agents may "not . . . acquire a material benefit from a third party in connection with . . . actions taken . . . through the agent's use of the agent's position" Id. § 8.02.  Further, agents have a duty "not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."  Id. § 8.05(2); Huong Que. Inc., 150 Cal. App. 4th at 413.  The duty of loyalty is not breached solely because an employee transacts business on the employee's own account.  However, by statute, "[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer."  Cal. Lab. Code § 2863.

An employee may conduct "a business enterprise independent from, though similar to, that conducted by" his or her employer, so long as the employee acts in good faith and

ER-Trust-0102

does not "seize . . . business opportunities in the company's line of activities which the company has an interest and prior claim to obtain . . . ." Thomas Petroleum, LLC v. Lloyd, 1:11-CV-00902-LJO, 2012 WL 4511369 at *6–7 (E.D. Cal. October 2, 2012) (quoting Industrial Indem. Co. v. Golden State Co., 17 Cal. App. 2d 519, 533(1953)). An employee may also conduct legitimate business activities to capture opportunities of which the employer was either unwilling or unable to take advantage. Id. at *7. Thus, California law permits an employee to seek other employment and even to make some "preparations to compete" before resigning. It also permits an employee to set up a competing organization through which business might be conducted. See Mamou v. Trendwest Resorts, Inc., 165 Cal. App. 4th 686, 719–20 (2008).

There are "[n]o ironclad rules as to the type of conduct which is permissible . . . since the spectrum of activities [of an employee seeking to leave a company] is as broad as the ingenuity of man itself." Bancroft Whitney Co. v. Glen, 64 Cal. 2d 327, 346 (1966). But it can be said with certainty that where an employee is doing nothing more than preparing for his or her future employment, the duty of loyalty has not been breached. See Mintz v. Mark Bartelstein & Assocs, Inc., 906 F. Supp. 2d 1017, 1037-38 (C.D. Cal. 2012).

Thus, to establish liability for breach of the duty of loyalty, Google must prove the following elements: (1) that Levandowski or Ron or both were employees of Google; (2) that while employed, beyond merely seeking or preparing for alternative employment, each or both of them engaged in conduct inimical to the best interest of Google; and (3) that Google suffered damages as the result of Levandowski and Ron's breach.

### 2.    Actions by Respondents

44

ER-Trust-0103

It is undisputed that Respondents were employees of Google and as employees each owed a duty of loyalty to Google. In its post-hearing opening brief, Google summarizes the evidence upon which it bases its breach of the duty of loyalty claim as follows:

> Here, Levandowski and Ron breached their duty of loyalty to Google in multiple ways: ... Beginning in 2012, Levandowski formed, funded, assisted and supported Tyto – a company that developed LiDAR technology – at the same time he was head of the Laser team developing LiDAR technology at Google for Chauffeur. ***
>
> In 2015, Levandowski and Ron launched efforts to create and sell to Uber a company staffed by solicited Google employees, first to sell laser to Uber for its self-driving cars, and later to sell the employees themselves to Uber. *** Respondents also violated their duty of loyalty to Google by forming 280 Systems to develop technology for self-driving cars and trucks, the same technology Google was working on at Chauffeur.***
>
> By mid-September 2015, Levandowski and Ron had resolved to recruit dozens of Google employees to join their new company. (Google Post-Hrg. Opening Brief at 38-40.)

Respondents contend that the evidence proves that Respondents engaged in conduct that was permissible for employees under California law. The issue therefore becomes whether the conduct of Respondents exceeded that allowed for employees, because it was inimical to the best interests of Google, and breached Respondents' respective duty of loyalty to Google.

With respect to the duty of loyalty, the Panel evaluates the evidence of Respondents' conduct with respect to three interrelated events: (a) Tyto LiDAR; (b) formation of Otto and negotiations of a commercial transaction with Uber; and (c) soliciting Google employees and negotiation of a sale of Otto to Uber.

### a. Tyto LiDAR

With respect to the first set of events, Google contends:

> Beginning in 2012, Levandowski formed, funded, assisted and supported Tyto – a company that developed LiDAR technology – at the same time he

45

ER-Trust-0104

was head of the Laser team developing LiDAR technology at Google for Chauffeur. ***. (Google Post-Hrg. Opening Brief at 38.)

This event seeks to impose liability for breach of the duty of loyalty only on Levandowski.

In his post-hearing brief, Levandowski contends that his conduct with respect to Tyto LiDAR did not breach his duty of loyalty to Google because he merely helped others set up the company and that his conduct was not competitive:

> Mr. Levandowski merely helped his friends set up Tyto; his subsequent involvement with the company was well within the bounds of the California duty of loyalty. Second, Ognen Stojanovski, Brent Schwarz, and James Haslim had full autonomy in all aspects of Tyto's decision making, operations, and business and technical directions. Third Tyto was not competitive with anything at Google. Fourth, Google was presented with the Tyto opportunity and did not want it. (Resp. Post-Hrg. Brief at 19.)

Based on the facts as recited above, the Panel finds that beginning as early as May 2012, and at least by August 2012, while he was a Google employee working on self-driving technology, Respondent Levandowski created, financed and provided technical support to Tyto LiDAR. The Panel rejects Levandowski's assertion that his conduct with respect to Tyto LiDAR was mere assistance of other people who had full autonomy of Tyto LiDAR. The evidence shows that Levandowski provided financial, logistical and technical support to Tyto LiDAR while he was still an employee of Google. Although he did not take an official title with the company, the Panel finds that Levandowski was its control person.

Moreover, the Panel finds that Levandowski's conduct with respect to Tyto LiDAR was competitive. ████████████████████████████████████████

████████████████████████████████████████████████

████████ The evidence that Google's principal "product" development was for internal

---

[39] Exhs. 166, 172.

46

ER-Trust-0105

use and that Tyto LiDAR's principal "product" development was for sale to others does not eliminate the competitive nature of Levandowski's conduct.  In 2012, Google and other companies were competing for which company would win the race to develop reliable and safe autonomous vehicle technology.  LiDAR sensors were a critical part of that technology.



During this same period of time, Levandowski was the head of the LiDAR team at Google.  His duty of loyalty precluded him from creating, financing and providing technical support to Tyto LiDAR.  Thus, the Panel finds and concludes that Google proved that, commencing in May 2012 and continuing to August 2015, Levandowski's conduct with respect to Tyto LiDAR was competitive with Google and that this conduct breached his duty of loyalty.

### b.   Otto

As recited in the facts section above, beginning in August 2015, while they were Google employees, Levandowski and Ron created what eventually became Otto.  During its

---

[40] Exhs. 166, 172, 1205.
[41] Exh. 1541.096.
[42] Exh. 1541.164.

47

ER-Trust-0106

formation, the principal business pursuit of the company was to develop LiDAR technology

for autonomous trucking and passenger cars, the latter of which was developed for sale to

Uber.  In the Fall of 2015, Uber was Google's primary competitor in the self-driving

automobile technology space.  Levandowski and Ron negotiated to become Uber's sole

supplier of LiDAR technology for its use in competition with Google.[43]  The Panel finds that

Respondents' conduct was competitive with Google and breached their duty of loyalty.

### c.   Soliciting of Google Employees

In the creation of Otto, Respondents had various conversations and meetings with

key Google employees.  Respondents contend that their conduct did not amount to

soliciting.

Soliciting is a general term.  In <u>Aetna Bldg. Maint. Co. v. West</u>, 39 Cal. 2d 198 (1952),

albeit in the context of soliciting customers, the California Supreme Court defined "solicit"

as follows:

> "Solicit" is defined as: "to ask for with earnestness, to make petition to, to
> endeavor to obtain, to awake or excite to action, to appeal to, or to invite,"
> <u>Black's Law Dictionary</u>, 3rd ed., p. 1639.  "It implies personal petition and
> importunity addressed to a particular individual to do some particular thing.
> * * * <u>Golden & Co. v. Justice's Court</u>, 23 Cal. App. 778, 789.  It means: "to
> appeal to (for something); to apply to for obtaining something; to ask
> earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking
> or pleading; to entreat, implore, or importune; to make petition to; to plead
> for; to try to obtain." [Citation omitted.]
>
> Merely informing customers of one's former employer of a change of
> employment, without more is not solicitation.  Neither does the willingness
> to discuss business upon invitation of another party constitute solicitation on
> the part of the invitee.  Equity will not enjoin a former employee from
> receiving business from the customers of his former employer, even though
> the circumstances be such that he should be prohibited from soliciting such
> business. [Citation omitted.] <u>Id.</u> at 203-204.

---

[43] Exh. 476.

Case: 20-03050   Doc# 16-1   Filed: 07/31/20   Entered: 07/31/20 18:27:01   Page 55
of 71

ER-Trust-0107

The duty would not be breached if an employee, who had decided to leave his or her employment, merely informs co-workers of that decision, or if, when asked by a co-worker to do so, describes the new venture. Levandowski's and Ron's conduct far exceeded that limit. Respondents approached fellow employees on and off-campus about joining Otto. They invited their fellow employees to attend meetings at Levandowski's home for the purpose of convincing them to join the new company. The Panel reviews the following individual cases to exemplify the solicitous nature of Respondents activities:

Don Burnette became a software engineer at Google on Project Chauffeur in August 2010. In December 2015, in a conversation on the Google campus, Levandowski told Burnette he was creating a self-driving company and he invited Burnette to join his new company. Afterward, Burnette had four or five more conversations with Levandowski about the new company. Levandowski told Burnette he wished to have as many people as he could get from Project Chauffeur. He wanted the Chauffeur group to quit Google all on the same day. On January 21, 2016, Burnette wrote a check for $1 million to invest in Levandowski's company. Burnette terminated his employment at Google on February 9, 2016.

In December 2015, Levandowski told Google employee ▮▮▮▮▮ that he was planning to start a new company to bring self-driving trucking technology to the market and he wanted ▮▮▮ to join him.

Also in December 2015, Levandowski interviewed, and in January 2016 hired Rhian Morgan as the Director of Human Resources for Otto. In that capacity, Morgan conducted an organized effort that assisted Levandowski and Ron to solicit Google employees and employees of other companies to join Otto. Morgan attended the January 2016 recruitment meetings at Levandowski's home, sought and obtained Levandowski's approval for offer

49

ER-Trust-0108

letters[44] and tracked whether individuals had signed non-disclosure agreements ("NDAs").[45]

     In January 2016, Levandowski and Ron approached ████████ about Otto. ████ was and is a Google electrical engineer who had joined Google when ████████. Earlier, in the summer of 2015, Levandowski had discussed his new company with ████ At that time, ████ told Levandowski that he was not interested. After the January 2016 conversation, ████ was invited to attend a recruitment meeting at Levandowski's home. At the meeting, ████ stated that he would join Otto.

     In January 2016, Levandowski told ████████ that he was considering leaving Google to start a new company that would be in the business of self-driving trucks. ████ had begun work at Google in ████████. In March 2015 ████ had begun reporting to Levandowski as a ██████████████████████████████████. ████ was contemplating ██████████████████████. In January 2016 Levandowski told ████ that he was not soliciting ████ but that ████ could join Otto and potentially work remotely. On January 8, 2016, Ron texted ████, inviting ████ to meet with him. They met on January 10. ████ also attended the January meetings at Levandowski's home. Levandowski offered ████ a salary at Otto that was close to ████ Google salary. Levandowski and ████ discussed that, in order to prevent ████ resignation from being cited by Google as a cause for ████████████████████ ████████████████████████ could delay the termination of ████ Google employment and the commencement of ████ employment at Otto until after the ████████ ████. Christopher Urmson, the head of engineering for Project Chauffeur ████

---

44 Exhs. 770; 800.
45 Exh. 1006.

ER-Trust-0109

 and ▉ decided to remain a Google employee. Again, although ▉ decided to remain a Google, employee, both Levandowski and Ron solicited ▉.

The conversations and meetings that Levandowski and Ron had with their fellow Google employees about joining Otto constituted soliciting Google employees to leave their employment. The Panel finds that since these solicitations were done while they were Google employees, they breached the duty of loyalty.

### d.   Negotiations to Sell Otto to Uber

Beginning in late 2015, while they remained Google employees, Levandowski and Ron negotiated to sell Otto to Uber. The breach of loyalty claim is based on their proposal not only to sell the company to Uber but to do so in a way that would harm Google.

Respondents were fully aware and intended that the sale of Otto's technology to Uber would give Uber a significant competitive advantage over Google. As confirmed by Ron's notes from January 1, 2016, Respondents' vision for Otto was to "help Uber win the self-driving race," by "reduc[ing] capital cost to compete with G[oogle]."[46] Levandowski told Uber that taking a team of Google employees to Uber would damage Google because they were going right across the street to the competitor. Respondents believed that the loss of this Google team to Uber could have a "distressing hit on the valuation" and that Chauffeur's "valuation would be much lower." Indeed, Respondents wanted their plan to have added effectiveness by having the solicited employees stage a mass walk-out. The mass action was planned around Levandowski's departure. The plan was communicated

---

[46] Exh. 609.

ER-Trust-0110

orally and was reflected in offer letters.  The letters committed the employees to resign

from Google on January 26 and to start work at Otto the next day.[47]

    To keep Google from knowing about their plans and possibly taking steps to avoid

its impact, Respondents had each Google employee sign a non-disclosure agreement.

Respondents instructed some of their Google recruits to avoid communicating in writing

and to destroy communications with Respondents.  Further, in anticipation of the

devastating damages that their plan was expected to inflict on Google, and the consequent

risk that Google would seek to recoup those damages from them, Respondents sought and

obtained an agreement from Uber to indemnify them for their "Bad Acts," defined as

follows:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of
> the Company Group and/or committed by any Employee, (b) willful,
> intentional or deliberate conduct by an Employee or any member of the
> Company Group that constitutes or directly leads or contributes to the
> infringement (direct or indirect) or misappropriation by an Employee or any
> member of the Company Group of any patents, copyrights, trademarks or
> trade secrets of such Employee's Former Employer, including, without
> limitation, taking, removing and/or copying software, product plans, or
> invention disclosure in electronic or tangible form that are owned by such
> Employee's Former Employer, (c) willful and/or intentional breach by any
> member of the Company Group or any employee of any fiduciary duty or
> duty of loyalty to such Former Employer and/or (d) willful and/or
> intentional breach by any member of the Company Group or any Employee of
> any lawful and enforceable non-solicitation, non-competition, confidentiality
> or other similar restrictive covenant or agreement between any employee
> and such Employee's Former Employer.  (Exh. 1093.)

    This indemnification was of critical importance to Levandowski and Ron, who

proposed, and "insisted on," the concept.  According to Poetzsher, "They wouldn't have

done [the deal] without it."[48]

---

[47] See, e.g., Exhs. 782, 840, 832, 837, 836.
[48] Tr. 1783.

ER-Trust-0111

In making its determination that Respondents' conduct breached the duty of loyalty, the Panel gives great weight to the fact that Respondents negotiated to sell Otto and its LiDAR technology to Uber, known by Respondents to be Google's primary competitor in the self-driving space. An essential element of Respondents' pitch to Uber was that prior to the sale, they would populate Otto with a team of Chauffeur employees who had experience working together on self-driving vehicle technology. And the financials of the sale were tied to the number of Chauffeur employees Levandowski and Ron were able to bring out of Google.

In summary, the Panel finds that from August 2012 until his resignation in January 2016, while he was a Goggle employee, Levandowski engaged in competitive conduct that breached his duty of loyalty. And beginning in 2015 until his resignation in January 2016, by joining with Levandowski, Ron individually and jointly engaged in competitive conduct that breached his duty of loyalty.

### 3.   Defenses

As in civil cases, in an arbitration a respondent might allege that the claimant has not proved an essential element of a claim. Although raised by a respondent, the burden of proof of an essential element of a claim remains with the claimant. In their closing brief, Respondents contend that Google failed to prove an essential element of its claim. Respondents also contend that they have proved affirmative defenses. We consider these defenses in turn.

#### a.   Synthetic Equity Defense

In their closing brief, Respondents contend that Google is not entitled to recover any Chauffeur Bonus Plan payments because, *inter alia*, "Mr. Levandowski's initial allocation was 'synthetic equity' in Chauffeur given for the sale of 510 and AR, and is not recoverable

53

ER-Trust-0112

compensation." (Resp. Post-Hrg. Brief at 71.)  The Panel treats this as an argument that the Chauffeur Bonus was not "compensation" subject to disgorgement.  It was Google's burden to prove that the bonus payments were compensation and not consideration for its purchase of the LLCs.[49]

As recited in our factual findings, in 2010, Google began discussions with Levandowski about acquiring 510 and AR.[50]  During the discussions, various acquisition proposals were exchanged, including ███████████████████████

███████████████████ .[51]  The acquisition closed on July 28, 2011.[52]  The consideration for the acquisitions was recited in the closing documents.[53]

In interpreting the contracts, the Panel applies well-established standards.  If contractual language is clear and explicit it governs.  See Cal. Civ. Code § 1639.  The clear and explicit meaning of contract language, interpreted in its ordinary and popular sense, controls, unless used by the parties in a technical sense or with a special meaning is given to it by usage.  See Cal. Civ. Code § 1644; Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995).

The percentage allotted to Levandowski for his participation in the Chauffeur Bonus Plan was not recited as consideration in the contracts for the sale of his interests in 510 or AR.  The lack of any recital of a bonus allocation as consideration for the July 2011

---

[49] The Panel heard expert opinion testimony from James Malackowski regarding whether the Chauffeur bonus was compensation or consideration for a sale of Levandowski's LLCs. The Panel finds this to be governed by interpretation of contracts, a matter of law for the Panel to decide.  Accordingly, no weight was given to the opinion testimony.
[50] Exhs. 55, 77.
[51] See e.g., Exh. 75.
[52] Exhs. 105, 106.
[53] Under the agreements, Google acquired AR for an "Aggregate Acquisition Consideration" of ████████ , and 510 for an "Aggregate Merger Consideration" of ████████ .  (Exhs. 106, 105.)

ER-Trust-0113

acquisitions is significant because the formation of the Chauffeur Bonus Plan in 2012 and the allocations that were made in February 2012 were made retroactively effective back to ████████████. If the parties had intended to treat Levandowski's allocation as consideration for his 2011 sales of his interests in 510 and AR, it would have been easy to do so retroactively in the Chauffeur Bonus Plan documents.

There was evidence of some overlap in the period of time when Levandowski and Google officials were discussing the purchase of 510 and AR and when the discussions about the Chauffeur Bonus Program commenced. Aaron Crum, the Google corporate development employee who served as lead employee on the acquisition, testified that at one point, Levandowski proposed that his Chauffeur Bonus allocation be given to him in exchange for his sale of his interest in 510 and AR. However, the acquisitions closed before the Chauffeur Bonus Plan was finalized. And even after the acquisition had closed, during formation and implementation of the Chauffeur Bonus Plan, Google officials ████████ ████████████████████████████████████████████████████████ At one point, a Google official stated that Levandowski's ████████████████████████ ████████. However, as noted, *supra*, the finalized Bonus Plan documents did not recite that Levandowski's sale of his companies was consideration for the allocation.

Further, on January 1, 2012, Levandowski received a letter giving him the option of continuing under Google's regular bonus program or becoming a participant in the Project Chauffeur Bonus Plan. The letter stated that if he elected to participate in the Bonus Plan he would be eligible to receive ████████████████████████ that would be converted into a bonus in accordance with the terms of the Plan. In addition, he would be required to sign a new "At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement." There was no recitation in any of these

55

ER-Trust-0114

documents that his Chauffeur allocation would be related to the consideration he had received for Google's acquisitions of AR or 510. Significantly, under the Plan, if Levandowski were to leave the Chauffeur Project for any reason, he would "not be entitled to receive any further" vesting or allocations, and would "have no further rights under" the Chauffeur Bonus Plan.[54] This further militates against finding that Levandowski's Chauffeur Bonus was at all tied to the companies' acquisition.

Levandowski argues that the phrase "Related Agreements . . . constitute the entire agreement among the parties" in the 2011 NCNS Agreements and thus should be interpreted to incorporate a term sheet and two May 10, 2018 letter submissions from Levandowski. (Resp. Post-Hrg. Brief at 8.) California law recognizes that several contracts relating to the same matter, between the same parties, and made as parts of substantially one transaction, are to be taken together. Cal. Civ. Codes § 1642; Fillpoint, LLC v. Maas, 208 Cal. App. 4th 1170, 1178 (2012). Here, the Panel received evidence where, by reference and by attachment, the parties incorporated multiple agreements into a single transaction. However, it is clear that the acquisitions and bonus allocation did not close as one transaction. By definition, a "term sheet" that is superseded by a finalized agreement does not qualify as an "agreement."

We interpret the contracts in accordance with their clear language. The acquisition agreements recite that the consideration for the sale of the LLCs was money. Based on the language of the contracts, the Panel finds that Levandowski's allocation of an interest in the Chauffeur Bonus Plan was not equity, synthetic or otherwise; his Chauffeur allocation and bonus payments were compensation.

---

[54] Exh. 120; Tr. 1669:10–20.

ER-Trust-0115

### b.    Affirmative Defenses

An affirmative defense if proved will negate civil liability.  Respondents have the

burden to prove an affirmative defense.  In their closing brief, Respondents contend that

they have proved the following affirmative defenses:  (1) statute of limitations; (2) no proof

of termination; (3) voluntary payment; and (4) waiver.  The Panel discusses each of these

in turn.

### 1.    Statute of Limitations

As an affirmative defense, Respondents allege that Google's breach of loyalty claim

against Respondent Levandowski was not timely submitted.  (Resp. Post-Hrg. Brief at 19.)

Here, Google's Demands for Arbitration were submitted to JAMS on October 28, 2016.  The

parties dispute the applicable statute of limitations.  The California Code of Civil Procedure

does not have a provision that explicitly prescribes the limitations period for a claim for an

employee's breach of the duty of loyalty.

Respondents contend that the claim for breach of the duty of loyalty has a three-

year statute of limitations.  (Resp. Post-Hrg. Brief at 19.)  Respondents contend that a three-

year limitations period applies because Google's breach of loyalty claim and its fraud claim

are based on the same facts.  The Panel considers this argument despite its dismissal of the

fraud claim.[55]  The statute of limitations for fraud under California law is three years,

starting from the time that the aggrieved party discovers the facts constituting fraud.  Cal.

Code Civ. Proc. § 338(d).  Discovering the facts constituting fraud occurs with either actual

knowledge or when "[a claimant] has notice or information of circumstances to put a

---

[55] See Procedural History at II(E)(1).

ER-Trust-0116

reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation. . ."  General Bedding Corp. v. Echevarria, 9476 F.2d 1395, 1397 (9th Cir. 1991); see also Kline v. Turner, 87 Cal. App. 4th 1369, 1374 (2001).

Although a fraud claim and a breach of loyalty claim share elements in common, the gravamen of the two actions are different.  To sustain a claim for breach of loyalty, Google must have proved that while they were employees, Respondents engaged in conduct that was inimical to the best interests of their employer.  This conduct need not have been fraudulent.  Thus, the claims are not based on facts that are mutually exclusive.  See In re Brocade Commc'ns Sys., Inc. Derivative Litig, 615 F. Supp. 2d 1018, 1037 (N.D. Cal. 2009).  Therefore, the Panel rejects Respondents' argument that the same three-year statute of limitations that applies to a claim for fraud also applies to the claim for breach of the duty of loyalty.

California Code of Civil Procedure section 343 provides that an action for relief not explicitly otherwise provided for must be commenced within four years after the cause of action shall have accrued.  A breach of loyalty claim accrues when the employer discovered, or in the exercise of reasonable diligence could have discovered the facts giving rise to the breach of duty of loyalty claim.  In re Brocade  at 1036-37; General Bedding Corp. at 1397.  Thus, the Panel applies the four-year statute of limitations to Google's breach of loyalty claim.  The arbitration demand was submitted on October 28, 2016.  Section 343 requires commencement "within" four years.  Therefore, the demand was timely if Google discovered or could have discovered the facts giving rise to its breach of the duty of loyalty claim on or after October 28, 2012.  Stated differently, if Google discovered or could have discovered the breach on or before October 27, 2012, the demand was tardy.  Therefore, to prove its limitations affirmative defense, Respondents must have proved that Google

ER-Trust-0117

discovered or could have discovered the facts giving rise to its breach of the duty of loyalty claim on or before October 27, 2012.

Respondents do not contend that they proved knowledge or inquiry notice on or before October 27, 2012. Contending that a three-year limitations period applied, in their post-hearing brief, Respondents contend, "Google, through at least three of its employees, had knowledge of Mr. Levandowski's involvement in Odin Wave [Tyto LiDAR] no later than July 2013." (Resp. Post-Hrg. Brief at 26.) Moreover, while there might have been some at Google who had some knowledge of Levandowski's association with Tyto LiDAR, the preponderance of evidence is that Levandowski took affirmative actions to conceal the nature and extent of his involvement from his supervisors and officers of Google. The Panel finds and concludes that Respondents failed to prove that Google's demand for arbitration of its claim for breach of the duty of loyalty was time-barred.

### 2.   No Proof Google Would have Terminated

Respondents argue that Google is not entitled to disgorgement of his Chauffeur bonuses because there is no evidence that Google would have fired Levandowski for his alleged breaches:

> In California, an employer may recover compensation paid during an employee's period of disloyalty. Such recovery is based on the assumption that, had the employer known of the disloyalty, it would have terminated the employee or cease to pay him. [Citation] Contrary to that assumption, there was significant undisputed evidence at the hearing that, despite his actions, Google did not fire and would not have fired Mr. Levandowski. (Resp. Post-Hrg. Brief at 74.)

Given the secrecy with which Respondents shrouded their conduct, whether or not they would have been terminated for their disloyalty is irrelevant to Google's entitlement to disgorgement. Thus, the Panel rejects Respondents' argument that disgorgement should

ER-Trust-0118

be denied based on speculation about what Google would have done had it known the full extent of Respondents' conduct.

### 3.    Voluntary Payment

Respondents contend that Google cannot recover the Chauffeur bonus payments that it made to Levandowski because it voluntarily made those payments after it knew *or should have known* all material facts relating to what it now alleges to be breaches by Levandowski. (Resp. Post-Hrg. Brief at 75.)

Under California law, the voluntary payment doctrine is an affirmative defense that bars the recovery of money that was voluntarily paid with knowledge of the facts. See W. Gulf Oil Co. v. Title Ins. & Tr. Co, 92 Cal. App. 2d 257, 266 (1949); Steinman v. Malamed, 185 Cal. App. 4th 1550, 1557 (2010). To sustain this affirmative defense, Respondents must have proved that (1) Google knew the facts upon which it now relies to request disgorgement of the payments; and (2) after knowing those facts, Google voluntarily paid money for which it now seeks disgorgement.

The knowledge used to test whether a payment was voluntary must be knowledge of facts upon which Google bases its claim for disgorgement. Since Google is an entity, Respondents must prove that the knowledge was that of a high-ranking official who could act for and on behalf of Google. See Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton, LLP, 133 Cal. App. 4th 658, 679 (2005) ("an officer's knowledge is not imputed to the corporation when he has no authority to bind the corporation relative to the fact or matter within his knowledge"). As discussed above, Levandowski and Ron kept secret the activities and communications between Otto and Uber, claiming that they were legitimately operating in stealth mode. Their secrecy and stealth-mode conduct are inconsistent with

60

ER-Trust-0119

their claim that Google had full knowledge or should have had full knowledge of the

requisite facts.  See Rodman v. Safeway. Inc., 694 Fed. Appx. 612, 614 (9th Cir. 2017).

Respondents cite evidence that in August 2015, Chelsea Bailey, a Google Human

Resources employee, received an email from Levandowski's supervisor, Chris Urmson, that

Google should fire Levandowski.  Urmson wrote that he had heard from "two different

sources" that Levandowski is approaching Chauffeur employees to set up "a package deal of

people that he could sell en mass to Uber."[56]  Bailey testified that she investigated the

matter, including personal interviews with members of the Chauffeur team.  Individuals on

the Chauffeur team denied that they had been approached.  Bailey testified that she was

unable to substantiate Urmson's allegations.

Respondents also cite evidence that in 2016 Bailey investigated information that

Chauffeur employees had received offers to join a startup company.  Bailey confirmed that

some employees had received offers, but the employees said that they had signed a non-

disclosure agreement that forbid them from identifying the company.  As part of the

investigation, in January 2016, Bailey attended a Chauffeur team meeting where

Levandowski stated that he intended to stay with Google.  After Levandowski resigned, on

January 27, 2016, Bailey conducted his exit interview.  Levandowski stated that he was

undecided about what he would next do.  He said that he was considering joining a

company called Kitty Hawk or starting a self-driving semi-truck company.  Employment

counsel Jade Wagner joined the conversation.  Levandowski acknowledged his intent to

abide by Google's confidentiality and non-solicitation policies.  Bailey's notes taken during

the meeting were received in evidence.[57]  The Panel also received in evidence an email

---

[56] Exh. 428.
[57] Exh. 845.

ER-Trust-0120

written by Bailey to John Krafcik and others that summarized her exit interview with Levandowski.[58] Based on the totality of evidence, the Panel finds that Respondents have failed to prove that before the bonus payments were made a sufficiently high-ranking Google official had full knowledge of the facts upon which Google relies for disgorgement.

Moreover, to substantiate their voluntary payment defense, Respondents must also show that the payment was voluntary. Legally obligated payments fall outside the voluntary payment doctrine. The bonus payments made to Levandowski were "earned" on ▇▇▇▇▇▇▇▇▇▇ and on ▇▇▇▇▇▇▇▇▇▇ when they ▇▇▇▇ (although subject to divestment upon proof of breach of the duty of loyalty). Thus, although Google did not pay the bonus on the dates they vested, upon vesting, Google had a contractual obligation to pay them. As such, Respondents failed to prove that the payments were voluntary.

### 4.   Waiver

In their post-hearing brief, Respondents contend that Google should be deemed to have waived each of its claims. (Resp. Post-Hrg. Brief at 63-65.)

In California, waiver is the intentional relinquishment of a known right after knowledge of the facts, or a waiver can occur as the result of an act which, according to its natural import, is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. See Chase v. National Indemnity Co., 129 Cal. App. 2d 853, 858 (1954); Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1559 (9th Cir. 1991) (discussing and citing California cases.) The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not

---

[58] Exh. 880.

Case: 20-03050   Doc# 16-1   Filed: 07/31/20   Entered: 07/31/20 18:27:01   Page 69 of 71

ER-Trust-0121

leave the matter to speculation, and doubtful cases will be decided against a waiver. <u>Waller</u> 11 Cal. 4th 1 at 31.

While Google clearly had knowledge of its rights concerning employee conduct, Respondents must prove that a high ranking individual at Google had actual knowledge of Respondents' conduct that was a breach of those rights and took an action or took no action with the intent of relinquishing the breach on behalf of Google. <u>See Peregrine Funding, Inc.</u>, 133 Cal. App. 4th at 679. The individuals cited in Respondents' brief appear, at most, to have received inconclusive, piecemeal information about some of Respondents' actions. Moreover, it does not appear that Respondents have proven that any high ranking individuals at Google engaged in acts "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." Indeed, evidence was introduced to show that Google did, in fact, instruct Levandowski about his legal obligations. Thus, Google did not act inconsistently. Based on the totality of the evidence, the Panel finds that Respondents did not prove that Google had full knowledge of their actions. Therefore, the affirmative defense of waiver was not proved.[59]

In the alternative, Respondents contend that they should be excused from liability for their disloyal acts because such competitive acts were known to Google and Google did not care about them because that was standard behavior at Google. (Resp. Post-Hrg. Brief at 1.) The Panel regards this argument as within the ambit of Respondents' affirmative

---

[59] In their pre-hearing brief, Respondents' contend that, based on its inconsistent words and actions, Google is estopped from asserting any claims based on the Odin Wave/Tyto LiDAR facts. (<u>See</u> Resp. Pre-Hrg. Brief at 22-23.) This affirmative defense was not raised in the post-hearing brief. And even if it were, because estoppel is based on knowledge of actions that induce detrimental reliance by another party, our finding that Google lacked full knowledge of Respondents' conduct leads us to find that Respondents did not prove the affirmative defense of estoppel.

63

ER-Trust-0122

defense of waiver. While the Panel did receive evidence that various Google officials initiated outside ventures, none of the outside ventures shown by the evidence rose to the level of competition against Google practiced by Respondents. Thus, the Panel finds no waiver by Google of its claims based on outside ventures pursued by other Google employee.

The Panel finds that Google has proved that Levandowski was in breach of his duty of loyalty beginning with his actions with respect to Tyto LiDAR in May 2012, and continuing together with Ron with respect to Otto and Uber, up to his resignation of his employment. Similarly, Ron was in breach of his duty of loyalty beginning with his conduct with respect to Otto up to his resignation. The Respondents failed to prove that their respective conduct was excused by any affirmative defense.

In Section IV below the Panel analyzes to what relief Google is entitled based on this finding of liability. We now turn to Google's claim for breach of fiduciary duty.

### B.    SECOND CLAIM: BREACH OF FIDUCIARY DUTY

Google claims that Levandowski was a fiduciary while he was employed at Google and that "all of the misconduct identified above for Levandowski's breaches of the duty of loyalty also constitutes breaches of Levandowski's fiduciary duty to Google." (Google Post-Hrg. Opening Brief at 40-41.) Before analyzing Levandowski's conduct, the Panel determines whether Google proved a fiduciary relationship between itself and Levandowski.

#### 1.    Essential Elements of Claim

In California, while corporate directors and officers typically are deemed to owe fiduciary duties to their employer, non-officers have also been found to owe fiduciary duties if they participate in management. See Les Fields/C.C.H.I. Ins. Servs. v. Hines, No. 15-

ER-Trust-0123

# Appellees' Exhibit 3

ER-Trust-0124

# Exhibit D

ER-Trust-0125

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4                    ---oOo---

 5

 6   WAYMO LLC,

 7          Plaintiff,

 8   vs.                        No. 3:17-cv-00939-WHA

 9   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11          Defendants.

     _____/

12

13      WAYMO & UBER CONFIDENTIAL ATTORNEYS' EYES ONLY

14

15       VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER

16              SAN FRANCISCO, CALIFORNIA

17               MONDAY, JUNE 19, 2017

18

19

20   BY:  ANDREA M. IGNACIO,

21   CSR, RPR, CRR, CCRR, CLR

22   CSR LICENSE NO. 9830

23   JOB NO. 2642012

24

25   Pages 1 - 374

                                        Page 1
```

ER-Trust-0126

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4                     ---oOo---

 5   WAYMO LLC,

 6          Plaintiff,

 7   vs.                        No. 3:17-cv-00939-WHA

 8   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

 9   INC.,

10          Defendants.

     _____/

11

12

13          Videotaped Deposition of Cameron Poetzscher,

14     taken on behalf of the Plaintiffs, on June 19,

15     2017, at Quinn, Emanuel, Urquhart & Sullivan, LLP,

16     50 California Street, 22nd Floor, San Francisco,

17     California 94111, beginning 8:59 a.m., and

18     commencing at 5:17 p.m., Pursuant to Notice, and

19     before me, ANDREA M. IGNACIO, CSR, RPR, CRR,

20     CLR ~ License No. 9830.

21

22

23

24

25

                                          Page  2
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 3 of
28

ER-Trust-0127

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   A P P E A R A N C E S :

 2

 3

 4      FOR THE PLAINTIFFS:

 5           QUINN EMANUEL URQUHART & SULLIVAN LLP

 6           By:  ANDREA ROBERTS, Esq.

 7                JORDAN R. JAFFE, Esq.

 8           50 California Street, Suite 2200

 9           San Francisco, California 94111

10           Phone:  415.875.6600

11           andrearoberts@quinnemanuel.com

12

13

14      THE DEFENDANTS UBER TECHNOLOGIES INC.:

15           MORRISON & FOERSTER LLP

16           By:  MICHAEL A. JACOBS, Esq.

17           425 Market Street

18           San Francisco, California 94105

19           Phone:  415.268.7455

20           mjacobs@mofo.com

21

22

23

24

25

                                         Page 3
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 4 of 28

ER-Trust-0128

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    A P P E A R A N C E S:  (Cont.)

2

3

4       THE DEFENDANTS OTTO TRUCKING, INC.:

5            GOODWIN & PROCTER LLP

6            By: HAYES HYDE, Esq.

7            Three Embarcadero Center, 28th Floor

8            San Francisco, California 941111

9            Phone:  415.733.6000

10           hhyde@goodwinlaw.com

11

12

13      ALSO PRESENT:  Cyril Suszckiewicz, Videographer

14                     Justin Suhr, Uber

15

16

17

18

19

20

21

22

23

24

25
```

Page  4

ER-Trust-0129

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to think about it a little bit harder.  I don't recall | 14:09 |
| 2 | this particular e-mail. | 14:09 |
| 3 | Q   So, separate and apart from this e-mail, do | 14:09 |
| 4 | you recall thinking it was a strange move on Google's | 14:09 |
| 5 | part to have Levandowski tell the entire team that he | 14:09 |
| 6 | was planning to leave? | 14:09 |
| 7 | A   I mean, I only recall that now having this | 14:09 |
| 8 | e-mail in front of me.  I don't -- didn't recall it | 14:09 |
| 9 | independently of that. | 14:09 |
| 10 | Q   Does this e-mail refresh your recollection | 14:09 |
| 11 | that that was -- you thought that was strange? | 14:09 |
| 12 | A   Vaguely.  I mean, it does seem strange that | 14:09 |
| 13 | they would let Anthony tell the whole team that he was | 14:09 |
| 14 | leaving; right? | 14:10 |
| 15 | Typically, companies -- if someone is leaving | 14:10 |
| 16 | to form, you know, what could be a competitive | 14:10 |
| 17 | enterprise, they kind of march you out of the | 14:10 |
| 18 | building. | 14:10 |
| 19 | Q   So, what's strange about it is that they | 14:10 |
| 20 | allowed him to tell the team? | 14:10 |
| 21 | A   Correct. | 14:10 |
| 22 | Q   Okay. | 14:10 |
| 23 | A   Right. | 14:10 |
| 24 | If you're retiring, you know, they give you a | 14:10 |
| 25 | retirement party.  If you leave Goldman Sachs and go | 14:10 |

Page 224

ER-Trust-0130

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | to Morgan Stanley, it's, like, Pack your bags and get | 14:10 |
| 2 | out of here; right? | 14:10 |
| 3 | So, if he was leaving to form a competitive | 14:10 |
| 4 | enterprise in NewCo, right, I was surprised that they | 14:10 |
| 5 | would let him sit there and address his whole team and | 14:10 |
| 6 | so on. | 14:10 |
| 7 | That's my recollection reading this e-mail. | 14:10 |
| 8 | I can't say for sure what I thought at the time. | 14:10 |
| 9 | Q   Okay.  And then there is the sentence there | 14:10 |
| 10 | that says: | 14:10 |
| 11 | "I worry about what tactics they might have | 14:10 |
| 12 | up their sleeve." | 14:10 |
| 13 | Do you recall what you were referring to | 14:10 |
| 14 | there? | 14:10 |
| 15 | A   Again, from this e-mail refreshing my memory | 14:10 |
| 16 | is that I imagine, if they're doing such a strange | 14:10 |
| 17 | move, then maybe they have some super clever motive | 14:10 |
| 18 | behind it; right?  Like, Google is not stupid.  So why | 14:10 |
| 19 | would they do something apparently stupid unless they | 14:10 |
| 20 | have a tactic up their sleeve? | 14:10 |
| 21 | Q   So, you thought it was stupid for Google to | 14:10 |
| 22 | allow Anthony Levandowski to tell his team he was | 14:11 |
| 23 | leaving? | 14:11 |
| 24 | A   I mean, perhaps I shouldn't use the word | 14:11 |
| 25 | "stupid."  It's certainly, as I said, unusual in the | 14:11 |

Page 225

ER-Trust-0131

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    corporate setting for companies to allow departing     14:11
 2    employees, who are forming potentially competitive     14:11
 3    enterprises or going to a competitor, to sort of       14:11
 4    remain on the premises addressing employees.           14:11
 5        Q   And did you have in mind what tactics you       14:11
 6    thought Google might have up its sleeve?               14:11
 7        A   Not that I can recall.                          14:11
 8        Q   You were just nervous about them?               14:11
 9        A   Uh-huh.  Google makes us very nervous.  It      14:11
10    makes a lot of people nervous, as you know.            14:11
11            MS. ROBERTS:  I'm going to hand you what we     14:11
12    will mark as Exhibit 277, which begins with Bates      14:11
13    No. UBER00063617.                                      14:11
14            (Document marked Exhibit 277                    14:11
15             for identification.)                           14:12
16            MS. ROBERTS:  Q.  And this is an e-mail from    14:12
17    you to Travis and Emil, dated January 28th, 2016;      14:12
18    correct?                                               14:12
19        A   Correct.                                        14:12
20        Q   And this is the shortest e-mail we've seen, I   14:12
21    think.                                                 14:12
22            "TK" refers to Travis Kalanick?                 14:12
23        A   Correct.                                        14:12
24        Q   Okay.  And you asked:                           14:12
25            "Did you tell Anthony that you would           14:12
```

Page 226

ER-Trust-0132

```
 1   indemnify them if they get sued by G as part of or        14:12

 2   after the deal?  They're under that impression."          14:12

 3       Correct?                                              14:12

 4    A   That's what it says.                                 14:12

 5    Q   Okay.  Why is it that you asked Mr. Kalanick         14:12

 6   and Mr. Michael if Goo- -- if Anthony was told he         14:12

 7   would be indemnified?                                     14:12

 8    A   Again, I don't recall this.  But, it seems to        14:12

 9   imply that they, meaning Anthony and Lior, are under      14:12

10   the impression that Travis had told them that.  And I     14:12

11   wanted to confirm with Travis that that was his           14:13

12   understanding.  I don't recall this e-mail, but that's    14:13

13   what it would suggest.                                    14:13

14    Q   Do you recall having conversations with             14:13

15   Mr. Levandowski and Mr. Ron about their impression        14:13

16   that they would be indemnified if they were sued by       14:13

17   Google?                                                   14:13

18    A   I mean, ultimately, the indemnification was         14:13

19   an important part of the deal.  It wasn't just against    14:13

20   Google.  It was against anyone; right?  So I -- I knew    14:13

21   at some point -- I can't say if it was here -- that       14:13

22   that was an important part of the deal for them.          14:13

23    Q   Is that something that Mr. Levandowski and          14:13

24   Mr. Ron insisted on including in the agreement?           14:13

25    A   Yes.                                                 14:13
```

Page 227

ER-Trust-0133

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      Q   Okay.  So, Mr. Levandowski and Mr. Ron        14:13

 2   insisted that, in the agreement in which Uber acquired   14:13

 3   Otto, that they be indemnified by Uber if they were      14:13

 4   sued by Google as part of or after the deal?             14:13

 5      A   If they were sued by anyone or any former       14:13

 6   employer or anyone alleging trade secret, you know,      14:13

 7   infringements, among other things, I believe.           14:13

 8      Q   And so, do you recall -- this is an e-mail      14:13

 9   from you to Travis Kalanick.                            14:13

10        Do you remember what discussions you had with   14:14

11   Anthony or Mr. Ron, prior to this, that led to this     14:14

12   e-mail?                                                 14:14

13      A   I don't recall, no.                            14:14

14      Q   And did you receive a response to this         14:14

15   e-mail?                                                 14:14

16      A   I don't recall.                                14:14

17      Q   Did you have any conversations with Travis     14:14

18   about indemnifying Mr. Levandowski and Mr. Ron?         14:14

19      A   Yes, we had, because there was obviously       14:14

20   important deal point.  We had to get clearance at some  14:14

21   point for us to do that.                                14:14

22        I believe all of the conversations that I       14:14

23   recall involved -- other than this e-mail, involved     14:14

24   attorneys.  I know Salle Yoo, our general counsel, was  14:14

25   present at all the discussions I recall with Travis or  14:14
```

Page 228

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 10 of
28

ER-Trust-0134

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    others regarding the topic of indemnity.           14:14

2        Q   But indemnity was an issue that was raised by  14:14

3    Mr. Levandowski and Mr. Ron as something they wanted  14:14

4    included in the agreement?                          14:14

5        A   As I recall.                                14:14

6        Q   Was there any resistance from Uber, at least  14:14

7    initially, to including that in the agreement?      14:14

8            MR. JACOBS:  You can answer that to the     14:14

9    extent there was resistance expressed -- first of all,  14:15

10   you can answer if resistance was expressed to Anthony  14:15

11   or Lior.  And you can also answer to the extent     14:15

12   resistance was articulated internally, separate from  14:15

13   discussions with counsel.                           14:15

14           THE WITNESS:  Okay.  I believe we did       14:15

15   articulate some resistance to Anthony and Lior      14:15

16   generally.                                          14:15

17           Obviously, an indemnity is a liability,     14:15

18   essentially; right?  You're acting as an insurance  14:15

19   company.  And we didn't want to take on any         14:15

20   liabilities that we didn't have to.  So, our        14:15

21   preference, like any other company's preference, would  14:15

22   be to not indemnify someone; right?                 14:15

23           So we -- I believe we conveyed something    14:15

24   along those lines to them.                          14:15

25           MS. ROBERTS:  Q.  So, at some point after   14:15
```

Page 229

ER-Trust-0135

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    Mr. Levandowski and Mr. Ron requested that       14:15

 2    indemnification be included as a term of the     14:15

 3    agreement, Uber informed them that the preference --   14:15

 4    Uber's preference would be to not include indemnity    14:15

 5    provisions; is that correct?                     14:15

 6        A    Something along those lines, yes.       14:15

 7        Q    And then how -- how did Uber and        14:15

 8    Mr. Levandowski and Mr. Ron get to the point where    14:16

 9    there was an agreement on including indemnification   14:16

10    provisions?                                      14:16

11        A    I mean, it was negotiated.  They told us it   14:16

12    was a critical part of the deal.  They wouldn't do the   14:16

13    deal without indemnity.  So, we negotiated an    14:16

14    indemnity that we were comfortable with, with a lot of   14:16

15    safeguards for us.                               14:16

16        Q    Did they say why they wouldn't do a deal   14:16

17    without an indemnity?                            14:16

18        A    They were worried that the, you know, risk of   14:16

19    them getting sued in the deal if we were acquired --   14:16

20    if we -- sorry -- if we acquired them was going to --   14:16

21    was going to increase; right?                    14:16

22            Because they felt that Google viewed Uber as   14:16

23    a key competitor in the race for autonomous vehicles.   14:16

24    And it would be one thing if they were to do     14:16

25    autonomous trucking independently.  They would be much   14:16
```

Page 230

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 12 of
28

ER-Trust-0136

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    less of a threat to Google.                        14:16

 2           But, if we were to acquire their talent,    14:16

 3    right, that would bolster our team.  As I said, we 14:16

 4    already thought we had the best team, but this would 14:16

 5    bolster it further.                                 14:16

 6           They were worried that out of, you know,     14:16

 7    anger or whatever, Google would sue us, and they felt 14:16

 8    the risk to them of getting sued increased.  And,   14:17

 9    therefore, they wanted to have us indemnify them.   14:17

10    Q    Did Mr. Levandowski or Mr. Ron convey to you  14:17

11    any indication that there would be merit to any claims 14:17

12    by Google against them following the deal?          14:17

13    A    No, none whatsoever; in fact, quite the        14:17

14    opposite.  As I told you, all of our discussions -- 14:17

15    well, not all of our discussions -- but on several  14:17

16    occasions, we discussed with them, Don't bring      14:17

17    anything.  We don't want anything.                  14:17

18           And they assured us they had no interest in  14:17

19    doing so because they had new approaches.  So, neither 14:17

20    of us had any worry that it would be a substantive   14:17

21    concern.                                             14:17

22           At the same time, anyone can bring a lawsuit. 14:17

23    There are legal fees and other expenses.  And they   14:17

24    wanted to be indemnified for all of that indemnity to 14:17

25    cover, as I recall, legal fees, not just damages.    14:17
```

Page 231

ER-Trust-0137

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q   And, when you first heard from         14:17

 2   Mr. Levandowski that he had been told by Travis that  14:17

 3   Uber would indemnify them, did that surprise you?     14:17

 4        A   I don't recall.                          14:17

 5        Q   Did you have any impressions as to whether  14:17

 6   Uber should indemnify Mr. Levandowski and Mr. Ron?    14:18

 7        A   I mean, as I said, obviously, I'd prefer not  14:18

 8   to indemnify.  It's a liability for us.  But it seemed  14:18

 9   like a reasonable risk, because we knew that we       14:18

10   weren't going to be taking anything.  We were assured  14:18

11   by them they wouldn't take anything.  So, we felt like  14:18

12   the risk of anyone successfully suing us was low.     14:18

13            As I said, anyone can bring a lawsuit, but  14:18

14   winning is a different story.  So, we felt like this  14:18

15   was a very reasonable risk to take on, at least as I  14:18

16   recall.                                              14:18

17        Q   And, was agreeing to the indemnity provision  14:18

18   that Mr. Levandowski and Mr. Ron requested, dependent  14:18

19   on the results of the due diligence report by Stroz?  14:18

20            MR. JACOBS:  So, you can answer that      14:18

21   sequentially, i.e., whether the final agreement was to  14:18

22   be triggered after whatever was done in the Stroz     14:18

23   diligence effort.                                    14:18

24            You can answer as to sequence, and you can  14:18

25   answer as to what your impression was of -- your      14:19
```

Veritext Legal Solutions
866 299-5127

ER-Trust-0138

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | understanding was of how that sequence would work | 14:19 |
| 2 | without revealing the contents of the Stroz report. | 14:19 |
| 3 | THE WITNESS:  Okay.  Can you break the | 14:19 |
| 4 | question down into smaller pieces so I can go through | 14:19 |
| 5 | it as my attorney suggested? | 14:19 |
| 6 | MS. ROBERTS:  Yes.  Let me try. | 14:19 |
| 7 | Q   Did Uber receive the final due diligence | 14:19 |
| 8 | report from Stroz before deciding whether it would | 14:19 |
| 9 | agree to the indemnity provision that Mr. Levandowski | 14:19 |
| 10 | and Mr. Ron were requesting? | 14:19 |
| 11 | A   I don't know for sure.  I never received a | 14:19 |
| 12 | copy of any of the reports. | 14:19 |
| 13 | Q   So, you have never seen the Stroz report? | 14:19 |
| 14 | A   Not that I recall. | 14:19 |
| 15 | Q   Okay.  Was there -- I understand there was a | 14:19 |
| 16 | data room in the context of this acquisition, where | 14:19 |
| 17 | documents were -- were put in for due diligence | 14:20 |
| 18 | purposes? | 14:20 |
| 19 | Are you aware of that? | 14:20 |
| 20 | A   Vaguely.  I mean, it's very typical in an M&A | 14:20 |
| 21 | deal to have a data room. | 14:20 |
| 22 | Q   In your role, do you review the due diligence | 14:20 |
| 23 | documents that are shared in the data room? | 14:20 |
| 24 | A   I very rarely review them.  I rely on either | 14:20 |
| 25 | people on my team or the attorneys, as the case may | 14:20 |

Page 233

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 15 of 28

ER-Trust-0139

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    number of conditions, including a $100 million      15:59

 2    potential litigation, something to that effect.      15:59

 3          At this point in the term sheet, we just       15:59

 4    merely put a placeholder and called it super duper.  15:59

 5      Q   So, super duper litigation at the time of the  15:59

 6    term sheet was intended to refer to litigation against  15:59

 7    Otto or -- yeah, against Otto that was more than a   15:59

 8    minor litigation?                                    15:59

 9      A   I'm not sure whether it was against Otto or    15:59

10    against us.  I would have to read the documents       15:59

11    carefully and --                                     15:59

12      Q   Okay.                                          15:59

13      A   -- refresh my memory.  But it's certainly      15:59

14    referring to litigation in general that was more than  15:59

15    minor.                                               15:59

16      Q   Okay.  And so you said that Otto was           15:59

17    concerned.  It didn't want Uber to be able to back out  15:59

18    of the deal based on litigation that was not, quote,  16:00

19    super duper litigation?                              16:00

20      A   I mean, both sides in any transaction are      16:00

21    concerned to make sure that once they have a signed   16:00

22    deal, the other side has little possibility of walking  16:00

23    away, and we -- and -- and your side has as much     16:00

24    possibility; right?  It's just retaining flexibility.  16:00

25    They didn't want us to be able to walk away based on,  16:00
```

Page 309

ER-Trust-0140

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    you know, minor litigation.                        16:00

 2        Q   And so the -- the portion that I just read to   16:00

 3    you, where it says super duper litigation, it says:   16:00

 4            "To be defined in definitive documentation."   16:00

 5            Was super duper litigation ever defined in   16:00

 6    documentation?                                     16:00

 7        A   I don't know whether we retained that defined   16:00

 8    term, but we certainly retained the concept.  And, in   16:00

 9    the definitive documentation, as I just referenced,   16:00

10    there are a set of conditions that would allow us to   16:00

11    walk away from the deal.                           16:00

12        Q   And, would that be in the merger and         16:00

13    acquisition agreement?                             16:00

14        A   Yeah, the merger and acquisition agreement;   16:01

15    correct.                                           16:01

16        Q   But, it may not be referred to as super duper   16:01

17    litigation in that document?                       16:01

18        A   I don't recall what we referred to it as.  I   16:01

19    think that term may have gone away.                16:01

20        Q   At the time of the term sheet, was Uber       16:01

21    concerned about super duper litigation as a result of   16:01

22    its transaction with Otto?                         16:01

23            MR. JACOBS:  Again, you can answer that --    16:01

24    the question to the extent you personally had some   16:01

25    understanding of litigation risks, but not in -- but   16:01
```

Page 310

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 17 of
28

ER-Trust-0141

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    you really can't answer on behalf of the company.    16:01
 2         THE WITNESS:  Right.                             16:01
 3         Yeah, I mean, me personally, I wouldn't say I    16:01
 4    was concerned.  Concern implies worry.  But obviously, 16:01
 5    there were many things we wanted to do to protect     16:01
 6    Uber; right?  Which is why we put various conditions  16:01
 7    in.                                                   16:01
 8         Just having a condition there doesn't mean       16:01
 9    you were worried something is going to happen.  I have 16:01
10    fire insurance on my home, but I'm not concerned that 16:01
11    it's going to burn down.  I just want to make sure    16:01
12    that, if something happens, I'm protected.  It was    16:01
13    similar here.                                         16:02
14         MS. ROBERTS:  Q.  If you'd turn to page 4.       16:02
15    A    (Witness complies.)                              16:02
16         Uh-huh.                                          16:02
17    Q    And we're still on the "Put Call Closing         16:02
18    Condition" section.  In the second-to-last bullet     16:02
19    point on the page, can you take a minute to review    16:02
20    that.                                                 16:02
21    A    Is that the one beginning "unless mutually       16:02
22    agreed by the parties"?  That one?                    16:02
23    Q    Yes.                                             16:02
24    A    Okay.                                            16:02
25         (Witness reading document.)                      16:02
```

                                                    Page 311

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 18 of
28

ER-Trust-0142

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Okay.                                         16:02

 2     Q    What was the purpose of this provision?    16:02

 3     A    This goes back to what we've been talking  16:02

 4  about all along, which is we -- it was a talent deal. 16:02

 5  We wanted to get more talent rather than less.  As   16:03

 6  much as we loved Anthony and Lior, we didn't want to  16:03

 7  just hire two people.  We wanted to get at least 25.  16:03

 8        So, this is ensuring that they have 25, but   16:03

 9  the 25 includes key employees, and that those        16:03

10  employees all sign our standard form, the CIAA or     16:03

11  whatever we call it, to make sure they're not bringing 16:03

12  any, you know, third-party or proprietary information  16:03

13  to Uber.                                              16:03

14     Q    Who were the key employees?                 16:03

15     A    They've not been defined as of this date.   16:03

16  I'm not even sure -- I don't recall whether they were 16:03

17  defined as of the date of signing the definitives.    16:03

18        But, it was a group of, I believe, up to       16:03

19  five employees that were alongside Anthony and Lior,  16:03

20  like, the -- you know, the most significant employees 16:03

21  in the company in Otto.                               16:03

22     Q    So, as of the term sheet that we're looking  16:03

23  at that's Exhibit 81, we're still not talking about -- 16:03

24  at least from Uber's point of view, not talking about 16:03

25  specific individuals?                                 16:03
```

Page 312

ER-Trust-0143

# Appellees' Exhibit 4

ER-Trust-0144

# Exhibit F

ER-Trust-0145

ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5   In re:                      ) Bankruptcy Case No.
                                 ) 20-30242 (HLB)
 6   ANTHONY SCOTT LEVANDOWSKI,   ) Chapter 11
                                 )
 7   Debtor.                      )
     _____)
 8                                ) Adv. Pro. No.
     ANTHONY LEVANDOWSKI, an      ) 20-03050 (HLB)
 9   individual,                  )
                                 )
10              Plaintiff,        )
                                 )
11              vs.               )
                                 )
12   UBER TECHNOLOGIES, INC.,     )
                                 )
13              Defendant.        )
     _____)
14
15
16       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17   UBER TECHNOLOGIES, INC. THROUGH ITS 30(B)(6) WITNESS
18               CAMERON POETZSCHER
19            Tuesday, January 26, 2021
20                  Volume I
21          *** ATTORNEYS' EYES ONLY ***
22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 4429738
25   Pages 1 - 225

                                        Page 1
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 21 of 28

ER-Trust-0146

ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5   In re:                      ) Bankruptcy Case No.
                                 ) 20-30242 (HLB)
 6   ANTHONY SCOTT LEVANDOWSKI,   ) Chapter 11
                                 )
 7   Debtor.                      )
     _____)
 8                                ) Adv. Pro. No.
     ANTHONY LEVANDOWSKI, an      ) 20-03050 (HLB)
 9   individual,                  )
                                 )
10             Plaintiff,         )
                                 )
11             vs.                )
                                 )
12   UBER TECHNOLOGIES, INC.,     )
                                 )
13             Defendant.         )
     _____)
14
15
16        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17   UBER TECHNOLOGIES, INC. THROUGH ITS 30(B)(6) WITNESS
18   CAMERON POETZSCHER, Volume I, taken on behalf of
19   Plaintiff, beginning at 9:12 a.m., and ending at
20   4:21 p.m., on Tuesday, January 26, 2021, before
21   CARLA SOARES, Certified Shorthand Reporter No. 5908.
22
23
24
25

                                          Page 2
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 22 of 28

ER-Trust-0147

ATTORNEYS EYES ONLY

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2

 3    For the Plaintiff:

 4              GOODWIN PROCTER LLP

 5              BY:  RACHEL M. WALSH, Attorney at Law

 6              BY:  THERESA ANN SUTTON, Attorney at Law

 7              Three Embarcadero Center

 8              San Francisco, California 94111

 9              415.733.6000

10              rwalsh@goodwinlaw.com

11              tsutton@goodwinlaw.com

12

13

14    For the Defendant:

15              JENNER & BLOCK, LLP

16              BY:  DAVID J. BRADFORD, Attorney at Law

17              BY:  CHRISTIAN PLUMMER, Attorney at Law

18              353 N. Clark Street

19              Chicago, Illinois 60654

20              312.222.9350

21              dbradford@jenner.com

22              cplummer@jenner.com

23

24

25

                                           Page  3
```

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 23 of
28

ER-Trust-0148

ATTORNEYS EYES ONLY

```
 1   APPEARANCES VIA VIDEOCONFERENCE (Continued):

 2

 3   For the Intervenor Google, LLC:

 4             KEKER, VAN NEST & PETERS LLP

 5             BY:  REID MULLEN, Attorney at Law

 6             BY:  W. HAMILTON JORDAN, Attorney at Law

 7             633 Battery Street

 8             San Francisco, California 94111

 9             415.391.5400

10             rmullen@keker.com

11             wjordan@keker.com

12

13

14   ALSO PRESENT:  Anthony Levandowski, Plaintiff

15                  Randall Haimovici, Uber In-House

16                  Counsel

17                  Ann O'Regan, Uber In-House Counsel

18                  Carlos Velasquez, Video Operator

19                  Stephen Hilton, Replacement Video

20                  Operator

21

22                  --o0o--

23

24

25

                                        Page  4
```

ER-Trust-0149

ATTORNEYS EYES ONLY

```
 1    waited, you know, the more risk there was we          11:56:40

 2    wouldn't get to do the deal, number one; number two,

 3    obviously the longer we had to wait to get the

 4    benefit of their talent to contribute to our

 5    autonomous efforts.                                   11:56:49

 6          So we certainly wanted to move fast.  And

 7    I remember discussing it with both of them, you

 8    know, on various occasions.  I don't know about this

 9    particular date.

10       Q   And then the second sentence in Ms. Qi's       11:57:03

11    e-mail says, "All diligence and documentation need

12    to be completed and finalized by the week of 3-21."

13          Do you see that?

14       A   Yes.

15       Q   Was that a deadline that was set by Uber?      11:57:23

16          MR. BRADFORD:  Objection.  Foundation.

17          THE WITNESS:  Yeah.  I mean, again, I

18    don't know if it's a deadline.  I think it was more

19    of an aspiration.

20          I don't know who it came from necessarily,      11:57:38

21    but if Nina is e-mailing Lior, it may have come from

22    us.

23          We certainly understood she shared our

24    objective to want to move quickly, so I don't know

25    for sure, but it may have come from us.               11:57:51
```

Page 88

ER-Trust-0150

ATTORNEYS EYES ONLY

```
 1   BY MS. WALSH:                                   11:57:53

 2       Q    And as part of the due diligence process,

 3   Uber and the parties retained Stroz Friedberg,

 4   correct?

 5       A    Yes.                                   11:58:19

 6       Q    And they were to perform essentially

 7   forensic due diligence on Mr. Levandowski and the

 8   other employees, correct?

 9       A    Forensic and more general diligence, yes.

10       Q    And did Uber intend that the due diligence   11:58:46

11   performed by Stroz be completed by this March 21st

12   date in this e-mail?

13            MR. BRADFORD:  Objection.  Foundation,

14   scope.

15            THE WITNESS:  Yeah.  I mean, again, I        11:59:02

16   didn't send the e-mail, and I can't recall five

17   years later exactly what we had in mind.

18            I do know that in general, you know, as I

19   said, first of all, we wanted to move as fast as

20   possible.                                            11:59:11

21            But second of all, we didn't want to sign

22   a deal or commit ourselves to a deal until we were,

23   you know, 100 percent comfortable the deal made

24   sense for us generally, and also that we had, you

25   know, sufficient assurance that we weren't taking    11:59:21
```

Page 89

ER-Trust-0151

ATTORNEYS EYES ONLY

```
 1   undue risk of litigation from either Google or          11:59:24

 2   from -- you know, directly against us or against

 3   Anthony that we'd have to indemnify them for, right?

 4           As I said, you can never be 100 percent

 5   protected that you won't even get sued, but we          11:59:37

 6   wanted to make sure that if we did get sued, we felt

 7   comfortable we would win.

 8   BY MS. WALSH:

 9       Q   And was Stroz's investigation completed by

10   the time the deal was finalized?                        12:00:22

11           MR. BRADFORD:  Object to form.

12   Foundation.

13           Have we with switched topics at this

14   point?

15           MS. WALSH:  I mean, this is relevant to         12:00:36

16   Topic 1.  It may also be relevant to Stroz's

17   investigation.

18           MR. BRADFORD:  Thank you.

19           THE WITNESS:  When you say -- can you

20   repeat the question, please, actually, Rachel?          12:00:56

21           Sorry.  Can you repeat the question,

22   please?

23   BY MS. WALSH:

24       Q   Sure.

25           Was Stroz's investigation completed by the      12:01:13
```

Page 90

Case: 20-30242   Doc# 948   Filed: 03/31/22   Entered: 03/31/22 11:54:43   Page 27 of 28

ER-Trust-0152

ATTORNEYS EYES ONLY

```
1    time the deal to acquire Otto was finalized?        12:01:15

2            MR. BRADFORD:  Object to form.

3            THE WITNESS:  I'm not sure what you mean

4    by "finalized."  Do you mean by -- signed?

5    BY MS. WALSH:                                        12:01:28

6        Q   Signed.  Yes.

7        A   Right.  So that would be April 11th when

8    we signed the definitive docs.  So no, it wasn't

9    100 percent complete.

10           They had collected all of Anthony's         12:01:41

11   devices, or what he purported to be all of his

12   devices, and they had done the same for the other

13   diligenced employees, and also completed their

14   preliminary -- completed their interviews of those

15   people, and then completed some preliminary forensic  12:01:55

16   analysis using, you know, some of the keywords that

17   they got either from us or from Anthony's

18   interviews.  But the process wasn't 100 percent

19   complete.

20       Q   What information did Stroz provide to Uber   12:02:19

21   prior to the closing of the deal?

22           MR. BRADFORD:  Object to form.

23   Foundation.

24           THE WITNESS:  They didn't provide the

25   final report because that didn't come until later.   12:02:31
```

Page 91

ER-Trust-0153

# Appellees' Exhibit 5

ER-Trust-0154

**KELLER BENVENUTTI KIM LLP**
1   TOBIAS S. KELLER (Cal. Bar No. 151445)
    (tkeller@kbkllp.com)
2   DARA L. SILVEIRA (Cal. Bar No. 274923)
    (dsilveira@kbkllp.com)
3   650 California Street, Suite 1900
    San Francisco, California  94108
4   Telephone: (415) 496-6723
    Facsimile: (650) 636-9251
5
    *Attorneys for Anthony S. Levandowski,*
6   *Debtor and Debtor in Possession*

7

8                   **UNITED STATES BANKRUPTCY COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN FRANCISCO DIVISION**

11

12   In re:                                  Bankruptcy Case
                                             No. 20-30242 (HLB)
13   ANTHONY SCOTT LEVANDOWSKI,
                                             Chapter 11
14                             Debtor.
                                             **SUPPLEMENTAL DISCLOSURES IN**
15                                           **SUPPORT OF MOTION PURSUANT**
                                             **TO 11 U.S.C. §§ 105(a) AND 363(b)**
16                                           **AND FED. R. BANKR. P. 9019 FOR**
                                             **ENTRY OF ORDERS APPROVING (I)**
17                                           **THE SETTLEMENT BETWEEN THE**
                                             **DEBTOR, UBER TECHNOLOGIES,**
18                                           **INC., AND GOOGLE LLC; (II) THE**
                                             **CLAT SETTLEMENT; (III) THE**
19                                           **PLAN SUPPORT AGREEMENT**
                                             **BETWEEN THE DEBTOR AND**
20                                           **GOOGLE; AND (IV) GRANTING**
                                             **RELATED RELIEF**
21
22                                           Date:   March 3, 2022
                                             Time:  10:00 a.m. (Pacific Time)
23                                           Place:  (Tele/Videoconference Only)
                                                     United States Bankruptcy Court
24                                                   Courtroom 17, 16th Floor
                                                     San Francisco, CA 94102
25
26                                           Objection Deadline:  February 24, 2022
27

28

ER-Trust-0155

1  Anthony S. Levandowski, as debtor and debtor in possession (the "<u>Debtor</u>") in the above-

2  captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby submits the following disclosures in

3  support of the *Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019*

4  *for Entry of Orders (I) Approving Settlement Between the Debtor, Uber Technologies, Inc., and*

5  *Google LLC; (II) the CLAT Settlement; (III) the Plan Support Agreement Between the Debtor*

6  *and Google; and (IV) Granting Related Relief* (the "<u>9019 Motion</u>").  Capitalized terms used but

7  not defined herein shall have the meanings given to them in the 9019 Motion.

8  **I.    PLAN SUPPORT AGREEMENT.**

9  Attached hereto as <u>Exhibit A</u> is an execution copy of the Plan Support

10  Agreement; and attached hereto as <u>Exhibit B</u> is a redlined document showing the changes from

11  the version filed with the 9019 Motion.  The changes modify Google's consent rights and extend

12  the deadlines for various commitments made by the Debtor.

13  **II.    THE ESTATE'S LIQUIDITY.**

14  The 9019 Motion notes, at pages 20-21, that the Google payment should be

15  authorized based on the Debtor's analysis of its resources.  The following supplements the

16  discussion contained therein.

17  **A.  The Debtor Will Have Adequate Liquidity at Confirmation.**

18  As set forth in the Supplemental Declaration of Allen Soong, the liquidity

19  analysis submitted with the 9019 Motion has been updated in light of (1) recent changes that

20  have impacted the stock market (thereby reducing the proceeds available from the CLAT

21  Settlement) and (2) updated assumptions regarding certain claims and expenses.  The analysis

22  indicates that there is sufficient Cash to make all Plan Effective Date payments.  Moreover, even

23  if there were otherwise inadequate liquidity, the Plan has sufficient flexibility that the Debtor

24  believes the Plan would still be confirmable.[1]

25

26  [1]    Specifically, the Plan permits deferred payment of administrative expenses, including

27  professional fee claims, with the claimant's consent.  The Debtor has initiated discussions with his professionals to defer a portion of their fee claims should additional liquidity be necessary.

28  The assets to be transferred to the Trust are more than sufficient to pay those obligations over time if necessary.

ER-Trust-0156

1    **B.  Taxes for the Uber Settlement Payment.**

2          The foregoing analysis assumes that the Uber Settlement Payment is not taxable

3    to the Bankruptcy Estate.  See 9019 Motion at 21, n.6.  As indicated in the 9019 Motion, the

4    Debtor has consulted with tax professionals and believes that there is support for the position that

5    the Uber Settlement Payment will not result in material tax liability to the Debtor or to the

6    Bankruptcy Estate.  The Debtor's position has not yet been presented to the federal or state

7    taxing authorities, however and the Debtor has not been assured that his position will prevail.

8          The Debtor anticipates that the issue will be presented in connection with the Plan

9    and its confirmation.

10

11   Dated:  March 1, 2022                        **KELLER BENVENUTTI KIM LLP**

12

13                                               By:   */s/ Dara L. Silveira*
                                                       Dara L. Silveira

14                                               *Attorneys for Anthony S. Levandowski,*
                                                 *Debtor and Debtor in Possession*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER-Trust-0157

# Appellees' Exhibit 6

ER-Trust-0158

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

*Attorneys for Anthony S. Levandowski,*
*Debtor and Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>          Debtor. | Bankruptcy Case<br>No. 20-30242 (HLB)<br><br>Chapter 11<br><br>***EX PARTE* MOTION TO REINSTATE HEARING ON MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND FED. R. BANKR. P. 9019 FOR ENTRY OF ORDERS APPROVING (I) THE SETTLEMENT BETWEEN THE DEBTOR, UBER TECHNOLOGIES, INC., AND GOOGLE LLC; (II) THE CLAT SETTLEMENT; (III) THE PLAN SUPPORT AGREEMENT BETWEEN THE DEBTOR AND GOOGLE; AND (IV) GRANTING RELATED RELIEF; DECLARATION OF TOBIAS S. KELLER IN SUPPORT THEREOF**<br><br>Date:   March 3, 2022<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  (Tele/Videoconference Only)<br>       United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102 |

ER-Trust-0159

Anthony S. Levandowski, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby submits the following *ex parte* motion to reinstate the hearing on the *Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019 for Entry of Orders (I) Approving Settlement Between the Debtor, Uber Technologies, Inc., and Google LLC; (II) the CLAT Settlement; (III) the Plan Support Agreement Between the Debtor and Google; and (IV) Granting Related Relief* (the "9019 Motion"); and respectfully represents as follows:

On March 1, 2022, the Debtor submitted his supplemental disclosures (the "Supplemental Disclosures") with respect to the 9019 Motion. *See* Docket No. 867. Among other things, the Supplemental Disclosures address tightening liquidity and, as indicated in the 9019 Motion, fuller disclosures regarding whether the Uber Settlement Payment is taxable to the Bankruptcy Estate. See 9019 Motion at 21, n.6. The circumstances described in Supplemental Disclosures are relevant to the 9019 Motion and may require additional briefing or procedures, particularly with respect to parties that have not appeared in this Chapter 11 case.

Prior to the time that the Supplemental Disclosures were filed, the Court entered a Docket Text Order granting the Motion. Because such order was entered without the Court having the benefit of the new information contained in the Supplemental Disclosures, the Debtor requests that the Docket Text Order be stayed and that the Court conduct an actual hearing on the Motion.

**WHEREFORE**, the Debtor respectfully requests that this Court reinstate the hearing on the Motion previously set for March 3, 2022, at 10:00 am, so that the Court may consider the issues raised in the Supplemental Disclosures, and for such further relief as may be appropriate.

Dated: March 1, 2022

**KELLER BENVENUTTI KIM LLP**

By:   */s/ Tobias S. Keller*
Tobias S. Keller

*Attorneys for Anthony S. Levandowski,*
*Debtor and Debtor in Possession*

ER-Trust-0160

1    **DECLARATION OF TOBIAS S. KELLER IN SUPPORT OF EX PARTE MOTION**

2        I, Tobias S. Keller, pursuant to section 1746 of title 28 of the United States Code, hereby

3    declare under penalty of perjury that the following is true and correct to the best of my

4    knowledge, information, and belief:

5        1.    I am an attorney with the law firm of Keller Benvenutti Kim LLP, a law firm with

6    offices at 650 California Street, Suite 1900, San Francisco, California.  I am admitted to practice

7    in the State of California and am also admitted to practice before this Court.  Unless otherwise

8    stated in this Declaration, I have personal knowledge of the facts set forth herein, and could and

9    would testify competently thereto.

10        2.    I submit this declaration in support of the *Ex Parte Motion to Reinstate Hearing*

11    *on Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019 for Entry of*

12    *Orders (I) Approving Settlement Between the Debtor, Uber Technologies, Inc., and Google LLC;*

13    *(II) the CLAT Settlement; (III) the Plan Support Agreement Between the Debtor and Google; and*

14    *(IV) Granting Related Relief* (the "Motion").[1]

15        3.    In accordance with his duties to the Court, the Debtor filed the Supplemental

16    Disclosures on March 1, 2022.  Before they were filed, and without the Court having the benefit

17    of the Supplemental Disclosures, the Court entered a Docket Text Order granting the Motion and

18    canceling the hearing scheduled on the Motion.

19        4.    For the reasons set forth in the Motion, the Debtor requests the opportunity to

20    discuss the Supplemental Disclosures with the Court and determine whether the Docket Text

21    Order should be amended.

22        5.    At 4:16 pm on March 1, 2022, I sought the consent of Google and Uber, through

23    their counsel, to the relief requested in the Motion.  As of the filing hereof, neither has

24    responded.

25

26

27

---

[1]    Capitalized terms used but not otherwise herein defined have the meanings ascribed to such terms in the Motion.

28

ER-Trust-0161

1        I declare under penalty of perjury that, to the best of my knowledge and after reasonable

2  inquiry, the foregoing is true and correct.  Executed this first day of March, 2022, in San

3  Francisco, California.

4                         */s/ Tobias S. Keller*
                          Tobias S. Keller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER-Trust-0162

# Appellees' Exhibit 7 (Sealed)

ER-Trust-0163

# Appellees' Exhibit  8 (Sealed)

ER-Trust-0164

# Appellees' Exhibit 9 (Sealed)

ER-Trust-0165

# Appellees' Exhibit 10

ER-Trust-0166

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**

ER-Trust-0167

# REDACTED VERSION OF LIQUIDATION ANALYSIS

**In re Levandowski**
**Liquidation Analysis**

This schedule provides a summary of the Debtor's assets, the estimated value of such assets, and the realized value such assets that are available to the Debtor's Estate.

| Asset | Estimated Value as of 1/31/22 | Est. Realized Value under Plan as of 4/30/22 $ | % | Est. Realized Value under Ch. 7 liquidation as of 4/30/22 $ | % |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash and cash equivalents (including bank accts., CDs, ets.) | 481,280 | 340,000 | 71% | 340,000 | 71% |
| Accounts receivable (net) | 1,800 | 0 | 0% | 0 | 0% |
| Retainer(s) paid to professionals | 476,811 | 429,130 | 90% | 429,130 | 90% |
| **Total Current Assets** | **$959,892** | **$769,130** | **80%** | **$769,130** | **80%** |
| | | | | | |
| **Long Term Assets (Market Value)** | | | | | |
| Indemnification Claim | 179,523,572 | 2,000,000 | 1% | 1,000,000 | 1% |
| Furniture, Fixtures, and Equipment | 20,000 | 2,000 | 10% | 2,000 | 10% |
| Vehicles - non-exempt | 86,169 | 8,617 | 10% | 8,617 | 10% |
| Partnership interests | 15,563,293 | 2,249,806 | 14% | 2,249,806 | 14% |
| Notes Receivable Fawn Park | 720,000 | 400,000 | 56% | 400,000 | 56% |
| Other investments | 5,964,690 | 4,985,721 | 84% | 4,985,721 | 84% |
| Interests in IRA, Keogh, other retirement plans | 14,288,614 | 4,018,639 | 28% | 4,018,639 | 28% |
| CLAT | 8,077,564 | 7,785,421 | 96% | 7,785,421 | 96% |
| Notes Receivable | 14,676,104 | 1,279,467 | 9% | 1,279,467 | 9% |
| Avoidance Actions | 0 | 0 | 0% | 0 | 0% |
| **Total Long Term Assets** | **$238,920,006** | **$22,729,671** | **10%** | **$21,729,671** | **9%** |
| | | | | | |
| **Total Assets Available to Disburse** | **$239,879,897** | **$23,498,801** | **10%** | **$22,498,801** | **9%** |
| | | | | | |
| **Secured Claims** | **($2,100,000)** | **($2,100,000)** | **100%** | **($2,100,000)** | **100%** |
| *Net Proceeds After Secured Claims* | | *$21,398,801* | | *$20,398,801* | |
| | | | | | |
| **Administrative and Priority Claims** | **($7,550,000)** | **($7,550,000)** | **100%** | **($7,429,990)** | **100%** |
| *Net Proceeds After Administrative and Priority Claims* | | *$13,848,801* | | *$12,968,811* | |
| | | | | | |
| **Class 2 – Google Claim** | | | | | |
| Proceeds from Uber to Google | | ▮▮▮▮ | ▮▮▮ | N/A | - |
| Recovery Pari Passu with Class 3 | | ▮▮▮▮ | ▮▮▮ | N/A | - |
| **Total Google Claim** | **(179,047,999)** | ▮▮▮▮ | ▮▮▮ | **(12,658,417)** | **7%** |
| | | | | | |
| **Class 3 – General Unsecured Claims** | **(4,390,388)** | ▮▮▮ | ▮▮ | **(310,394)** | **7%** |
| | | | | | |
| **Class 4 – Levandowski Claims and Rights** | | ▮ | - | **0** | - |
| *Net Proceeds After Class 4 – Levandowski Claims and Rights* | | ▮ | | *$0* | |

ER-Trust-0168