ROB BONTA
Attorney General of California
TAMAR PACHTER
Senior Assistant Attorney General
LISA W. CHAO
Supervising Deputy Attorney General
JOHN C. KEITH
Deputy Attorney General
State Bar No. 229755
  300 S. Spring St., Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6251
  Fax:  (916) 731-2144
  E-mail:  john.keith@doj.ca.gov
*Attorneys for Appellant*
*California Franchise Tax Board*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **In re:**<br><br>**ANTHONY SCOTT LEVANDOWSKI,**<br><br>Debtor. | District Court Case Nos.<br>4:22-cv-02781-YGR<br>4:22-cv-02783-YGR<br>4:22-cv-02786-YGR<br>4:22-cv-02789-YGR<br>(Jointly Administered) |
| **THE UNITED STATES OF AMERICA on behalf of THE INTERNAL REVENUE SERVICE and CALIFORNIA FRANCHISE TAX BOARD,**<br><br>Appellants,<br><br>**v.**<br><br>**THE LEVANDOWSKI RESIDUAL LIQUIDATION TRUST, as successor to the Debtor in Possession, and ANTHONY SCOTT LEVANDOWSKI,**<br><br>Appellees. | Bankruptcy Court Case No.<br>3:20-bk-30242-HLB<br><br>**CALIFORNIA FRANCHISE TAX BOARD'S REPLY IN SUPPORT OF ITS APPEAL OF TAX ORDER** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    The Bankruptcy Court Lacked Authority To Determine the Tax
Effects of the Plan Under Section 505(a) .............................................. 2

A.    Debtor Fails To Distinguish UAL, Which Persuasively Holds
that § 505(a)(1) Does Not Grant Bankruptcy Courts Power To
Determine the Tax Consequences of a Chapter 11 Plan....................... 2

    1.    The Tax Question in UAL Was Similarly Tied To
A Pending Contested Matter (Plan Confirmation)
Like Debtor's Settlement and Plan Confirmation............ 2

    2.    Debtor Cannot Distinguish UAL By Arguing
Proposed Plans Do Not Present a Case or
Controversy but Settlement Agreements Do; UAL
Also Involved Executed Agreements, and the Court
Found No Jurisdiction Under § 505(a) Even If
There Might Be a Constitutional Case or
Controversy ...................................................................... 4

    3.    Debtor's Attempt To Distinguish the Tax Effects of
the Proposed Plan from Those of the Proposed
Settlement Are Unpersuasive and Belied by Many
Admissions and Other Evidence that the Two
Transactions Were Inextricably Linked or Even
One and the Same.............................................................. 4

B.    Section 1146(b), Which Authorizes the Determination of
Proposed Plans' State Income Tax Consequences, Prevails Over
Section 505(a)'s General Grant of Authority, Which Debtor
Cannot Use to Circumvent Section 1146(b)'s Specific Timing
Requirements ....................................................................................... 9

C.    Debtor Still Fails To Cite a Single Case Holding that Section
505(a) Authorizes a Court To Determine the Tax Effects of a
Proposed Plan...................................................................................... 10

D.    Debtor's Policy Arguments Ignore Countervailing
Considerations..................................................................................... 12

II.    The Settlement Payment Was Not a Non-Taxable Insurance
Payment................................................................................................ 13

i

**TABLE OF CONTENTS**
(continued)

**Page**

A.   It Is Undisputed the Settlement Payment Relieved Debtor from a Judgment Disgorging His Compensation from His Old Employer and Was Pursuant to an Indemnification Agreement with His New Employer; Debtor Cannot Meet His Burden to Show That Was Not Taxable Income By Comparing It to Coverage of a Taxpayer's Car Accident, Which Has Nothing to do with Compensation ........................................................................ 13

B.   It Is Debtor, Not FTB, Who Fundamentally Misstates the Nature of the Indemnity, Which Was Against a Judgment for Disgorgement Based on Debtor's Willful Misconduct, and Therefore Cannot Constitute Insurance ........................................ 14

　　　1.   FTB Has Not Waived Any Arguments Concerning the Uninsurable Nature of Debtor's Indemnified Conduct ............................................................... 15

　　　2.   The Arbitration Award and Ensuing Judgment Were Clearly Based on Debtor's Uninsurable Willful Conduct ............................................... 17

C.   Debtor Fails To Rebut That There Was No Risk Distribution Here As Required for Insurance ......................................... 18

III.   Debtor's Alternative Bases for Affirmance All Fail........................... 19

CONCLUSION................................................................................. 19

CERTIFICATE OF COMPLIANCE.................................................... 20

ii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adirondack Med. Ctr. v. Sebelius*
740 F.3d 692 (D.C. Cir. 2014) ............................................................................ 10

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*
953 F.3d 707 (11th Cir. 2020) ............................................................................ 10

*Bank of the West v. Super. Ct.*
2 Cal.4th 1254 ...................................................................................................... 15

*Brown v. Alton Water Co.*
222 U.S. 325 (1912) ............................................................................................... 9

*California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v.*
*United States*
215 F.3d 1005 (9th Cir. 2000) ............................................................................ 10

*California Shoppers, Inc. v. Royal Globe Ins. Co.*
175 Cal. App. 3d 1 (1985) .................................................................................... 18

*Central Valley AG Enterprises v. United States*
531 F.3d 750 (9th Cir. 2008) (*Central Valley*) ........................................... 11, 12

*Certain Underwriters at Lloyd's London v. ConAgra Grocery Prod.*
*Co., LLC*
77 Cal. App. 5th 729 (2022) ................................................................................ 17

*Chu v. Canadian Indem. Co.*
224 Cal. App. 3d 86 (1990) ................................................................................. 16

*Clougherty Packing Co. v. Commissioner*
811 F.2d 1297 (9th Cir. 1987) ............................................................................ 18

*Consolidated Accessories Corp. v. Franchise Tax Board*
161 Cal.App.3d 1036 (1984) ............................................................................... 14

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*
830 F.3d 515 (D.C. Cir. 2016) ............................................................................ 10

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Agway, Inc.*
447 B.R. 91 (N.D.N.Y. 2011) (*Agway*) ................................................................. 11

*In re Amoskeag Bank Shares, Inc.*
215 B.R. 1 (Bankr. D.N.H. 1997) ........................................................................ 11

*In re Barr's Estate*
104 Cal.App.2d 506 (1951) ................................................................................ 19

*In re Goldblatt Bros., Inc.*
106 B.R. 522 (Bankr. N.D. Ill. 1989) .................................................................. 11

*In re Grand Chevrolet, Inc.*
153 B.R. 296 (C.D. Cal. 1993) ............................................................................ 11

*In re Jercich*
238 F.3d 1202 (9th Cir. 2001) ............................................................................ 13

*In re Kilen*
129 B.R. 538 (Bankr. N.D. Ill. 1991) ............................................................. 11, 12

*In re Liuzzo*
204 B.R. 235 (Bankr. N.D. Fla. 1996) ................................................................ 15

*In re Popa*
218 B.R. 420 (Bankr. N.D. Ill. 1998) .................................................................. 11

*In re Schmidt*
205 B.R. 394 (Bankr. N.D. Ill. 1997) .................................................................. 11

*In re Schwartz*
192 B.R. 90 (Bankr. D.N.J. 1996) ...................................................................... 12

*In re UAL Corp.*
336 B.R. 370 (Bankr. N.D. Ill. 2006) (*UAL*) ............................................... *passim*

*J. C. Penney Cas. Ins. Co. v. M. K.*
52 Cal. 3d 1009 (1991) ...................................................................................... 18

*Off. Depot, Inc. v. AIG Specialty Ins. Co.*
722 F. App'x 745 (9th Cir. 2018) ........................................................................ 18

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Osborn v. Bank of U.S.*
   22 U.S. 738 (1824) .................................................................. 9

*Patten v. D.C.*
   9 F.4th 921 (D.C. Cir. 2021) ................................................... 10

*Puerta v. United States*
   121 F.3d 1338 (9th Cir. 1997) ................................................. 15

*Raleigh v. Illinois Department of Revenue*
   530 U.S. 15 (2000) .................................................................. 13

*Rooker v. Fid. Tr. Co.*
   263 U.S. 413 (1923) ................................................................ 9

*S.V. v. Sherwood Sch. Dist.*
   254 F.3d 877 (9th Cir. 2001) .................................................... 9

*Trailer Marine Transp. Corp. v. Chicago Ins. Co.*
   791 F. Supp. 809 (N.D. Cal. 1992) .......................................... 18

*Upper Deck Co. v. Endurance Am. Specialty Ins. Co.*
   No. 10CV1032 JM WMC, 2011 WL 6396413 (S.D. Cal. Dec. 15,
   2011) ....................................................................................... 16

*W. Watersheds Project v. U.S. Dep't of the Interior*
   677 F.3d 922 (9th Cir. 2012) ............................................... 15, 17

**STATUTES**

11 U.S.C.
   § 505 ................................................................................. *passim*
   § 1146 ............................................................................... *passim*

26 U.S.C.
   § 1 .......................................................................................... 13
   § 61 ........................................................................................ 13

Cal. Rev. & Tax. Code
   § 17041 ................................................................................. 13
   § 17071 ................................................................................. 13

v

**TABLE OF AUTHORITIES**
(continued)

**Page**

Cal. Ins. Code
  § 533 ................................................................................15, 16, 17, 18

1

# INTRODUCTION

2   There are two grounds for reversing the Bankruptcy Court's Tax Order,

3   pursuant to which it declared that the Settlement Payment from Uber to Google for

4   Debtor's benefit did not constitute gross income for Debtor or his bankruptcy

5   estate.[1]  First, the Bankruptcy Court lacked authority to issue the order under 11

6   U.S.C. (Bankruptcy Code) § 505(a)(1).  Second, the Bankruptcy Court committed

7   reversible error in holding on the merits that the Settlement Payment was not gross

8   income but instead a non-taxable insurance payment.

9   As to the first ground, much ink has been spilled on both sides on various

10   issues concerning the Bankruptcy Court's authority.  The parties' back-and-forth

11   has clarified one critical point: the only case that appears to have addressed the

12   issue, *In re UAL Corp.*, 336 B.R. 370 (Bankr. N.D. Ill. 2006) (*UAL*), unequivocally

13   holds that "§ 505(a) does not grant bankruptcy courts power to determine the tax

14   consequences of a Chapter 11 plan." *Id.* at 379.  Debtor's attempts to distinguish

15   *UAL* fail.  His argument that the tax consequences of his proposed Plan were

16   distinct from those of the proposed settlement between him, Google, and Uber (the

17   Settlement) is form over substance, belied by his multiple admissions that the Plan

18   and the settlement were inextricably linked or even one and the same.  Given those

19   admissions, it is of no moment that, despite the admitted inextricable link between

20   the proposed Plan and proposed settlement, Debtor and Google insisted – for

21   reasons never explained, much less adequately – that the Settlement Payment not be

22   made pursuant to the Plan itself but instead in the nether space between the Plan's

23   "Confirmation Date" and its "Effective Date."

24   As to the second ground for reversal, Debtor does not dispute that he bore the

25   burden of proving the Settlement Payment was a non-taxable insurance payment,

26   and no evidence or argument Debtor has presented, either in this Court or below,

27   ───────────────

[1] Capitalized terms not defined herein have the same definitions as in FTB's
28   Opening Brief on appeal (Dkt. 39) or, if surrounded by quotation marks, in the
document indicated by the context.

1

1  satisfied that burden.  It is undisputed that the Settlement Payment: (1) relieved

2  Debtor from a judgment for disgorgement of compensation he received from his

3  prior employer (Google) for periods when he was aiding his future employer (Uber)

4  to compete with Google; and (2) was made pursuant to an Indemnification

5  Agreement that was part of the consideration Debtor insisted upon in exchange for

6  selling his company to Uber and coming to work there.  On its face, then, the

7  Settlement Payment was income.  Debtor cannot transform it into insurance for

8  various reasons, including that, as a matter of law, one cannot insure against having

9  to disgorge wrongfully acquired funds, or against willful misconduct (findings of

10  which pervade the arbitration award that underlies the judgment against Debtor).

11      While Debtor also raises alternative arguments for affirmance not ruled on by

12  the Bankruptcy Court, those all fail.  Therefore, this Court should reverse.

## ARGUMENT

### I.   THE BANKRUPTCY COURT LACKED AUTHORITY TO DETERMINE THE TAX EFFECTS OF THE PLAN UNDER SECTION 505(A)

15      FTB joins in the United States' arguments at pages 1-2 of its reply (Dkt. 61),

16  to the effect that "Appellees continue to repeatedly mischaracterize the

17  government's argument as requiring a 'tax return.'"  FTB has never argued that

18  Section 505(a) requires a filed tax return, as opposed to a completed tax period

19  (whether a normal twelve-month cycle or a shortened tax year).  In addition, FTB

20  states as follows:

#### A.   Debtor Fails To Distinguish *UAL*, Which Persuasively Holds that § 505(a)(1) Does Not Grant Bankruptcy Courts Power To Determine the Tax Consequences of a Chapter 11 Plan

23      Debtor makes a number of arguments to attempt to distinguish *UAL*.  None

24  succeeds.

##### 1.   The Tax Question in *UAL* Was Similarly Tied To A Pending Contested Matter (Plan Confirmation) Like Debtor's Settlement and Plan Confirmation

28  Debtor argues that, unlike this case, "*UAL* did not involve a tax determination

2

1   that was inextricably intertwined with the Bankruptcy Court's exercise of its core

2   function of Plan confirmation."  (Debtor's Response Brief, Dkt. 49 [Resp. Br.],

3   19/43[2].)  That is simply wrong.  In *UAL*, the related United Airlines debtors

4   (United) had filed a proposed plan, and a plan confirmation hearing had been set for

5   shortly after the ruling on United's motion for "a determination that the property

6   distribution to union employees proposed in its plan is not subject to federal income

7   and employment taxes."  336 B.R. at 372.  In addition, United argued "that 'the

8   IRS's jurisdictional arguments put United in a dilemma wholly inconsistent with

9   the 'fresh start' policy of bankruptcy,' by prolonging an uncertainty as to whether

10   United needs to engage in payroll withholding in connection with the property

11   transfers to union members proposed in its plan."  *Id.* at 379.

12       Likewise here, Debtor argues "the issue of tax treatment 'pose[d] a direct

13   threat to Mr. [Levandowski's] fresh start in bankruptcy."  (Resp. Br. 20/43, original

14   brackets.)  However, Debtor deliberately chose to pursue a settlement and plan that

15   did not provide for reserves for any taxes on the Settlement Payment.  Debtor could

16   have chosen instead to pursue a path that included such reserves (or other

17   reasonable resolutions such as electing a shortened tax year or seeking a

18   determination under 11 U.S.C. § 1146(b)), and thereby obviated any need for the

19   Tax Motion.  Debtor faced no more of a dilemma than United in *UAL*, which

20   likewise faced "an uncertainty" as to whether it needed to hold funds back for

21   potential future taxes.  336 B.R. at 379.  Finally, the transfers in *UAL* were pursuant

22   to post-petition "revised collective bargaining agreements [United entered into]

23   with all of its major unions," under which "any plan of reorganization that United

24   proposes or supports must provide for the issuance of securities or other property

25   for distribution to employees represented by the unions."  *Id.* at 372.  Thus, the tax

26   question in *UAL* was not any (and certainly not materially) less intertwined with

27

28   _____
   [2] Debtor's Response Brief lacks page numbers on the bottom.  The pdf is 43
   pages long, so page cites are in the form of "[x]/43."

1   plan confirmation than that here.

2       **2.**     **Debtor Cannot Distinguish *UAL* By Arguing Proposed Plans**
              **Do Not Present a Case or Controversy but Settlement**
3               **Agreements Do; *UAL* Also Involved Executed Agreements,**
              **and the Court Found No Jurisdiction Under § 505(a) Even If**
4               **There Might Be a Constitutional Case or Controversy**

5        Debtor also argues that "*UAL* concerns the Bankruptcy Court's authority to

6   declare the tax consequences of *a proposed plan*," while "this case concerns 'the

7   tax consequences of an actual settlement that had been executed.'" (Resp. Br.

8   19/43.)  However, just as here, in *UAL* there was an actual settlement that had been

9   executed – *i.e.*, the "revised collective bargaining agreements" United entered into

10   post-petition, pursuant to which the transfers at issue were required to be made.

11   336 B.R. at 372.  Therefore, Debtor's contention that an executed agreement is

12   sufficiently concrete to present a case or controversy while a proposed plan is not

13   (Resp. Br. 19-20/43), if correct, would apply just as well to *UAL* as this case.[3]  Yet

14   the *UAL* court still found no jurisdiction.  Ultimately, Debtor misreads *UAL*, which

15   held that Section 505(a) did not provide for the relief United requested, that the

16   Declaratory Judgment Act's general exception for federal tax questions therefore

17   applied, and, "[b]ecause the narrower, tax-focused limitation applies … it is not

18   necessary to determine whether a dispute regarding the consequences of a proposed

19   Chapter 11 plan presents a constitutional case or controversy." 336 B.R. at 373.

20   This undermines Debtor's argument that "Section 505(a) requires only a live

21   controversy necessitating a tax determination." (Resp. Br. 13/43.)

22       **3.**     **Debtor's Attempt To Distinguish the Tax Effects of the**
              **Proposed Plan from Those of the Proposed Settlement Are**
23               **Unpersuasive and Belied by Many Admissions and Other**
              **Evidence that the Two Transactions Were Inextricably**
24               **Linked or Even One and the Same**

25        Finally, Debtor argues that, "unlike *UAL*, the tax issue here is not 'based on

26

27       [3] Debtor also ignores that the Settlement Agreement here was not approved
by the Court prior to, but contemporaneous with, plan confirmation.  (1-ER-FTB-
0001, 0005 [Dkt. 44]; 4-ER-FTB-0724-25 [Dkt. 44-4].)

28

4

1    facts that would only arise *after* the estate has been terminated by confirmation of a

2    plan.'" (Resp. Br. 20/43.) However, that was only one of a number of bases for the

3    *UAL* court's decision, which included: (1) "[t]wo contextual considerations;"[4] (2)

4    that "the legislative history of the Bankruptcy Code emphatically supports the

5    conclusion that § 505(a) does not grant bankruptcy courts power to determine the

6    tax consequences of a Chapter 11 plan;" and (3) that "[t]here appear to be no

7    published decisions applying § 505(a) … to determine the tax effects of a proposed

8    Chapter 11 plan." 336 B.R. at 375, 379.

9        As the above indicates, the actual "issue presented" in *UAL* was "whether §

10   505(a) allows a court to declare the tax consequences of a proposed chapter 11

11   plan." 336 B.R. at 374; *see also id.* at 376 ("legislative history confirms that

12   determinations of the tax consequences of Chapter 11 plans are not within the scope

13   of § 505"). Debtor's argument that the tax consequences of the proposed Plan

14   present an issue distinct from those of the proposed Settlement is belied by: (1) his

15   multiple arguments and admissions to the effect that the two were inextricably

16   linked or even the same, and that plan confirmation hinged on settlement approval

17   and a determination the Settlement Payment was not taxable; (2) corroborating Plan

18   provisions; and (3) the fact that the terms of the Settlement Payment clearly

19   impacted the overall terms of the Plan itself.

20       In his motion to approve the proposed Settlement (Settlement Motion), Debtor

21   described the proposed "Global Settlement" as including not only the Settlement

22   Agreement but also an attached "Plan Term Sheet" and a "Plan Support

23   Agreement" between Debtor and Google. (3-ER-FTB-0294 [Dkt. 44-3].) Debtor

24   further described the Global Settlement as "comprised of three major

25   _____

26   [4] The contextual considerations were the placement of Section 505 in a
     subchapter of the Bankruptcy Code titled "Creditors and Claims," and that what
27   was "§ 1146(d) [now § 1146(b)], provides explicit authority for the court to declare
     the tax consequences of a proposed plan, but only with respect to state and local
28   taxation." 336 B.R. at 376.

components—the Uber Settlement, *the proposed reorganization plan* contemplated by the Plan Term Sheet, and the CLAT Settlement." (3-ER-FTB-0304 [Dkt. 44-3], italics added.) In other words, the proposed Plan and proposed Settlement were part of the same broader transaction that would resolve the case.

Moreover, Debtor made crystal clear that without approval of the proposed Settlement, and in particular the Settlement Payment, there would be no confirmable plan. In his Settlement Motion, Debtor described the Settlement Payment as a "key provision in the Global Settlement" and "the key to the resolution of the case," and he stated that Google's "commitments and agreements throughout the Global Settlement clear the way to confirmation of the plan described in the Plan Term Sheet." (3-ER-FTB-0309 [Dkt. 44-3].) Debtor also stated that the proposed "payment allows the Global Settlement to go forward as it is a condition to all of the other agreements provided by Google, which are necessary elements of the Global Settlement, including the Plan Support Agreement which allows for resolution of the Chapter 11 Case." (3-ER-FTB-0308 [Dkt. 44-3].) Moreover, Debtor admitted that he "cannot realistically propose a plan absent … the support of Google (which is not assured absent its support of the Global Settlement)." (3-ER-FTB-0309 [Dkt. 44-3].)

Although admissions like these are inimical to Debtor's position that the tax effects of the proposed Plan and those of the proposed Settlement Payment are distinct issues, he continues to make them in his Response Brief, in which he states that:

- "[t]he settlement ('Global Resolution') … established a roadmap for filing, and seeking confirmation of, a disclosure statement and Chapter 11 plan;"

- both "the Settlement Motion and the Plan made clear that the feasibility of the Plan depended on how the Main Uber Payment was treated for tax purposes;"

- "the feasibility and confirmability of the Plan hinged on the requested determination" of the Tax Motion;

6

- "[w]hether the Global Resolution could be approved and the Plan confirmed hinged on the outcome of the Tax Motion," and "Debtor made this crystal clear in advancing the Settlement Motion, the Tax Motion, and the Plan confirmation all simultaneously;"

- Determination of the Tax Motion "was inextricably intertwined with the Bankruptcy Court's exercise of its core function of Plan confirmation;" and

- "whether the Main Uber Payment gave rise to a taxable event was 'inexorably tied to a contested matter then pending before the Court," *i.e.*, "[t]he determination was critical to the feasibility (and thus confirmability) of the Plan." (Resp. Br. 11-13/43, 19-20/43.)

Many of these admissions are explicitly corroborated by the actual terms of the Plan, which provides that non-waivable conditions to the Plan's "Effective Date" are that "[t]he Settlement Agreement Effective Date shall have occurred" and that "Google shall have indefeasibly received the Main Uber Settlement payment," and further provides that the "Confirmation Order" may be vacated if those conditions are not satisfied within 45 days of the "Confirmation Date."  (4-ER-FTB-0567-0568 [Dkt. 44-4].)  Finally, the terms of the proposed Settlement, particularly those surrounding the Settlement Payment, were integral to the overall terms of the Plan itself.  As Debtor stated in his Settlement Motion:

- "other unsecured creditors will receive *pro rata* recoveries from the estate and the Residual Trust in amounts no lower than the *pro rata* recovery Google would have received if it were paid by the Debtor;"

- "as a result of the making of the Main Uber Payment to Google, Google has reduced its claims against the estate;" and

- the proposed "Plan will provide for an equalizing payment for the remaining creditors of the estate in the amount of no less than the percentage paid to Google by Uber; if they prefer, they can take a single, final payment of 50% of such claims."

7

1    (3-ER-FTB-0307, 0309.)

2          In light of these admissions and corroborating Plan provisions, and the clear

3    impact of the Settlement Payment on the Plan's substantive terms, Debtor's attempt

4    to distinguish the tax consequences of the proposed Plan from those of the

5    Settlement Payment is the epitome of elevating form over substance.  As the United

6    States aptly put it in its reply: "If Appellees are right, all a debtor in bankruptcy

7    need do to get an otherwise barred ruling about future [] tax consequences of a

8    proposed plan is put that part of the plan in a different document and call it a

9    'settlement.'"  (Dkt. 61, p. 4.)  Permitting that approach might appeal to debtors and

10   other plan proponents, but would effectively endorse evasion of both: (1) the

11   established pre-Code prohibition on courts declaring the tax consequences of

12   reorganization plans, which was not lifted by Section 505[5]; and (2) the limitations

13   of Section 1146(b), which permits bankruptcy courts to determine proposed plans'

14   income tax consequences only as to state and local taxes and, as to those, subject to

15   requirements not followed here.  11 U.S.C. § 1146(b) (providing that, upon request,

16   "court may declare [proposed plan's state or local tax] effects after the earlier of--

17   (1) the date on which such governmental unit responds to the request under this

18   subsection; or (2) 270 days after such request").

19         Debtor argues that Section 505(a) should be interpreted "to provide the

20   bankruptcy courts with tax powers when the exercise of those powers is necessary

21   for the courts to perform their responsibilities in bankruptcy."  (Resp. Br. 20/43.)

22   _____

[5] "Prior to the Code, it was established that courts had no jurisdiction to declare the tax consequences of reorganization plans." *UAL*, 336 B.R. at 376.  "As originally proposed, § 505 of the Code was intended to retain the basic scope of the pre-Code power to adjudicate tax issues." *Id.* at 377.  "Nothing in the compromise language [ultimately adopted] changed the principle in place throughout the legislative process—that § 505(a) would only allow adjudication of existing tax liabilities or refund claims." *Id.* at 378.  As to the amendments to "the Declaratory Judgment Act to allow for declarations under §§ 505 and 1146[,] [t]he reports of both the House and Senate Judiciary Committees describe this change the same way, indicating an intent to allow declarations of future tax consequences only under § 1146(d) [now § 1146(b)], not § 505(a), and explaining the reference to § 505 as intended to address declarations under § 505(c) of the taxes generated by estate administration." *Id.* at 379.

8

1   As Debtor seems to acknowledge, the Bankruptcy Court relied heavily on its

2   perception that interpreting Section 505(a) as it did could be necessary to facilitate

3   debtors' reorganizations.  (Resp. Br. 22-23/43; 4-ER-FTB-0740-41, 0770 [Dkt. 44-

4   4].)  However, "[n]o necessity can warrant a judicial tribunal in disregarding the

5   maxim, that that which cannot legally be directly done, cannot rightfully be effected

6   by indirection."  *Osborn v. Bank of U.S.*, 22 U.S. 738, 763 (1824); *see also Rooker*

7   *v. Fid. Tr. Co.*, 263 U.S. 413, 416 (1923) ("an aggrieved litigant cannot be

8   permitted to do indirectly what he no longer can do directly"); *Brown v. Alton*

9   *Water Co.*, 222 U.S. 325, 331 (1912) ("we may not by indirection do that which we

10  cannot do directly").

   **B.    Section 1146(b), Which Authorizes the Determination of Proposed**
11         **Plans' State Income Tax Consequences, Prevails Over Section**
           **505(a)'s General Grant of Authority, Which Debtor Cannot Use**
12         **to Circumvent Section 1146(b)'s Specific Timing Requirements**

13  As noted above, Section 1146(b) authorizes a bankruptcy court to determine

14  the state or local income tax effects of a proposed plan, subject to specific

15  requirements and limitations.  Section 1146(b) provides in full:

16
           The court may authorize the proponent of a plan to request a
17         determination, limited to questions of law, by a State or local
           governmental unit charged with responsibility for collection or
18         determination of a tax on or measured by income, of the tax effects,
           under section 346 of this title and under the law imposing such tax, of
19         the plan. In the event of an actual controversy, the court may declare
           such effects after the earlier of--(1) the date on which such
20         governmental unit responds to the request under this subsection; or (2)
           270 days after such request.
21
22  Despite Debtor's attempt to distinguish the tax effects of the proposed Plan

23  from those of the proposed Settlement, Section 1146(b) plainly applies here.

24  Moreover, as the more specific and directly-applicable provision, Section 1146(b)

25  prevails over the more general grant of bankruptcy court authority in Section

26  505(a).  "It is a well-established tenet of statutory construction that a specific statute

27  controls over a general statute."  *S.V. v. Sherwood Sch. Dist.*, 254 F.3d 877, 881

28  (9th Cir. 2001).  Debtor argues that "Congress often provides overlapping grants of

9

authority … 'to make assurance double sure.'" (Resp. Br. 18/43.)  However, the cases Debtor cites for this proposition, *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014), and *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515 (D.C. Cir. 2016), are inapposite.  First, those cases involved the scope of delegated administrative agency authority (including which agency actions were immune from judicial review).  That has nothing to do with this case.  Second, in neither case was there any indication that applying a more general statute would enable a party to nullify specific requirements of a narrower statute.

"It is fundamental that a general statutory provision may not be used to nullify or to trump a specific provision, irrespective of the priority of enactment." *California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1013 (9th Cir. 2000).  "Allowing [litigants] to proceed through a more general statute is particularly inappropriate when doing so would eviscerate specific requirements of the narrower scheme." *Patten v. D.C.*, 9 F.4th 921, 928 (D.C. Cir. 2021).  Yet that is precisely what happens if a party can use Section 505(a), with 14 days notice pursuant to local rules as in this case, to obtain a determination of the state income tax effects of a proposed plan without regard to the mandatory timing requirements of Section 1146(b), which were not complied with here.[6]

## C. Debtor Still Fails To Cite a Single Case Holding that Section 505(a) Authorizes a Court To Determine the Tax Effects of a Proposed Plan

To support his argument that the Bankruptcy Court had authority under Section 505(a) to determine the Tax Motion, Debtor cites one Ninth Circuit case,

---

[6] *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 721 (11th Cir. 2020) ("We cannot read Rule 6(b)(1)(B), a general provision governing extensions of time, to circumvent the specific time limits in Rules 59 and 60 that exist to protect the finality of judgments.  (Citations.)  And to be clear, [that] is exactly what affirming the use of Rule 6(b)(1)(B) to set aside a final judgment would entail.  If we read Rule 6(b)(1)(B) to apply postjudgment, a plaintiff could seek a postjudgment extension of time to amend its complaint based on excusable neglect at *any time* after the entry of judgment. That reading would turn the time limits for seeking relief from a final judgment in Rules 59 and 60 into surplusage.")

10

1  *Central Valley AG Enterprises v. United States*, 531 F.3d 750 (9th Cir. 2008)

2  (*Central Valley*), and an assortment of secondary authorities and cases from other

3  jurisdictions.  None of Debtor's cases holds that Section 505(a) authorizes

4  bankruptcy courts to determine the tax effects of a proposed plan (much less the

5  state income tax effects of a proposed plan).  Unlike *UAL*, all of Debtor's cases

6  arose in a different context than this one.

7      *Central Valley* did not involve plan confirmation or reorganization plans at all.

8  Neither did *In re Amoskeag Bank Shares, Inc.*, 215 B.R. 1 (Bankr. D.N.H. 1997),

9  *rev'd*, 239 B.R. 653 (D.N.H. 1998), or *In re Popa*, 218 B.R. 420 (Bankr. N.D. Ill.

10  1998), a Chapter 7 case.[7]

11      In a number of Debtor's cases, the proceeding at issue was commenced post-

12  confirmation and involved an already-confirmed plan.  *In re Agway, Inc.*, 447 B.R.

13  91 (N.D.N.Y. 2011) (*Agway*); *In re Schmidt*, 205 B.R. 394 (Bankr. N.D. Ill. 1997);

14  *In re Kilen*, 129 B.R. 538 (Bankr. N.D. Ill. 1991); *In re Goldblatt Bros., Inc.*, 106

15  B.R. 522 (Bankr. N.D. Ill. 1989).  The *UAL* court acknowledged that "[s]ome other

16  decisions have exercised jurisdiction to determine postconfirmation tax disputes

17  under § 505(a), but only in the context of a confirmed Chapter 11 plan."  336 B.R.

18  at 375.  Obviously, it found that to have little bearing on its analysis.  That makes

19  sense, especially with respect to state income taxes.  The courts in those cases

20  would not have needed to decide whether Section 505(a) permits a debtor to avoid

21  the specific timing requirements that govern a request for determination of the state

22  income tax effects of a proposed plan under Section 1146(b).  Furthermore, the

23  *Agway* court specifically distinguished *UAL* on the ground that "[a]t issue in this

24  case is determination of the tax liability of a *confirmed* plan, not a proposed plan"

25  as in *UAL*.  447 B.R. at 95 (original italics).

26

27  [7] The same is true of the only case from California Debtor cites, *In re Grand
*Chevrolet, Inc.*, 153 B.R. 296 (C.D. Cal. 1993), which FTB and the United States
28  also cited and in which the court held that the bankruptcy court did not have
jurisdiction to make the requested declaration.  *Id.* at 299.

*In re Schwartz*, 192 B.R. 90 (Bankr. D.N.J. 1996), is also distinguishable. That case involved an adversary proceeding to determine that a debtor was not a "responsible person" liable for his former companies' nonpayment of taxes. *Id.* at 91. Only the IRS moved to dismiss (*id.* at 91-92), and so the court did not need to (and did not) analyze the interplay between Section 505(a) and Section 1146(b). Moreover, unlike here, the potential tax liabilities all arose prepetition, as the court expressly stated that that the debtor "terminated his relationship with all three corporations" in 1993, before filing for bankruptcy in 1994. *Id.* at 92. In other words, unlike this case, *In re Schwartz* involved completed transactions and past tax periods, not a future transaction provided for in or inextricably linked to a proposed reorganization plan.[8]

### D. Debtor's Policy Arguments Ignore Countervailing Considerations

Debtor argues that, to the extent policy considerations are relevant, they support finding jurisdiction under Section 505(a). However valid Debtor's policy arguments may or may not be in isolation, Debtor ignores countervailing policy considerations. Some of those were identified in *UAL*, which noted that "one commentator has described the question of whether bankruptcy courts can declare the tax consequences of proposed Chapter 11 plans as 'a violent clash between bankruptcy and tax policies.'" 336 B.R. 379-80. Indeed, Debtor cites no authority (and FTB is aware of none) under the Internal Revenue Code, California Revenue and Taxation Code, or related regulations or tax court rules, that would permit a taxpayer to obtain from a court – as Debtor did here – a predetermination of a single tax line item in a vacuum, before a tax period ends.

Moreover, interpreting Section 505(a) in a way so at odds with the normal processes for resolving tax questions was not necessary to fulfill bankruptcy policies, including "one of the fundamental policies of bankruptcy law," which "is

---

[8] The same is true of *Central Valley*, 531 F.3d at 753, and *In re Kilen*, 129 B.R. at 548.

to give a fresh start only to the 'honest but unfortunate debtor.'" *In re Jercich*, 238 F.3d 1202, 1206 (9th Cir. 2001).  Honest but unfortunate is simply not the way to describe Debtor, who was determined to have willfully breached his contractual and fiduciary duties to his former employer.  Thus, however important may be the goal of speedy resolution of bankruptcy petitions, speed should not be had at the expense of the underpinnings of the bankruptcy process itself.

## II.   THE SETTLEMENT PAYMENT WAS NOT A NON-TAXABLE INSURANCE PAYMENT

### A.   It Is Undisputed the Settlement Payment Relieved Debtor from a Judgment Disgorging His Compensation from His Old Employer and Was Pursuant to an Indemnification Agreement with His New Employer; Debtor Cannot Meet His Burden to Show That Was Not Taxable Income By Comparing It to Coverage of a Taxpayer's Car Accident, Which Has Nothing to do with Compensation

Debtor admits the arbitration panel ordered disgorgement of "compensation Google paid to Debtor" (Resp. Br. 25/43), and that much is indisputable anyway. In his Tax Motion, Debtor admitted that "[t]he Panel ordered the Debtor to disgorge his salary and regular compensation … and the Debtor's special 'Chauffeur' bonus."  (4-ER-FTB-0463 [Dkt. 44-4].)  Debtor also admits the Indemnification Agreement with Uber underlying the Settlement Payment is a critical component of the deal pursuant to which Debtor agreed to sell his company to Uber and begin working there.  (Resp. Br. 26/43 ["Debtor was [] insistent that Uber assume that risk as part of the overall transaction … [and] wouldn't have done the deal without it.'"].  Because the Settlement Payment relieved Debtor from having to pay back compensation he received from Google, and was made pursuant to an Indemnity Agreement that was part of the compensation or consideration Debtor received from Uber, on its face the payment is taxable income.  *See* 26 U.S.C. §§ 1, 61; Cal. Rev. & Tax. Code §§ 17041, 17071.

As FTB argued below (4-ER-FTB-0621 [Dkt. 44-4]), and as Debtor has not disputed, it was Debtor's burden to prove the Settlement Payment was not taxable income.  *See Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 21, 26 (2000);

13

*Consolidated Accessories Corp. v. Franchise Tax Board*, 161 Cal.App.3d 1036, 1039 (1984). Debtor argues that "[i]nsurance payments to third parties on behalf of policyholders in satisfaction of a judgment are not gross income of policyholders," for which Debtor cites a secondary authority stating that, "in the case of an automobile accident caused by the taxpayer's negligence, the payment is not taxed, even though the taxpayer's liability to the victim is thereby discharged." (Resp. Br. 28/43.) That is irrelevant. Debtor cites no authority holding that an indemnification payment that relieves a taxpayer from paying back compensation to a prior employer, as part of compensation or consideration received from his new employer, does not constitute taxable income.[9]

> **B. It Is Debtor, Not FTB, Who Fundamentally Misstates the Nature of the Indemnity, Which Was Against a Judgment for Disgorgement Based on Debtor's Willful Misconduct, and Therefore Cannot Constitute Insurance**

In response to FTB's arguments that the Settlement Payment could not be akin to insurance because there is no insurance for willful unlawful conduct and insurance for disgorgement and restitution is against public policy (FTB Op. Br. 27-28), Debtor contends FTB fundamentally misstates the nature of the indemnity at issue "because the Arbitration Judgment for which Debtor sought indemnification was not based on any willfully bad acts" and "the 'disgorgement' to which the Taxing Authorities refer was simply the measure of damages (compensation Google paid to Debtor) found by the arbitration panel." (Resp. Br. 25-26/43.) It is

---

[9] Debtor cites the Bankruptcy Court's assertion in its oral ruling that "FTB and Mr. Levandowski do not dispute that insurance payments made by insurers to third parties on behalf of their insureds are not included in the insured's gross income for tax purposes." (Resp. Br. 27/43 n.9.) The Bankruptcy Court did not cite any evidence for this assertion (4-ER-FTB-0773 [Dkt. 44-4]), and there is no evidence in the record to support it, at least to the extent the court was talking not just about a general concept but instead the actual Settlement Payment here. Regardless of whether some insurance payments are excluded from gross income (like Debtor's car accident example), FTB specifically argued that "[w]here a taxpayer performs services to a third party, and the third party issues payment as consideration … that payment is the taxpayer's taxable income;" that "[i]t is immaterial if the third party makes payment to the taxpayer … [or] directly to th[e] creditor;" and that this applies "[r]egardless of whether the payment is for … legal fees to defend criminal or civil charges, or similar payments." (*Id.* at 0619.)

14

1  actually Debtor who fundamentally misstates the nature of the indemnity at issue,

2  which fell outside well-established limitations on what constitutes insurance.

3      Debtor's argument regarding the "disgorgement" issue is readily disposed of.

4  As noted above, it is undisputed that the judgment against Debtor was for

5  disgorgement of compensation he received from Google for periods during which

6  he breached his contractual and fiduciary duties by secretly aiding Google's

7  competitor.  Debtor provides no explanation for why this case should fall outside

8  the "well established [rule] that one may not insure against the risk of being ordered

9  to return money or property that has been wrongfully acquired."  *Bank of the*

10  *West v. Super. Ct*., 2 Cal.4th 1254, 1266.[10]

11      Debtor's arguments regarding the asserted willful nature of Debtor's

12  indemnified conduct also fail, for reasons set forth below.

13          **1.  FTB Has Not Waived Any Arguments Concerning the Uninsurable Nature of Debtor's Indemnified Conduct**

14

15      In a footnote, Debtor argues: "FTB cites California Insurance Code §533 for

16  the proposition that 'willful acts' cannot be insured.  The issue was not briefed

17  before the Bankruptcy Court and thus should not be considered here."  (Resp. Br.

18  26/43 n.8.)  Debtor reads the waiver doctrine far too broadly.  "The waiver doctrine

19  does not apply to new or additional authority cited on appeal in support of

20  arguments or claims made below."  Rutter Group Prac. Guide Fed. Ninth Cir. Civ.

21  App. Prac. Ch. 7-C, ¶ 7:81.2; *Puerta v. United States*, 121 F.3d 1338, 1341–42 (9th

22  Cir. 1997).  In addition, "[w]here an issue has been raised properly below, a party

23  may make more thorough or elaborate arguments on appeal than it did before the

24  district court."  Rutter Group Prac. Guide Fed. Ninth Cir. Civ. App. Prac. Ch. 7-C, ¶

25  7:83a; *W. Watersheds Project v. U.S. Dep't of the Interior*, 677 F.3d 922, 925 (9th

---

[10] Because Debtor argued the Settlement Payment was not gross income because it was akin to insurance, and because FTB assesses state taxes, whether the Settlement Payment fell outside the scope of insurance under California law is relevant.  *See, e.g., In re Liuzzo*, 204 B.R. 235, 237 (Bankr. N.D. Fla. 1996).  In any event, below, both Debtor and FTB cited both federal and California authorities on this issue. (3-ER-FTB-0468-70 [Dkt. 44-3]; 4-ER-FTB-0622-24, 0752 [Dkt. 44-4].)

15

1   Cir. 2012).

2        FTB sufficiently raised this issue below, arguing:

3        • "Insurance is a contract whereby one undertakes to indemnify another against

4   loss, damage, or liability arising from a contingent or unknown event," citing Cal.

5   Ins. Code § 22.[11]

6        • "To be 'insurance,' an arrangement must [among other things] involve

7   insurance risk, and [] meet the commonly accepted notions of insurance."

8        • The disputed issues included "whether insurance risk existed" and whether,

9   the payments at issue "meet the commonly accepted notions of insurance."

10       • "There Was No Insurance Risk Because It Was Anticipated that Google

11  Would File A Claim."

12       • "The Indemnification Agreement indemnified Debtor and others against

13  willful acts such as fraud and breach of fiduciary duty." And

14       • "[T]he liability flowed from Debtor's intentional conduct."

15  (4-ER-FTB-0622-24 [Dkt. 44-4].)

16       Debtor's counsel understood FTB well enough to: (1) highlight at oral

17  argument that "Franchise Tax Board argues it's not like insurance because,

18  'liability flowed from the debtor's intentional conduct;'" and then (2) raise on his

19  own Insurance Code section 533, which he argued provided that, "[e]ven if the

20  conduct could be characterized as intentional, that does not mean that it's not

21  insurable."  (4-ER-FTB-0752 [Dkt. 44-4].)  Debtor's counsel having raised Section

22  533, FTB's counsel argued in response that, "[u]nder Insurance Code Section 553,

23  you can't insure for willful acts … Willful acts are just not insurable as a matter of

24  public policy …"  (4-ER-FTB-0759 [Dkt. 44-4].)  The Bankruptcy Court then gave

25  Debtor's counsel the chance to reply regarding Section 533, which he did, at length.

26

27  _____

[11] Section 22 has been cited as prohibiting insurance against nonaccidental harm inflicted by the insured.  *Chu v. Canadian Indem. Co.*, 224 Cal. App. 3d 86, 94–95 (1990); *Upper Deck Co. v. Endurance Am. Specialty Ins. Co.*, No. 10CV1032 JM WMC, 2011 WL 6396413, at *7 (S.D. Cal. Dec. 15, 2011).

28

16

(4-ER-FTB-0763-64 [Dkt. 44-4].)  The Court later acknowledged FTB's argument that the Settlement Payment "does not conform to commonly accepted notions of insurance because the indemnification agreement hedged against Mr. Levandowski's intentional rather than accidental or unanticipated misconduct," and ruled against FTB on the issue.[12]  (4-ER-FTB-0776-77 [Dkt. 44-4].)  Simply put: "There is no waiver if the issue was raised, the party took a position, and the [trial] court ruled on it."  *W. Watersheds Project*, 677 F.3d at 925.

## 2.  The Arbitration Award and Ensuing Judgment Were Clearly Based on Debtor's Uninsurable Willful Conduct

Section 533 prohibits insurance coverage of "deliberate conduct that the insured expected or intended to cause damage."  *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prod. Co., LLC*, 77 Cal. App. 5th 729, 740 (2022).  "The appropriate test for 'expected' damage is whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage."  *Id.*  That test is met by the arbitrators' findings that:

• "The breach of loyalty claim is based on [Respondents'] proposal not only to sell the company to Uber but to do so in a way that would harm Google."

• "Respondents were fully aware and intended that the sale of Otto's technology to Uber would give Uber a significant competitive advantage over Google."

• "Levandowski told Uber that taking a team of Google employees to Uber would damage Google because they were going right across the street to the competitor."

• "Respondents believed that the loss of this Google team to Uber could have a 'distressing hit on the valuation' and that [Google] Chauffeur's 'valuation would be much lower.'"

---

[12] The Bankruptcy Court did not make findings of fact as to the nature of Debtor's indemnified conduct, but rather dismissed FTB's argument out-of-hand based on its incorrect perception that FTB had not cited any relevant authority.  (4-ER-FTB-0776-77 [Dkt. 44-4].)

17

- "Respondents wanted their plan to have added effectiveness by having the solicited employees stage a mass walk-out."  And

- "[I]n anticipation of the devastating damages that their plan was expected to inflict on Google, and the consequent risk that Google would seek to recoup those damages from them, Respondents sought and obtained an agreement from Uber to indemnify them for their 'Bad Acts.'"

(ER-Trust-0110-11 [Dkt. 50].)

Debtor cites *Off. Depot, Inc. v. AIG Specialty Ins. Co.*, 722 F. App'x 745 (9th Cir. 2018), which holds that Section 533 requires more than recklessness (*id.* at 746), and *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1 (1985), which holds that Section 533 requires "a 'preconceived design to inflict injury.'"  *Id.* at 32.  The first of those cases is a nonbinding unpublished decision. The second has been abrogated, as recognized by this District.  *Trailer Marine Transp. Corp. v. Chicago Ins. Co.*, 791 F. Supp. 809, 811 (N.D. Cal. 1992) ("the *California Shoppers* case was based upon *Clemmer* [*v. Hartford Ins. Co.*, 22 Cal. 3d 865 (1978)], and was before the California Supreme Court revisited *Clemmer* in *J.C. Penney*"); *J.C. Penney Cas. Ins. Co. v. M. K.*, 52 Cal. 3d 1009, 1025 (1991) ("*Clemmer* does not require a showing … of [an] insured's 'preconceived design to inflict harm' when the insured seeks coverage for an intentional and wrongful act if the harm is inherent in the act itself.").  Regardless, the arbitrators' findings reflect that Debtor's conduct was more than reckless and involved a preconceived design to inflict injury on Google.

### C.    Debtor Fails To Rebut That There Was No Risk Distribution Here As Required for Insurance

In its Opening Brief, FTB argued (at 29-30) that there was no risk distribution here as required for insurance because, among other reasons, insurance involves "numerous relatively small, independent risks that occur randomly over time," *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987), and

18

is for the purpose of "distributing the losses of the few among *the many* who are subject to the same risk." *In re Barr's Estate*, 104 Cal.App.2d 506, 508 (1951) (italics added). Debtor's response boils down to little more than that "Uber indemnified five people, and Google sued only two." (Resp. Br. 28/43.) Again, it was Debtor's burden to prove that the Settlement Payment was non-taxable insurance. Debtor cites no authority that the risks here were sufficiently numerous, independent, and randomly occurring to constitute insurance.

## III. DEBTOR'S ALTERNATIVE BASES FOR AFFIRMANCE ALL FAIL

FTB joins in the United States' arguments at pgs. 11-14 of its reply (Dkt. 61) as to why Debtor's alternative bases for affirmative (that "the Main Uber Payment was not taxable (1) under the tax benefit rule; (2) because it was a working condition fringe; and (3) because it was an expense reimbursement" [Resp. Br. 30/43]) all fail.

## CONCLUSION

For the foregoing reasons and those stated in FTB's Opening Brief, this Court should reverse the Tax Order. If the Court concludes Bankruptcy Court had jurisdiction to issue the Tax Order, the Court should remand for further proceedings.

Dated:  December 15, 2022                    Respectfully submitted,

ROB BONTA
Attorney General of California
TAMAR PACHTER
Senior Assistant Attorney General
LISA W. CHAO
Supervising Deputy Attorney General


*/s/ John C. Keith*
JOHN C. KEITH
Deputy Attorney General
*Attorneys for Creditor and Appellant*
*California Franchise Tax Board*

19

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Bankruptcy, rule 8015(a)(7)(B)(i) the undersigned counsel for appellant California Franchise Tax Board hereby certifies that the foregoing CALIFORNIA FRANCHISE TAX BOARD'S REPLY IN SUPPORT OF ITS APPEAL OF TAX ORDER is printed in fourteen (14) point Times New Roman font and that based on the Microsoft Word computer word count function, excluding those parts of the brief not included in the word count by rule 8015(g), the text of the brief contains 6497 words.

/s/ John C. Keith
John C. Keith
Deputy Attorney General
*Attorneys for Appellant*
*California Franchise Tax Board*

20